UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY**, *et. al.* | |
| *Plaintiffs* | |
| v. | Civil Action No. 3:21-cv-00055-GFVT |
| **JOSEPH R. BIDEN** in his official capacity as President of the United States, *et. al.* | |
| *Defendants* | |

---

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Plaintiffs, the Commonwealth of Kentucky, the State of Ohio, and the State of Tennessee, by and through their Attorneys General; Frederick W. Stevens, in his official capacity as Sheriff for the Seneca County (Ohio) Sheriff's Office; and Scott A. Hildenbrand, in his official capacity as Sheriff for the Geauga County (Ohio) Sheriff's Office, move for a temporary restraining order under Fed. R. Civ. P. 65(b) and preliminary injunction under Fed. R. Civ. P. 65(a).

### INTRODUCTION

*"Get vaccinated."*

President Biden ended his September remarks on the COVID–19 pandemic with these words. Joseph Biden, Remarks at the White House (Sept. 9, 2021), *available at* https://perma.cc/GQG5-YBXK ("Biden Remarks"). Plaintiff States have recommended the same. But the President was not recommending vaccination; he

was commanding it.  Until quite recently, the Biden Administration recognized that compulsory vaccination is "not the role of the federal government."  Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House, *available at* https://perma.cc/Q32Z-5S6M.

But in a dramatic about-face from his prior position, the President followed his remarks by signing an order to "require more Americans to be vaccinated," *id.*— Executive Order 14042, 86 Fed. Reg. 50,985 (Sept. 9, 2021).  That order, and his Administration's directives that have followed, impose a vaccine mandate on wide swaths of Americans.

The thin justification for the mandate asserts that it will "reduc[e] absenteeism and decreas[e] labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691 (Sept. 28, 2021) ("OMB Determination").  But even if the mandate *might* produce this result (and it will not), and assuming such a cursory statement constitutes reasoned decisionmaking (and it does not), the President and his Administration lacked the authority to order the mandate, and they failed to follow the administrative procedures required to issue such an order. Even in a pandemic, "our system does not permit agencies to act unlawfully even in the pursuit of desirable ends."  *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2490 (2021) (per curiam).

2

The Plaintiffs seek judicial relief from the President's and his Administration's unlawful and unconstitutional vaccine mandate. The mandate is unlawful for four reasons.

First, in taking either relevant executive action, the President and his Administration did not even try to satisfy the notice-and-comment procedures required by 41 U.S.C. § 1707(a)(1). They did not do so when the Office of Management and Budget ("OMB") issued its September 28, 2021 determination without notice and comment. Likewise, the Federal Acquisition Regulatory Council ("FAR Council") failed to provide for notice and comment before issuing its September 30, 2021 memorandum. *See* Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042, *available at* https://perma.cc/9BQ8-XBT6 ("FAR Council Guidance").

Second, the President and his Administration do not possess the authority to issue the mandate under the Federal Property and Administrative Services Act ("FPASA"), *see* 40 U.S.C. § 101, *et seq.*[1] The FPASA's delegation of power to the executive is limited in scope; Congress never provided a boundless grant of presidential rulemaking authority.

Third, the Administration must offer a rationale, and a nonarbitrary one at that, for the OMB Determination and FAR Council Guidance. The Administration cannot hide that its offered rationale—improving federal efficiency—is entirely

---

[1] Plaintiffs explained the FPASA's history and purpose in more detail in its Complaint. *See* Compl. ¶¶ 77–86.

3

pretextual, a workaround to regulate public health having grown "frustrated with the nearly 80 million Americans who are not still vaccinated."  Biden Remarks.

Finally, the vaccine mandate runs afoul of the Constitution. The federal government lacks the authority to issue this mandate, and its attempt to do so disregards traditional principles of federalism, exceeds the spending power, and violates the nondelegation doctrine.

## BACKGROUND

### Executive Order 13991 – Creation of the Safer Federal Workforce Task Force

On his first day in office, President Biden signed Executive Order 13991, 86 Fed. Reg. 7,045, 7,046 (Jan. 20, 2021).  Section 4 established the "Safer Federal Workforce Task Force."[2]  *Id.* at 7,046.  The mission of the Task Force is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic."  *Id.*

For the first six months of the Administration, neither the Task Force nor any federal agency sought to impose vaccine mandates on the American population.  As recently as July 23, 2021, the White House announced that mandating vaccines is "not the role of the federal government."  Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House, *available at* https://perma.cc/Q32Z-5S6M.

---

[2] The Co-Chairs of the Task Force include Defendants Ahuja, Carnahan, and Zients. *Id.*; *see also* Compl. ¶ 87.  Members subordinate to the Co-Chairs include Defendants Young, Patterson, Murray, Criswell, and Walensky.  *See* Compl. ¶ 87.

**Executive Order 14042 – The Vaccine Mandate for Federal Contractors**

On September 9, 2021, in a dramatic about-face, President Biden signed Executive Order 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*, 86 Fed. Reg. 50,985 (Sept. 9, 2021). The purpose of that order, and other executive actions announced that day, was to "require more Americans to be vaccinated." *See* Biden Remarks.

Executive Order 14042 instructs departments and agencies, including independent establishments, to require that contractors and subcontractors "comply with all guidance for contractor or subcontractor workplace locations published by the . . . Task Force . . . , provided that the Director of [the OMB] approves the Task Force Guidance and determines that the Guidance . . . will promote economy and efficiency in Federal contracting." 86 Fed. Reg. at 50,985.

The Executive Order provides a series of directives to carry out its mandate: the newly created Task Force must create procurement standards, the OMB must approve those standards under the President's supposed FPASA authorities, and the FAR Council must recommend that agencies deviate from the Federal Acquisition Regulation before a new regulation is published. *See id.* at 50,985–88.

**The Task Force's September 24, 2021 Guidance**

On September 24, 2021, President Biden's Task Force, an invented group with no connection to federal procurement, issued its Guidance pursuant to Executive Order 14042. *See* Safer Federal Workforce Task Force, *COVID–19 Workplace Safety:*

*Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021), *available at* https://perma.cc/2R27-9J4U ("Task Force Guidance").

The Task Force Guidance requires an extremely broad range of covered contractor employees to be vaccinated by December 8, 2021. For example, the FAQ section provides that the Guidance covers outdoor areas, employees who are not directly engaged in performing work called for by the covered contract, and employees who work entirely from home. *Id.* at 9-14. Only if the employee is "legally entitled to an exception," does the Guidance not require vaccination. *Id.* at 5.

To comply with that mandate, "[c]overed contractor employees must be fully vaccinated no later than December 8, 2021." *Id.* at 5. This means that said employees must obtain the final dose of their vaccine of choice no later than November 24, 2021. *See* Centers for Disease Control and Prevention, *Different COVID–19 Vaccines* (updated Oct. 20, 2021), *available at* https://perma.cc/E3VW-PF5M (noting that individuals are fully vaccinated two weeks after their final shot).

**The OMB's September 28, 2021 Notice of Determination**

Next, the OMB issued its Notice of Determination on September 28, 2021, purportedly pursuant to the President's delegated authority under FPASA, 40 U.S.C. § 121(a). *See* OMB Determination, 86 Fed. Reg at 53,692.

As instructed by the President in Executive Order 14042, 86 Fed. Reg. at 50,985–86, Defendant Young, in her capacity as Acting Director of the OMB, declared "that compliance by Federal contractors and subcontractors with the [Task Force Guidance] will improve economy and efficiency by reducing absenteeism and

decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  OMB Determination, 86 Fed. Reg. at 53,692. That's it.  The Determination did not contain any supporting analysis; it just adopted the Task Force Guidance as helpful to "promote economy and efficiency," a rote recitation of the statute.

## The FAR Council's September 30 Memorandum and Attached Deviation Clause

The Executive Order tasked the FAR Council with "amend[ing] the Federal Acquisition Regulation," the federal-government-wide regulation agencies must use to draft procurement solicitation and contracts, *see* 48 C.F.R. Ch. 1, to incorporate the Task Force Guidance, as approved by OMB.  86 Fed. Reg. at 50,986.  The President also tasked the FAR Council with "recommending" agencies incorporate the Task Force Guidance earlier, under each agency's authority to deviate from the existing Federal Acquisition Regulation.  *Id.*

The FAR Council did just that.  On September 30, 2021, the FAR Council issued its Guidance for government officials with responsibility for government contracting to assist agencies in mandating contractor and subcontractor compliance with the Task Force Guidance, prior to amending the Federal Acquisition Regulation. *See* FAR Council Guidance.  The "deviation clause" attached to the FAR Council Guidance provides the text that federal contractors should use to mandate compliance with the Task Force Guidance:

> (c) *Compliance*. The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or

7

subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/

(d) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas.

*Id*. at 5.

Multiple agencies have already notified contractors, who have then notified subcontractors, that this language will be added to existing contracts. *See* Stevens Decl. 2–18.

**The Federal Contractor Vaccine Mandate's Disruptive Impact**

Unsurprisingly, the federal contractor vaccine mandate disrupts a sizeable portion of the U.S. labor force. "Workers employed by federal contractors" account for "approximately *one-fifth of the entire U.S. labor force.*" Office of Contract Compliance Programs, Dep't of Labor, History of Executive Order 11246, *available at* https://perma.cc/9NF2-WX2B (emphasis added). This section of the labor force includes significant proportions of the labor force in each Plaintiff State. According to a Kaiser Family Foundation survey, 72% of unvaccinated workers say they will quit their jobs if they are subjected to such a mandate. *See* Chris Isidore & Virginia Langmaid, *72% of unvaccinated workers vow to quit if ordered to get vaccinated*, CNN (Oct. 28, 2021), *available at* https://perma.cc/7JMV-SULY. This finding portends a massive disruption in the economy and to the operations of Plaintiffs, as well as the

millions of citizens served by Plaintiffs. *See* Compl. ¶¶ 1–48; Niknejad Decl. ¶¶ 4–12.

## ARGUMENT

When ruling on a preliminary injunction, the Court must consider:

1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction.

*Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 459 F. Supp. 3d 847, 853 (E.D. Ky. 2020). "These factors are not prerequisites, but are factors to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, where, as here, a violation of the Constitution is alleged, the first factor—the likelihood of success on the merits—largely dominates the analysis. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Even so, all four factors decidedly favor granting a temporary restraining order and preliminary injunction to preserve the status quo.

## I. The Plaintiffs are likely to succeed on the merits.

The actions of the Administration violate administrative and procurement law and pose serious constitutional questions. The OMB and the FAR Council have acted contrary to procedure required by law in imposing the vaccine mandate. The OMB acted contrary to law in attempting to circumvent the FAR Council, the only entity Congress has authorized to make government-wide procurement regulations. In

addition, by failing to include any rationale for their actions (much less a logical one), The OMB and the FAR Council acted arbitrarily and capriciously. Finally, the vaccine mandate intrudes on an area traditionally reserved to the States (public health and safety), and wrongly assumes that Congress delegated the President unfettered discretion to control federal contracts (a delegation Congress lacks the power to make).

### A. The OMB Determination and FAR Council Guidance were issued in violation of procedure required by law.

Under the Administrative Procedure Act (APA), a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

The President grounded the authority for his Administration's actions in the FPASA. *See* 86 Fed. Reg. at 50985. The purpose of that Act, among other things, "is to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying . . . nonpersonal services[.]" 40 U.S.C. § 101(1). But:

> [A] procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register . . . if it—
>
> (A) relates to the expenditure of appropriated funds; and
>
> (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or
>
> (ii) has a significant cost or administrative impact on contractors or offerors.

10

41 U.S.C. § 1707(a).[3]

Section 1707(a) controls here.[4]  To start, with his invocation of the FPASA as the statutory authority for his Administration's vaccine mandate, *see* 86 Fed. Reg. at 50,985, the President agrees his Administration's actions are "procurement polic[ies], regulation[s], procedure[s], or form[s]."  *See* 41 U.S.C. § 1707(a).  Federal contracts involve the expenditure of appropriated federal funds, and the vaccine mandate has both a significant effect beyond the internal operating procedures of the agencies and a significant cost and administrative impact on the Plaintiffs.  *See* Compl. ¶¶ 1–48; Niknejad Decl. ¶¶ 4–12; Maddox Decl. ¶¶ 5–11.  The OMB Determination, which approves the vaccine mandate as a government-wide procurement policy, and the FAR Council guidance, which works to require[5] that agencies incorporate the vaccine mandate in current contracts, were bound to follow Section 1707.

The Defendants entirely failed to publish the FAR Council Guidance in the Federal Register.  And although the Defendants published the OMB Determination in the Federal Register, it was not subject to comment, nor the requisite 60-day

---

[3] Similarly, "proposed significant revisions" to the Federal Acquisition Regulation must undergo notice and comment.  *See* 48 C.F.R. § 1.501–2(b); *see also* 48 C.F.R. § 1.501–1 (defining "significant revisions" essentially by the same test outlined in § 1707(a)).

[4] The Plaintiffs invoke both 41 U.S.C. § 1707 and 5 U.S.C. § 553 but focus on § 1707 because it is more stringent.

[5] While the FAR Council claims to be issuing only "guidance," the guidance is being "applied . . . in a way that indicates it is binding."  *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (explaining that agency action treated as binding is reviewed as a regulation).  Even if it were not binding, it is still a procurement "policy" subject to § 1707's requirements.

comment period before becoming effective.  Nothing indicates that Defendants invoked Section 1707(d)'s waiver of the notice and comment requirement, or waiver of notice and comment under the APA.[6]  In short, Defendants failed to adhere to the process mandated by law, and their mandate is without observance of procedure required by law, and must therefore be set aside.  *See* 5 U.S.C. § 706(2)(D).

**B.    The Administration acted contrary to law.**

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right."  *See* 5 U.S.C. § 706(2)(A), (C).

> *a.    The President does not have the authority to issue procurement regulations under the FPASA.*

Only the FAR Council has the authority to "issue and maintain . . . a single [g]overnment-wide procurement regulation."  41 U.S.C. § 1303(a)(1).  Despite this, the Executive Order asks OMB to issue a government-wide procurement regulation mandating vaccines.  86 Fed. Reg. at 50,985–96.  That violates Section 1303.  The OMB Determination also violates Section 1303 in carrying out the President's unlawful instruction.  86 Fed. Reg. at 53,591–92.  And the FAR Council Guidance violates Section 1303 because it abdicates the FAR Council's responsibility to issue government-wide procurement regulations, instead issuing cursory guidance about what agencies are "required" to do.  FAR Council Guidance at 2.

---

[6] Or waiver of notice and comment under 48 C.F.R. § 1.501–3.

The President instead invoked the FPASA, 40 U.S.C. § 101 *et seq.*, as his authority for issuing the federal contractor vaccine mandate.  *See* 86 Fed. Reg. at 50985.  To start, the FPASA does not grant the President the power to issue orders with the force or effect of law.  Congress authorized the President only to "prescribe policies and directives that the President considers necessary to carry out."  *See* 40 U.S.C. § 121(a).  "Policies and directives" describe the President's power to direct the *exercise* of procurement authority throughout the government.  *See Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. O.L.C. 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").  It does not authorize the President to issue regulations himself.

We know this because Congress authorized the Administrator of the General Services Administration—in the same section of the statute—to "prescribe regulations."  *Id.* at § 121(c); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").  Not only that, Congress gave the President, in another section of the FPASA, the power to "prescribe *regulations* establishing procedures to carry out" the establishment of motor vehicle pools and transportation systems.  40 U.S.C. § 603(b)(1) (emphasis added).  And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense.  *See, e.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe

13

regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

Regardless the FPASA does not authorize the President, and thus does not authorize the OMB, to issue whatever contracting requirement they think is "economical" or "efficient."[7]  The President seems to assume that the FPASA's prefatory statement of purpose authorizes him and his delegates to issue any order they believe promotes "an economical and efficient" procurement system.  40 U.S.C. § 101; *see* 86 Fed. Reg. at 50,985 ("This order promotes economy and efficiency in [f]ederal procurement.").  In doing so, the President and OMB mistakenly construe the prefatory purpose statement for a grant of authority.  *Dist. of Columbia v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."); *see also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 n.9 (D.C. Cir. 1995) ("[T]he agency may not simply disregard the specific scheme Congress has created . . . in order to follow a broad purpose statement.").

---

[7] To be sure, there is authority embracing a broader reading of the FPASA, principally *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979), and its progeny.  But *Kahn* is wrongly decided.  Invoking the purpose statement in § 101, *Kahn* considers whether the President can impose wage and price standards on contractors based on the "'economy and efficiency' touchstone" of the FPASA.  *Kahn*, 618 F.2d at 788, 793.  In addition to misreading § 101 as a grant of authority, the court conflates the FPASA's legislative history with its statutory text, *id*. at 788–89 n. 22–24, and turns basic statutory interpretation on its head by treating specific examples in which Congress authorized the use of the contracting power to advance policy—for example, setting aside certain purchases for small businesses—as evidence that Congress authorized the President to do so unilaterally in unrelated circumstances, *id*. at 789 & n.25.

Indeed, the grant of authority to the President in FPASA is quite narrow. Beyond the fact that he is not authorized to issue regulations, his power is limited to prescribing policies and directives he "considers necessary to carry out this subtitle." 40 U.S.C. § 121(a) (emphasis added). "Necessary" is a "word of limitation" and is synonymous with "required," "indispensable," and "essential." *Vorcheimer v. Phila. Owners Assoc.,* 903 F.3d 100, 105 (3d Cir. 2018); *accord In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004). The President's authority is therefore limited to that which he considers "essential" or "indispensable" to carry out the FPASA.

And even if the FPASA did authorize the President to issue binding procurement orders in the name of economy and efficiency, the nexus between the OMB Determination and goal of the statute is far too attenuated. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979). Even courts that adopt a broader reading of the President's power require a "reasonably close nexus between the efficiency and economy criteria of the [FPASA] and any exactions imposed upon federal contractors." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981).

To that end, the 210-word OMB Determination lacks any explanation indicating how the Task Force Guidance creates contracting efficiencies. *See* OMB Determination, 86 Fed. Reg. at 53,691–92. Indeed, the opposite will occur. *See* Niknejad Decl. ¶¶ 4–12; Maddox Decl. ¶¶ 5–11; Compl. ¶¶ 1–48. Employers must spend time and resources determining who does or does not fall under the mandate.

15

Employees who wish to be vaccinated must be given time off to receive and to recover from effects of the vaccine.  Employees who do not wish to be vaccinated must prove they qualify for an exemption.  *See* Task Force Guidance at 1.  Employers must process those requests, which will involve difficult decisions, and will certainly lead to litigation.  *See* Karl Evers-Hillstrom, *9 in 10 Employers Say They Fear They'll Lose Unvaccinated Workers Over Mandate: Survey*, The Hill (Oct. 18, 2021), *available at* https://perma.cc/V5ZJ-7XUQ.  Many employees whose exemption requests are denied will quit.  *See* Jordan Burrows, *Employees Not Given Exemption Prefer to Quit Job Than Get COVID Vaccine, Poll Shows*, Salt Lake City (ABC4) (Sept. 15, 2021), *available at* https://perma.cc/6A95-CJXD; *see also* Isidore & Langmaid, *supra*.  Employers will have to find new employees, likely at great cost given the many employers currently looking for employees.  There is no explanation whether, or how, this egregious effort is outweighed by unidentified contracting efficiencies.

        b.     *The President and his Administration's actions run afoul of the Competition in Contracting Act.*

Federal agencies are required to provide for "full and open competition through the use of competitive procedures" in procurement.  41 U.S.C. § 3301(a)(1).  The President's authority under the FPASA is expressly subject to that requirement.  *See* 40 U.S.C. § 121(a) (requiring "policies" issued by the President pursuant to FPASA to be "consistent with this subtitle"); 40 U.S.C. § 111 (defining "this subtitle" to include portions of Title 41, including § 3301).

The challenged actions violate that provision because they "effectively exclude[] an offeror from winning an award, even if that offeror represents the best

16

value to the government." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 990 (Fed. Cir. 2019).  The Defendants refuse to consider the specific situation of particular bidders, instead categorically excluding contractors that refuse to acquiesce to the Administration's sweeping COVID policies.   By excluding an entire class of contractors without regard to their ability to perform the contract, the challenged actions violate Section 3301.

### C.  The Administration acted arbitrarily and capriciously.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."   5 U.S.C. § 706(2)(A).   "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).   Courts must ensure "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id*.  The APA also requires that agency action take into account the reliance interests of those affected by the regulatory action, including the States.  *See Dep't of Homeland Security v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1913-15 (2020).  Here, the federal contractor vaccine mandate fails to satisfy these criteria.

As mentioned, neither the OMB Determination nor the FAR Council Guidance provide any explanation for how they promote economy and efficiency in procurement.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. . . . [C]onclusory statements do not suffice to explain

[an agency's] decision."). Defendants seemingly failed to consider the possibility that their actions would cause a labor shortage. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 658 (2007) (explaining that an agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))); *see also* Compl. ¶¶ 1–48 (outlining the negative economic effects of the mandate); Niknejad Decl. ¶¶ 4–12; Maddox Decl. ¶¶ 5–11. These concerns are particularly acute for the Plaintiff States and Plaintiff Sheriffs whose federal contracts directly relate to public safety and staffing shortages in already understaffed detention centers. *See* Compl. ¶¶ 4–7, 22–39; *see also* Niknejad Decl. ¶¶ 4–12; Stevens Decl. 2–18; Hildenbrand Decl. 2–29; Maddox Decl. ¶¶ 5–11.

Additionally, both the OMB Determination and FAR Council Guidance ignore costs to the Plaintiffs, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). The agencies ignored Plaintiffs' "legitimate reliance" on the absence of a federal mandate which allowed them to act in accordance with setting their own policies. *See Regents of Univ. of Calif.*, 140 S. Ct. at 1913. The Task Force Guidance, the OMB Determination, and the FAR Council Guidance fail to reflect even a minimal awareness that the mandate will undermine Plaintiffs' reliance interest and impose significant disruption into their economies and operations. *See* Niknejad Decl. ¶¶ 4–12; Compl. ¶¶ 1–48.

Moreover, neither the OMB Determination nor the FAR Council Guidance considers lesser alternatives to a vaccine mandate. *See Regents of the Univ. of Cal.,*

18

140 S. Ct. at 1913–14.

And the fact that the Task Force continues to change and update its guidance, *see* Safer Federal Workforce: What's New?, *available at* https://perma.cc/MB3M-397A (last visited Nov. 4, 2021), signals a knee-jerk, unsubstantiated mandate.

Finally, the conclusion that the Task Force Guidance and FAR Council Guidance will improve procurement efficiency by reducing absenteeism and decreasing labor costs is blatantly pretextual. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019) ("Accepting contrived reasons would defeat the purpose of the enterprise [of judicial review.]"). As described earlier, the President, in his remarks announcing the executive order, stated that he was "frustrated with the nearly 80 million Americans who are still not vaccinated," referred to "overcrowd[ed] . . . hospitals" and "overrun[] . . . emergency rooms," and blamed "elected officials actively working to undermine the fight against COVID-19." *See* Biden Remarks. The FAR Council Guidance likewise admits that the goal of this effort is "getting more people vaccinated and decreas[ing] the spread of COVID-19." FAR Council Guidance at 3. The vaccine mandate was never about procurement efficiency—it is about public health, which falls outside the scope of the FPASA.

### D.    The Administration's mandate runs afoul of the Constitution.

"[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Yet, in addition to being procedurally and substantively unlawful, the federal contractor mandate also violates three key constitutional limitations on federal government power. First,

19

a federal contractor vaccine mandate upends time-honored principles of federalism and separation of powers.   Second, binding federal contractors to ever-shifting guidance violates traditional limitations on the federal government's spending power. Third, any interpretation of the FPASA that enables the President to set national vaccine policy violates the nondelegation doctrine.

 1. *The federal contractor vaccine mandate violates the federalist system enshrined in our Constitution.*

The Administration's shifting mandate intrudes on an area traditionally reserved to the States.  The Tenth Amendment provides that powers not expressly delegated to the federal government are reserved to the States or the people.  U.S. Const. amend. X.  Unlike the state governments, the federal government "must show that a constitutional grant of power authorizes each of its actions."  *Nat'l. Fed. of Ind. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012).  By contrast, the States maintain the "general power of governing," referred to as the "police power."  *Id.* at 536.

Although "[t]he regulation of health and safety matters is primarily and historically, a matter of local concern," the contractor mandate attempts to claim this as a federal power, and in so doing, overturns the balance of power promised in the Tenth Amendment.  *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985).

The federal government has no general police power, and nothing in the Constitution gives the federal government the power it seeks to exercise here.  It has no innate authority to impose wide-reaching public health measures, which are instead powers reserved to the States.  But instead of respecting the time-honored

20

principles of federalism, the federal government is trying to trample this traditional state power.  Federal procurement laws do not trump the sovereign States' police power.

### 2. *The mandate exceeds Congress's spending power.*

When exercising its spending authority, the federal government is limited in several key ways.  As relevant here, the government must "state all conditions on the receipt of federal funds 'unambiguously' so as to 'enabl[e] the states to exercise their choice knowingly.'"  *Cutter v. Wilkinson*, 423 F.3d 579, 585 (6th Cir. 2005) (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

The mandate provides no clarity at all.  The executive order contemplates that the Task Force may continually issue guidance, approved by OMB, that agencies must require contractors to comply with.  86 Fed. Reg. at 50,985–87.  Indeed, the deviation clause that agencies have already begun to incorporate into their contracts requires contractors (and therefore subcontractors) to "comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract."  FAR Council Guidance at 5; *see also* Stevens Decl. 2–18.  As the guidance on the website changes frequently, *see* Safer Federal Workforce: What's New?, *available at* https://perma.cc/MB3M-397A (last visited Nov. 4, 2021), the agencies have already failed to provide the clarity required in imposing federal spending conditions.[8]  The federal government is trying to force states to

---

[8] Moreover, to the extent the government seeks to require compliance with "updates" to the Task Force guidance that the OMB Director has not approved, this raises

implement ever-changing public health measures, a clear violation of its spending power.

### 3. *Construing federal procurement law to authorize vaccine mandates violates the nondelegation doctrine.*

The nondelegation doctrine prevents Congress from delegating major policy questions to the executive without a clear and intelligible principle. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). The Constitution states, "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. To that end, "major national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch." *Paul v. United States*, 140 S. Ct. 342, (2019) (Mem.) (Kavanaugh, J., respecting the denial of certiorari) (citing *Industrial Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685–686 (1980) (Rehnquist, J., concurring in judgment)). Thus, "Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935).

The Biden Administration's purported statutory basis for its vaccine mandate—FPASA—lacks any intelligible principle if interpreted so loosely as to bless the Administration's practices here. Congress enacted the FPASA to provide the

---

additional issues, including the Task Force's absence of authority, the fact that delegations under 3 U.S.C. § 301 must be made to officials appointed by the President and confirmed by the Senate, and the fact that the Task Force includes officials not appointed pursuant to the Appointments Clause.

federal government with an "economical and efficient" procurement system. 40 U.S.C. § 101. Congress authorized a subpart of the OMB to "issue policy directives . . . for the purpose of promoting the development and implementation of [a] uniform procurement system." *See* Office of Federal Procurement Policy Amendment of 1979, Pub. L. No. 96-83, § 4(e), 93 Stat. 650. Each time Congress issued procurement instructions, its focus was on efficient purchasing, not mandating healthcare decisions.

The policy decision at issue here, whether to coerce millions of American workers to receive a vaccine, has no basis in the text of the FPASA. Instead, it is a major policy decision which must be made by Congress (assuming Congress has the authority in the first place). If the FPASA is so broad as to provide the Biden Administration with statutory authority to regulate public health, it lacks any intelligible principle and violates the nondelegation doctrine.

## II.   The Plaintiffs will be irreparably harmed absent an injunction.

Absent an injunction, Defendants will continue to intrude on the States' sovereign authority, violate the United States Constitution, violate federal statutory law, and cause unrecoverable damages to the Plaintiffs. All of these injuries are irreparable.

*First*, absent an injunction, the Defendants, acting in concert to impose the mandate, will irreparably harm the Plaintiff States by intruding on their sovereign authority to enact and enforce laws and policies that conflict with the mandate. As President Biden made clear in his announcement, his goal is to override any State

23

policies that conflict with the Administration's priorities, declaring that, if faced with States who disagree, "I'll use my power as President to get them out of the way." *See* Biden Remarks, *supra*. A State "suffers a form of irreparable injury" any time it is prevented from "effectuating" laws "enacted by representatives of its people." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 & n.17 (2018) (same).

Here, the mandate intrudes upon the Plaintiff States' sovereign authority to enact and enforce their own statutes, executive orders, and policies in response to the COVID-19 pandemic to protect vast swaths of their citizenry that will now be forced to undergo vaccination or lose their jobs under the mandate. Each State has enacted its own laws and policies—or declined to issue certain mandates—in a way that balances the need for public health, the rights of its citizens, and the health of its economy—which is itself an important tool to increasing public health. *See* Niknejad Decl. ¶¶ 10–11. Obviously, these issues are often politically sensitive and controversial, yet the Defendants, led by the President, have attempted to remove them from consideration by locally accountable political officials.

*Second*, all Plaintiffs suffer irreparable harm from the violation of the constitutional structure. "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (*quoting Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)); *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003). A constitutional

violation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  In addition to exceeding the federal government's enumerated power, the vaccine mandate violates the principles of federalism enshrined in the Tenth Amendment and separation of powers required by the nondelegation doctrine and limits to the Spending Clause.  These constitutional violations constitute irreparable harm.

*Third*, the mandate irreparably denies Plaintiffs their statutory rights of notice and comment under 41 U.S.C § 1707 and the APA, given the way in which Defendants are trying to impose it.  The Plaintiff States not only have standing to challenge these unlawful actions as employers but also on behalf of their citizens in their *parens patriae* capacity.  *See Massachusetts v. EPA*, 549 U.S. 497, 520, n. 17 (2007) (noting that states have *parens patriae* standing to assert federal rights on behalf of their citizens).  The FAR Council Guidance demands that all federal agencies employ a FAR Deviation Clause into new federal contracts and bid solicitations that bind the contractor to comply with a vaccine mandate and other requirements set forth in the Task Force Guidance.  *See* FAR Council Guidance at 1–5; Stevens Decl. 2–18.  All this is to be done before the FAR Council, the only agency with statutory authority to issue government-wide procurement regulations, does so properly.  *See* 41 U.S.C. § 1303(a).  The OMB Determination purporting to approve the Task Force Guidance as a procurement policy has not been subject to public input through the notice and comment.  Before the FAR Council can even issue a regulation commanded by the Executive Order, Plaintiffs and other employers within the

Plaintiff States face the decision to fire vaccine hesitant employees or lose federal contract opportunities. *See* Niknejad Decl. ¶¶ 4–12; Maddox Decl. ¶¶ 5–11. The damage will already be done at that point. It is irrelevant what the final FAR Council regulation may be, or whether the Court concludes on the merits that the FAR Council and President never had authority to issue a vaccine mandate under federal procurement statutes in the first place.

*Fourth*, Plaintiffs will suffer irreparable economic harm caused by loss of contracts with the federal government. *See Alfred v. Snapp & Sons, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982) (finding that a state has standing to protect its proprietary interests in court). Plaintiff States also face lost business income tax revenue as some employers may not have a sufficiently vaccinated workforce to bid on federal contracts and bring business into their states. Though these harms normally do not constitute irreparable harm when the amount lost "may be recovered through monetary damages," where the loss of funds cannot be recovered or have impaired a plaintiff's programs, such harm constitutes irreparable injury. *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *see also Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1235 (10th Cir. 2019) (finding "diminishment of competitive positions in marketplace" and "loss of employees' unique services" as factors supporting irreparable harm).

Here, because of the federal government's sovereign immunity, Plaintiffs likely cannot recover damages for lost contract opportunities resulting from the mandate, even if the court finds that it acted unlawfully. *Cf.* 5 U.S.C. § 702 (allowing "relief

26

other than money damages"); 28 U.S.C. § 2680 (excluding monetary claims "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid"). These damages, irrecoverable due to sovereign immunity, constitute irreparable harm. *See Kentucky v. United States*, 759 F.3d 588, 599–600 (6th Cir. 2014) (finding irreparable harm where "sovereign immunity bars" granting damages). Plaintiffs' irrecoverable economic harm constitutes yet another irreparable injury they will suffer if this Court does not enjoin the Defendants.

## III.   Enjoining the mandate will promote the public interest.

"Forcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp 3d 321, 330 (D.D.C. 2015). The public has an interest in a proper functioning of the federal government within our constitutional Republic. The Biden Administration has flouted its constitutional duty to faithfully execute the law. This is not the first time, straining public trust in our system of government. For example, President Biden admitted an expiring "eviction moratorium" issued by the Centers for Disease Control and Prevention was unlawful, but re-issued it anyway. *See* Kaylee McGhee White, *Biden admits he is proudly and deliberately breaking the law*, Washington Examiner (Aug. 8, 2021) *available at* https://perma.cc/THJ3-824E. Such actions, without an injunction, severely undermine our democracy.

The public has a right to a lawful government and this Court has the power and duty to preserve the rule of law and the public trust, especially where

constitutional principles are at stake. *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 382 (1979))).

An injunction additionally promotes the public interest by protecting the authority of States to respond to COVID-19 pandemic conditions particular to their own jurisdictions, and by preventing the nationwide confusion and economic upheaval that the mandate threatens.

Unless in conflict with individual citizens' constitutional rights, each State has the authority to respond to the COVID-19 pandemic as its elected officials deem proper.  It is "in the public interest" that courts "give effect to the will of the people by enforcing the laws they and their representatives enact." *Thompson*, 976 F.3d at 619.  This interest is "particularly" strong when "considerable disagreement exists about how best to accomplish" a challenge confronting the nation. *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).  "In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions." *Id.*; *see New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Since the beginning of the COVID-19 pandemic, Plaintiff States have fulfilled their function as laboratories of democracy.  Each State has responded to the ebbs and flows of the pandemic.  What was necessary at times in one State might not have been necessary, or may have become unnecessary, in others.  And each State has

28

encouraged its eligible citizens to get vaccinated. Tens of millions have done so voluntarily. But the vaccine mandate at issue here, along with federal vaccine mandates issued by other agencies, threatens to scrap this federalist solution to the pandemic's challenges by turning the entire country into one "single laboratory of experimentation." Jeffrey S. Sutton, *51 Imperfect Solutions: States & the Making of American Constitutional Law* 216 (2018). Only an injunction of the one-size-fits-all mandate will restore the constitutionally-guaranteed flexibility of Plaintiff States to respond to the pandemic.

An individualized approach, by state, is in the public interest. Vaccine mandates in other States have already exacerbated worker shortages. *See, e.g.*, Maria Caspani & Nathan Layne, *New York Hospitals Fire, Suspend Staff Who Refuse COVID Vaccine*, Reuters (Sept. 28, 2021), *available at* https://perma.cc/8DXR-ZVWT ("[S]taff shortages prompted some hospitals to postpone elective surgeries or curtail services."). Employers are already facing enormous challenges as they respond to the COVID-19 pandemic while continuing to provide employment, goods, and services to our local and national economy. And many employees' finances are already stretched thin from lost wages during COVID-19 shutdowns. Now, the federal government has threatened them with the loss of their livelihoods if they do not comply with this vaccine mandate or others issued by the Biden Administration. An injunction will preserve the status quo for employers and employees. Absent an injunction, the nation faces a severe economic slowdown with ramifications from coast to coast.

Defendants, meanwhile, will suffer no harm if this Court grants an injunction.

Because the mandate is procedurally and substantively unlawful, Respondents have no valid interest in enforcing it. *Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment[.]"); *see also League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). And the Delta variant—President Biden's stated rationale almost two month ago for ordering this mandate and others—has already receded from many States. *See* Biden Remarks; *see also* John Cheves, *Kentucky's COVID numbers continue their plunge to lowest in 11 weeks as surge recedes*, Lexington Herald-Leader (Oct. 25, 2021), *available at* https://www.kentucky.com/news/coronavirus/article255273276.html; Centers for Disease Control and Prevention, *COVID Data Tracker Weekly Review*, *available at* https://perma.cc/A7HG-P3AW.

**IV.     No bond is required under Fed. R. Civ. P. 65.**

A bond is required under Fed. R. Civ. P. 65 to "pay the costs and damages sustained by any party found to have been wrongfully enjoined."  No bond should be required here since the Defendants are agencies and officials of the United States who will not incur damages or cost during the pendency of this action. *See Static Controls Components, Inc. v. Lexmark Intern., Inc.*, 697 F.3d 387, 400-01 (6th Cir. 2012) (noting that a court has broad discretion in setting the bond amount, and may decline to order a bond at all).

## **CONCLUSION**

For the aforementioned reasons, the Plaintiffs respectfully request the Court enjoin the Defendants' federal contractor vaccine mandate.

Respectfully Submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

/s/ Christopher L. Thacker
Barry L. Dunn (KBA No. 93787)
Christopher L. Thacker (KBA No. 91424)
Heather L. Becker (KBA No. 94360)
Jeremy L. Sylvester (KBA No. 92771)
Alexander Y. Magera (KBA No. 97708, *admission application forthcoming*)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Christopher.Thacker@ky.gov
Heather.Becker@ky.gov
Jeremy.Sylvester@ky.gov
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*

**Dave Yost**
**ATTORNEY GENERAL**

/s/ Benjamin M. Flowers
Benjamin M. Flowers (*pro hac vice application forthcoming*)
Carol O'Brien (*pro hac vice application forthcoming*)
May Davis (*pro hac vice application forthcoming*)
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-4986
bflowers@OhioAGO.gov

*Counsel for the State of Ohio, Fredrick W. Stevens, and Scott A. Hildenbrand*

James R. Flaiz (*pro hac vice application forthcoming*)
Prosecuting Attorney
Geauga County Prosecutor's Office
231 Main St., 3rd Floor
Chardon, OH 44024
Phone:  (440) 279-2100

*Counsel for Scott A. Hildenbrand*

**Herbert H. Slatery III**
**ATTORNEY GENERAL**

<u>/s/ Brandon J. Smith</u>
Dianna Baker Shew (*pro hac vice application forthcoming*)
Brandon J. Smith (*pro hac vice application forthcoming*)
Office of the Attorney General
and Reporter
P.O. Box. 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-4081
dianna.shew@ag.tn.gov
brandon.smith@ag.tn.gov
*Counsel for State of Tennessee*

**CERTIFICATE OF SERVICE**

I certify that on November 8, 2021, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record, and by sending a copy by first-class United States mail to the following:

Kiran Ahuja
United States Office of Personnel
Management
1900 E Street, NW
Washington, D.C. 20415

Randolph D. Alles
Department of Homeland Security
2707 Martin Luther King Jr. Avenue,
SE
Washington, D.C. 20528

William W. Beach
Bureau of Labor Statistics
Postal Square Building
2 Massachusetts Avenue, NE
Washington, D.C. 20212

President Joseph R. Biden, Jr.
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Bureau of Labor Statistics
Postal Square Building
2 Massachusetts Avenue, NE
Washington, D.C. 20212

Robin Carnahan
General Services Administration
1800 F Street, NW
Washington, D.C. 20405

Francis S. Collins
National Institutes of Health
One Center Drive
Bethesda, MD 20892

National Aeronautics and Space
Administration
Mary W. Jackson NASA Headquarters
300 E Street, SW
Washington, D.C. 20546

National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892

Office of Management and Budget
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

United States Office of Personnel
Management
1900 E Street, NW
Washington, D.C. 20415

L. Eric Patterson
Federal Protective Service
800 North Capitol Street, NW
Suite 500
Washington, D.C. 20002

Safer Federal Workforce Task Force
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

United States of America
Attn: President Joseph R. Biden, Jr.
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

Deanne Criswell
Federal Emergency Management
Agency
500 C Street, SW
Room 828
Washington, D.C. 20472

SERVE: Civil Process Clerk
U.S. Attorney's Office for the Eastern
District of Kentucky
260 West Vine Street
Suite 300
Lexington, KY 40507

Federal Acquisition Regulatory Council
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Peter A. Feldman
Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

Lesley A. Field
Office of Management and Budget
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

General Services Administration
1800 F Street, NW
Washington, D.C. 20405

SERVE: Merrick Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Rochelle Walensky
Centers for Disease Control and
Prevention
1600 Clifton Road, NE
Room 5127
Atlanta, GA 30333

Janet Woodcock
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Shalanda Young
Office of Management and Budget
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Jeffrey Zients
Safer Federal Workforce Task Force
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Tae D. Johnson
Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536

Jeffrey A. Koses
General Services Administration
1800 F Street, NW
Washington, D.C. 20405

James M. Murray
United States Secret Service
245 Murray Drive, SW
Washington, D.C. 20223

34

Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536


/s/ Christopher L. Thacker
*Counsel for the Commonwealth*