UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY**; | |
| **STATE OF OHIO**; | |
| **STATE OF TENNESSEE;** | |
| **FREDRICK W. STEVENS** in his official capacity as Sheriff for the Seneca County (Ohio) Sheriff's Office; | |
| and | |
| **SCOTT A. HILDENBRAND** in his official capacity as Sheriff for the Geauga County (Ohio) Sheriff's Office; | |
| *Plaintiffs* | |
| v. | Civil Action No. |
| | 3:21-cv-00055-GFVT |
| **JOSEPH R. BIDEN** in his official capacity as President of the United States; | |
| **UNITED STATES OF AMERICA**; | |
| **SAFER FEDERAL WORKFORCE TASK FORCE**; | |
| **UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**; | |
| **KIRAN AHUJA** in her official capacity as Director of the Office of Personnel Management and as Co-Chair of the Safer Federal Workforce Task Force; | |
| **OFFICE OF MANAGEMENT AND BUDGET**; | |

**SHALANDA YOUNG** in her official capacity as Acting Director of the Office of Management and Budget and as a Member of the Safer Federal Workforce Task Force;

**GENERAL SERVICES ADMINISTRATION**;

**ROBIN CARNAHAN** in her official capacity as Administrator of the General Services Administration and as Co-Chair of the Safer Federal Workforce Task Force;

**JEFFREY ZIENTS** in his official capacity as Co-Chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator;

**L. ERIC PATTERSON** in his official capacity as Director of the Federal Protective Service;

**JAMES M. MURRAY** in his official capacity as Director of the United States Secret Service;

**DEANNE CRISWELL** in her official capacity as Administrator of the Federal Emergency Management Agency;

**ROCHELLE WALENSKY** in her official capacity as Director of the Centers for Disease Control;

**FEDERAL ACQUISITION REGULATORY COUNCIL**;

**LESLEY A. FIELD** in her official capacity as Acting Administrator for Federal Procurement, Office of Management and Budget;

**JEFFREY A. KOSES** in his official capacity as Senior Procurement Executive & Deputy Chief Acquisition Officer, General Services Administration;

**JOHN M. TENAGLIA** in his official capacity as Principal Director of Defense Pricing and Contracting, Department of Defense;

**KARLA S. JACKSON** in her official capacity as Assistant Administrator for Procurement, National Aeronautics and Space Administration;

**U.S. FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES**;

**JANET WOODCOCK** in her official capacity as Acting Commissioner of Food and Drugs;

**NATIONAL INSTITUTES OF HEALTH, DEPARTMENT OF HEALTH AND HUMAN SERVICES**;

**FRANCIS COLLINS** in his official capacity as Director of the National Institutes of Health;

**UNITED STATES BUREAU OF LABOR STATISTICS, DEPARTMENT OF LABOR**;

**WILLIAM W. BEACH** in his official capacity as Commissioner of the United States Bureau of Labor Statistics;

**UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION**;

**PETER A. FELDMAN** in his official capacity as Commissioner of the United States Consumer Product Safety Commission;

**TAE D. JOHNSON** in his official capacity as Director of Immigration and Customs Enforcement;

**RANDOLPH D. ALLES** in his official capacity as Undersecretary for Management of the Department of Homeland Security;

**DEPARTMENT OF HOMELAND SECURITY;**

and

**IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY;**

*Defendants*

---

## <u>FIRST AMENDED</u> COMPLAINT

---

Pronouncing that his "patience is wearing thin" with people who choose to forgo the COVID-19 vaccine,[1] President Joe Biden signed an unlawful executive order to compel millions of Americans who work for government contractors to receive a COVID-19 vaccine.  The vaccine mandate, as articulated in a newly created task force's guidance document, seeks to require covered contractor employees to be fully vaccinated by December 8January 18, with very minimal exceptions.  Even in a pandemic, "our system does not permit agencies to act unlawfully even in the pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S.

---

[1] Joseph Biden, Remarks at the White House (Sept. 9, 2021), *available at* https://perma.cc/GQG5-YBXK (last visited Nov. 2, 2021).

Ct. 2485, 2490 (2021) (per curiam).  The Plaintiffs therefore seek judicial relief from the President's unlawful and unconstitutional vaccine mandate.[2]

## PARTIES

### Kentucky Plaintiffs

1.    The Commonwealth of Kentucky is a sovereign State of the United States of America.  The Commonwealth sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

2.    The Attorney General of the Commonwealth of Kentucky is authorized to bring legal actions on behalf of the Commonwealth and its citizens.  The Attorney General is "charged with the duty of protecting the interests of all the people," *Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1973), including by ensuring that government actors perform their duties lawfully, *Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016).

3.    The Commonwealth, through its agencies and its political subdivisions, routinely contracts with the federal government.

[2] The Office of Management and Budget recently issued an updated determination scheduled to be published on November 16.  *See* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis ("Post Hoc OMB Determination"), *available at* https://perma.cc/4KQM-F6KG (Nov. 10, 2021).   The Post Hoc OMB Determination rescinds and supersedes the previous September 24 OMB Determination.  *Id*. at 1; *see also Ctr. for Science in the Pub. Interest v. Regan*, 727 F.2d 1161, 1164 (D.C. Cir. 1984) (finding that an agency's rescission of a prior rule moots any controversy surrounding that prior rule).  This First Amended Complaint addresses this recent issuance, which attempts to assuage a barrage of criticism faced in multiple lawsuits across the nation.  Exhibit A is a redlined version of the original Complaint showing what has changed between this First Amended Complaint and the original Complaint.

2

4.      For example, the Boone County Jail, Laurel County Jail, and Grayson County Jail all have contracts with United States Justice Department, U.S. Marshals Service to detain, house, and transport prisoners in custody for federal crimes.

5.      The revenue from these contracts accounts for a significant portion of these jails' operating budgets, alleviating the burden on Kentucky taxpayers to fund these facilities that are essential for ensuring public safety.

6.      Each of these jails encourages vaccination for staff but does not require vaccination as a condition of employment.

7.      Multiple staff members at these jails have indicated they will end their employment if forced to take a COVID-19 vaccine, which will only exacerbate the current staffing challenges at these institutions and threaten public safety.

8.      The Commonwealth expects to continue pursuing federal government contracts in the future.

9.      Upon information and belief, the Commonwealth has current contracts subject to renewal or the exercise of options on or after October 15, 2021.

10.      The Commonwealth also has some contracts that require it to comply with all applicable federal regulations and standards.  *See* Attached Kentucky Contracts.

10.11. Public employees are generally not required to be vaccinated under the laws of the Commonwealth.

3

11.12. The mandate threatens the Commonwealth with the loss of millions of dollars in future contracting opportunities and will put undue pressure on the Commonwealth to create new policies, which threatens irreparable harm.

**Ohio Plaintiffs**

12.13. The State of Ohio is a sovereign State of the United States of America. Ohio sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

13.14. The Attorney General of the State of Ohio is authorized to bring legal actions on behalf of the State and its citizens, and has been appointed by the prosecutors of Geauga and Seneca Counties to bring legal action on behalf of both counties' sheriffs.

14.15. On information and belief, arms of the State of Ohio routinely contract with the federal government.

15.16. For example, state universities engage in contracts and subcontracts that exceed the simplified acquisition threshold with multiple federal agencies, including the Food and Drug Administration, the National Institutes of Health, the Bureau of Labor Statistics, the National Aeronautics and Space Administration, and the Consumer Product Safety Commission.

16.17. In addition, executive bodies of the State of Ohio have contracts with federal agencies that exceed the simplified acquisition threshold, including the Ohio Department of Health, which contracts with the Centers for Disease Control and Prevention. *See* Flowers Decl. at 2.

4

17.18. The State of Ohio expects to continue pursuing government contracts in the future.

18.19. On information and belief, the State of Ohio has current contracts subject to renewal or the exercise of options on or after October 15, 2021.

19.20. On information and belief, federal agencies with contracts or subcontracts with arms of the State of Ohio have already updated certain contracts to incorporate the mandate. Arms of the State have therefore been notified that they will need to either require their employees to vaccinate or else forfeit their ability to contract with the federal government.

20.21. State employees are not generally required to be vaccinated. Certain state universities require employees to show proof of vaccination, but allow for broader exemptions than the mandate.

21.22. The mandate threatens Ohio with the loss of millions of dollars in future contracting opportunities and will put undue pressure on Ohio to create new policies, which threatens imminent irreparable harm.

22.23. Seneca County Sheriff Fredrick W. Stevens is an elected official in Seneca County, Ohio, responsible for the Seneca County Sheriff's Office. He sues in his official capacity.

23.24. Geauga County Sheriff Scott A. Hildenbrand is an elected official in Geauga County, Ohio, responsible for the Geauga County Sheriff's Office. He sues in his official capacity.

5

24.25. The Ohio Revised Code provides that each county shall have an elected sheriff.  Ohio Rev. Code § 311.01.

25.26. Sheriffs are authorized to appoint deputy sheriffs, Ohio Rev. Code § 311.04, and to hire non-deputy civilian employees to perform other functions, such as running county jails, Ohio Rev. Code § 341.05.

26.27. Sheriffs perform many functions of significant importance to the State.

27.28. For example, sheriffs are required to protect courthouses by providing personnel during all open court proceedings, Ohio Rev. Code § 311.07, and also to transport jailed defendants to court and back to jail during proceedings, *e.g.,* Ohio Rev. Code § 2945.371.  If they cannot adequately provide these services, the administration of justice in Ohio will be hampered.

28.29. Sheriffs process registrations under multiple civil registration schemes that record information of, and sometimes provide community notification regarding, those who pose danger to the community.  These include sex-offender registration and notification, Ohio Rev. Code § 2950.04(D), violent-offender registration, Ohio Rev. Code § 2903.43(A) and arsonist registration, Ohio Rev. Code § 2909.15(A).  The sheriff must then forward that information to the Bureau of Criminal Investigation and Identification ("BCI"), an office under the Attorney General, for inclusion in a statewide database, with different registries for different offenders.  Ohio Rev. Code § 2950.043 (sex offenders), Ohio Rev. Code § 2903.43(F) (violent offenders); Ohio Rev. Code § 2909.15(E)(1) (arsonists).  If the sheriffs cannot adequately maintain

6

registrations and supply information to BCI, the State will be unable to maintain an updated database as required by law, harming public safety.

29.30. Sheriffs operate county jails, where they hold pretrial detainees and convicted offenders serving certain sentences, such as misdemeanors. Sheriffs are authorized to hold state prisoners for the Ohio Department of Rehabilitation and Correction, and federal prisoners or detainees for federal authorities. Ohio Rev. Code §§ 341.21; 5120.161. If sheriffs experience a diminution in their ability to carry out these functions, the administration of justice in Ohio will suffer.

30.31. Sheriffs process Ohio citizens' applications for concealed-handgun licenses, including processing background checks, and must forward relevant information to state entities. Ohio Rev. Code §§ 311.41; 2923.125.

31.32. Sheriffs operate county-level public-safety communications systems in most Ohio counties, which are then used for multi-jurisdictional communications with state agencies and other local subdivisions. Ohio Rev. Code § 307.63.

32.33. Sheriffs deliver absentee ballots, or facilitate delivery by elections officials, to jailed voters, enabling them to vote while in a sheriff's custody. Without adequate sheriffs' office staffing, jailed voters might be unable to vote. In addition to harming would-be voters, that could expose the State to litigation and its attendant costs. *See, e.g., Mays v. LaRose*, 951 F.3d 775, 781 (6th Cir. 2020).

33.34. The Seneca County Sheriff and Geauga County Sheriff have both contracted with the federal government—in particular, with the Department of

Homeland Security—to house Immigration and Customs Enforcement detainees in their county jails.

34.35. On information and belief, the Department of Homeland Security has amended its contract with the Seneca County Sheriff to add a clause entitled "Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors." That clause reads, in full:

**Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors. (OCT 2021) (DEVIATION)**

(a) *Definition*. As used in this clause –

*United States or its outlying areas* means—

(1) The fifty States;
(2) The District of Columbia;
(3) The commonwealths of Puerto Rico and the Northern Mariana Islands;
(4) The territories of American Samoa, Guam, and the United States Virgin Islands; and
(5) The minor outlying islands of Baker Island, Howland Island, Jarvis Island, Johnston, Atoll, Kingman Reef, Midway Islands, Navassa Island, Palmyra Atoll, and Wake Atoll.

(b) *Authority*. This clause implements Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, dated September 9, 2021 (published in the Federal Register on September 14, 2021, 86 FR 50985).

(c) *Compliance*. The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https://www.saferfederalworkforce.gov/contractors/.

(d) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas.

8

35.36. Entities subject to the mandate must either give up their contracts (or their ability to compete for future contracts) or mandate vaccination among their staffs.

36.37. The Seneca County Sheriff and the Geauga County Sheriff will lose staff if they mandate vaccination.

37.38. The State of Ohio will be affected if sheriffs cannot perform, or cannot perform adequately, the many functions that sheriffs serve, including those detailed above.

38.39. Sheriffs' deputies and non-deputy employees are generally, with few exceptions, included in Ohio's classified civil service.  Ohio Rev. Code § 124.01(C); *Yarosh v. Becane*, 63 Ohio St. 2d 5 (1980).  That means that deputies and other employees whose service is terminated may appeal that action to the State Personnel Board of Review, a state agency, and to the state courts.  Ohio Rev. Code §§ 124.03; 124.06.

39.40. If deputies and non-deputy employees are terminated because of the mandate, the State will then expend both agency and judicial resources resolving such claims.

**Tennessee Plaintiffs**

40.41. The State of Tennessee is a sovereign State of the United States of America.  Tennessee sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

41.42. The Attorney General and Reporter of the State of Tennessee is authorized to bring legal actions on behalf of the State and its citizens.

42.43. The State of Tennessee, through its agencies and its political subdivisions, routinely contracts with the federal government.

43.44. The State of Tennessee, through its agencies and its political subdivisions, engages in a wide range of federal contracts, including but not limited to those that relate to staffing assistance, research, regulatory program agreements, leases of and access to federal real property, and agreements for data and information sharing. These contracts benefit millions of Tennesseans by providing vital services and resources.

44.45. The State of Tennessee expects to continue pursuing government contracts in the future.

45.46. The State of Tennessee has current contracts subject to renewal or the exercise of options after October 15, 2021.

46.47. Public employees are generally not required to be vaccinated under the laws of the State of Tennessee.

47.48. The mandate threatens the State of Tennessee with the loss of millions of dollars in future contracting opportunities and will put undue pressure on the State of Tennessee to create new polices, which threatens irreparable harm.

**Allegations pertaining to the States generally**

49.    According to official reports from the federal government's System for Award Management (SAM.gov),[3] $10,221,706,227 worth of federal contracts featured Kentucky as the place of performance in calendar year 2020.  Geographical Report by Place of Performance, SAM.gov (click on "Data Bank" tab; then click on "Geographical Report by Place of Performance" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").  Based on vendor location for that same time, $9,934,033,221 worth of federal contracts are held by vendors located in Kentucky, including numerous Kentucky agencies.  Geographical Report by Vendor Location, SAM.gov (click on "Data Bank" tab; then click on "Geographical Report by Vendor Location" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").

50.    According to official reports from SAM.gov, $8,935,417,106 worth of federal contracts featured Ohio as the place of performance in calendar year 2020.  Geographical Report by Place of Performance, SAM.gov (click on "Data Bank" tab; then click on "Geographical Report by Place of Performance" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").  Based on vendor location for that same time, $12,498,379,202 worth of federal contracts are held by vendors located in Ohio, including numerous Ohio agencies.  Geographical Report by Vendor Location, SAM.gov (click on "Data

---

[3] To access data on SAM.gov, users must create a free account.

Bank" tab; then click on "Geographical Report by Vendor Location" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").

51.    According to official reports from SAM.gov, $10,258,679,277 worth of federal contracts featured Tennessee as the place of performance in calendar year 2020.  Geographical Report by Place of Performance, SAM.gov (click on "Data Bank" tab; then click on "Geographical Report by Place of Performance" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").  Based on vendor location for that same time, $10,010,028,677 worth of federal contracts are held by vendors located in Tennessee, including numerous Tennessee agencies.  Geographical Report by Vendor Location, SAM.gov (click on "Data Bank" tab; then click on "Geographical Report by Vendor Location" hyperlink on second page of the "Contract Data Reports"; search from date field for "1/1/2020" and to date field for "12/31/2020").

48.52. The contractor vaccine mandate harms the Plaintiff States beyond the direct harms that flow from the fact that certain agencies and political subdivisions of the States are contractors subject to the mandate, including but not limited to the following:

a.   Because the mandate claims to preempt all contrary State law, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding workplace issues that would otherwise apply to contractors within the States' borders.

12

b.   Because the mandate claims to preempt all contrary State law, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding public health orders.

c.   Because the mandate claims to preempt all contrary State law, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding workforce vaccination policies under their "police power—a power which the state did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905).

d.   The mandate requires employees to prove vaccination status with documentation, and on information and belief, agencies of the Plaintiff States often possess such documentation.  A predictable consequence of the mandate is thus to increase the number of people seeking documentation from the States regarding vaccination status.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

e.   On information and belief, a natural predictable consequence of the mandate is that numerous employees may be fired, retire, or quit their jobs.  An ABC News poll shows that almost 70% of unvaccinated Americans would quit their jobs if a vaccine mandate were required and their exemption were denied.[4]

---

[4] Jordan Burrows, *Employees Not Given Exemption Prefer to Quit Job Than Get COVID Vaccine, Poll Shows*, Salt Lake City (ABC4) (Sept. 15, 2021), *available at* https://perma.cc/6A95-CJXD (last visited Nov. 2, 2021).

13

From an employer's perspective, 9 in 10 large employers fear reductions in their workforces if they have to implement vaccine mandates.[5] This injures the Plaintiff States' quasi-sovereign and *parens patriae* interest in the economic well-being of their citizens.

  f. On information and belief, a natural and predictable consequence of the mandate is that employers who are critical to the supply chain, and are also federal contractors, will likely lose significant numbers of employees. It is entirely predictable, therefore, that the mandate will exacerbate current supply chain issues. As a result, prices will continue to rise and cause direct injuries to the Plaintiff States as purchasers. It will also harm their quasi-sovereign *parens patriae* interest in the economic well-being of their residents, who will suffer from further supply chain disruptions.[6]

  g. The mandate unfairly discriminates between citizens of the Plaintiff States who are vaccinated and those who are not, thus denying the latter employment opportunities available to the former. The Plaintiff States have quasi-sovereign and *parens patriae* interests in protecting their citizens from discriminatory policies. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 609 (1982).

---

[5] Karl Evers-Hillstrom, *9 in 10 Employers Say They Fear They'll Lose Unvaccinated Workers Over Mandate: Survey*, The Hill (Oct. 18, 2021), *available at* https://perma.cc/V5ZJ-7XUQ (last visited Nov. 2, 2021); *see also* Society for Human Resource Management, *SHRM Surveys Reveal Employers' Anxiety Over Vaccine Mandate, available at* https://perma.cc/R2A2-BVKF (last visited Nov. 3, 2021).

[6] *See* Spencer Kimball, *Business Groups Ask White House to Delay Biden COVID Vaccine Mandate Until After the Holidays*, CNBC (Oct. 25, 2021, 9:03 AM), *available at* https://perma.cc/4S48-3YLE (last visited Nov. 3, 2021).

**Defendants**

49.53. Defendants are the United States, the President of the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged actions.

50.54. Defendant Joseph R. Biden, sued in his official capacity, is the President of the United States who, on September 9, 2021, signed Executive Order 14042. 86 Fed. Reg. 50,985 (Sept. 9, 2021).

51.55. Defendant Safer Federal Workforce Task Force ("Task Force") was established pursuant to President Biden's Executive Order 13991. 86 Fed. Reg. 7045, 7046 (Jan. 25, 2021). Three co-chairs oversee the Task Force, including: (1) the Director of the Office of Personnel Management; (2) the Administrator of the General Services Administration; and (3) the COVID-19 Response Coordinator. *Id*. The Director of the Office of Personnel Management is also a member of the Task Force. *Id*.

52.56. Defendant Office of Personnel Management is an agency of the United States government. Defendant Office of Personnel Management Director, Kiran Ahuja, sued in her official capacity, is a co-chair and member of the Task Force and represents the federal agency responsible for managing human resources for civil service of the federal government.

57. Defendant Office of Management and Budget (OMB) is an agency of the United States government, specifically, within the Executive Office of the President, and issued the 210-word determination finding that the Task Force's Guidance issued

15

on September 24, 2021 will improve "economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042 ("Initial OMB Determination"), 86 Fed. Reg. 53,691 (Sept. 28, 2021).  The Initial OMB Determination was not published for public comment, nor did it incorporate a 60-day comment period.  *See* 41 U.S.C. § 1707.  The Initial OMB Determination also failed to include either a 41 U.S.C. § 1707(d) waiver or to invoke the good-cause exception to the APA's notice-and-comment requirements.  *See* 5 U.S.C. § 553(b)(3)(B).

53. 58. The OMB, recognizing its failure to comply with these requirements, attempted to paper over those defects by rescinding the Initial OMB Determination and issuing a new determination on November 10, 2021, scheduled to be published in the Federal Register on November 16, 2021, that replicates that finding. Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis ("Post Hoc OMB Determination"), *available at* https://perma.cc/4KQM-F6KG (Nov. 10, 2021).  The Post Hoc OMB Determination purports to approve a now updated Task Force Guidance, issued on November 10, 2021.  *Id.*

54. 59. Defendant Shalanda Young, is the Acting Director of the Office of Management and Budget and a member of the Task Force, and represents the federal

agency with delegated authority to publish determinations relevant to Executive Order 14042 to the Federal Register.  She is sued in her official capacity

55.60. Defendant General Services Administration routinely contracts with entities in the Plaintiff States.

56.61. Defendant Administrator of General Services, Robin Carnahan, sued in her official capacity, is a co-chair and member of the Task Force and represents the federal agency responsible for managing and supporting the basic functioning of federal agencies.

57.62. Defendant COVID-19 Response Coordinator, Jeffrey Zients, sued in his official capacity, is a co-chair and member of the Task Force and is the Biden Administration's COVID-19 Response Coordinator.

58.63. Defendant Director of the Federal Protective Service, L. Eric Patterson, sued in his official capacity, is a member of the Task Force.

59.64. Defendant Director of the United States Secret Service, James M. Murray, sued in his official capacity, is a member of the Task Force.

60.65. Defendant Director of the Federal Emergency Management Agency, Deanne Criswell, sued in her official capacity, is a member of the Task Force.

61.66. Defendant Director of the Centers for Disease Control and Prevention, Rochelle Walensky, sued in her official capacity, is a member of the Task Force.

62.67. Defendant Federal Acquisition Regulatory Council (FAR Council) is responsible for "manag[ing], coordinat[ing], control[ing], and monitor[ing] the

maintenance of, issuance of, and changes in, the Federal Acquisition Regulation." 41 U.S.C. § 1303(d).

63.68. Defendant Lesley A. Field, sued in her official capacity, is a member of the FAR Council by virtue of her role as the Acting Administrator for Federal Procurement of OMB.

64.69. Defendant Jeffrey A. Koses, sued in his official capacity, is a member of the FAR Council by virtue of his role as the Senior Procurement Executive & Deputy Chief Acquisition Officer of the General Services Administration.

65.70. Defendant John M. Tenaglia, sued in his official capacity, is a member of the FAR Council by virtue of his role as the Principal Director of Defense Pricing and Contracting of the Department of Defense.

66.71. Defendant Karla S. Jackson, sued in her official capacity, is a member of the FAR Council by virtue of her role as the Assistant Administrator for Procurement of NASA.

67.72. Defendant U.S. Food and Drug Administration, within the Department of Health and Human Services, has current contractual relationships with Ohio, and will seek to impose the unlawful vaccine mandate on arms of the State of Ohio.

68.73. Defendant National Institutes of Health, within the Department of Health and Human Services, has current contractual relationships with Ohio, and will seek to impose the unlawful vaccine mandate on arms of the State of Ohio.

69.74. Defendant U.S. Bureau of Labor Statistics, with the Department of Labor, has current contractual relationships with Ohio and will seek to impose the unlawful vaccine mandate on arms of the State of Ohio.

70.75. Defendant U.S. Consumer Product Safety Commission is an independent agency and has current contractual relationships with Ohio and will seek to impose the unlawful vaccine mandate on arms of the State of Ohio.

71.76. Defendant Department of Homeland Security and Defendant Immigration and Customs Enforcement, within the Department of Homeland Security, have current contractual relationships with Ohio, and are and will continue to seek to impose the Biden Administration's unlawful requirements on Ohio.

72.77. Defendant Janet Woodcock is the Acting Commissioner of Food and Drugs. Defendant Francis Collins is the Director of the National Institutes of Health. Defendant William W. Beach is the Commissioner of the U.S. Bureau of Labor Statistics. Defendant Peter A. Feldman is the Commissioner of the U.S. Consumer Product Safety Commission. Defendant Tae D. Johnson is the Director of Immigration and Customs Enforcement.  Defendant Randolph D. Alles is the Undersecretary for Management of the Department of Homeland Security.  They are sued in their official capacities.

## JURISDICTION AND VENUE

73.78. The Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361 and 5 U.S.C. §§ 702–703.

74.79. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–02, the Constitution, and the Court's equitable powers.

75.80. Venue is proper within this District pursuant to 28 U.S.C. § 1391(e). Defendants are United States agencies or officers sued in their official capacities. Plaintiff Commonwealth of Kentucky is a resident of every judicial district in its sovereign territory, including this judicial district and division.

76.81. Under Local Rules 3.2(a)(3)(A), 3.2(a)(3)(B), and 8.1(c), the Central Division of the Eastern District of Kentucky at Frankfort is the proper division for this action because a substantial part of the events giving rise to this action occurred in Franklin County, Kentucky, where Kentucky's seat of government is located, and where Attorney General Cameron holds office.

## FACTUAL BACKGROUND

### Historical Background

77.82. In the aftermath of World War II, during which the federal government amassed a substantial amount of war supplies and other property, there was an evident need for "an improved and efficient property management program," H.R. Rep. No. 81-670, at 1475, and an overhaul of the internal "housekeeping" activities of the world's largest buyer of goods and services, *id.* at 1476.  As one member of Congress explained, the federal procurement system was "largely uncoordinated, to some extent duplicative," and in desperate need of reform.  95 Cong. Rec. 7441 (daily ed. June 8, 1949) (remarks of Rep. Holifield).

78.83.  Congress enacted the Federal Property and Administrative Services Act of 1949 ("FPASA") "to provide the [f]ederal [g]overnment with an economical and efficient system" for certain enumerated activities, including "[p]rocuring and supplying property and nonpersonal services," "establish[ing] . . . pools or systems of transportation of [g]overnment personnel," and "manag[ing] of public utility services."  40 U.S.C. § 101.

79.84. To effectuate the FPASA, Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out" that statute.  *Id.* at § 121(a).  Notably, Congress did not authorize the President to issue regulations with the force or effect of law, as it authorized the General Services Administrator to do.  *Compare id.* at § 121(a) ("prescribe policies and directives"), *with id.* at § 121(c) ("prescribe regulations").

80.85. Over time, however, the FPASA proved inadequate to control the lack of coordination across agencies, and the proliferation of procurement regulations by different agencies led to a morass of legal requirements.[7]  In 1979, Congress directed the Office of Federal Procurement Policy—part of the Office of Management and Budget—to "issue policy directives . . . for the purpose of promoting the development and implementation of [a] uniform procurement system," with concurrence of the Office of Management and Budget's Director.  *See* Office of Federal Procurement Policy Amendments of 1979, Pub. L. No. 96-83, § 4(e), 93 Stat. 650.

---

[7] *See generally* Kate M. Manuel et al., Cong. Rsch. Serv., R42826, The Federal Acquisition Regulation (FAR): Answers to Frequently Asked Questions 10 (2015), *available at* https://perma.cc/W9ZT-DGT2 (quoting United States Comm'n on Gov't Procurement, Report of the Commission on Government Procurement, Vol. 1, at 33 (1972)).

81. 86. In 1983, under the policy directive of the Administrator of the Office of Federal Procurement Policy, the Department of Defense, General Services Administration, and NASA jointly promulgated the first version of the Federal Acquisition Regulation.  48 Fed. Reg. 42,102 (Sept. 19, 1983).

82. 87. Even after creation of the Federal Acquisition Regulation, however, "[r]edundancies and inconsistencies continue[d] to exist between the [Federal Acquisition Regulation] and agency supplementing regulations implementing the Regulation." S. Rep. No. 100–424, at 13–14 (quoting study prepared by Office of Management and Budget Director Tom Daley (Nov. 1986)).

83. 88. Finally, in 1988, after decades of failure by executive-branch officials, Congress established the Federal Acquisition Regulatory Council "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overnment-wide procurement regulatory activities in the [f]ederal [g]overnment." Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. No. 100-679, § 3, 102 Stat. 4056, *later codified* at 41 U.S.C. § 1302(a).[8]

84. 89.  The FAR Council consists of the Office of Federal Procurement Policy Administrator, the Secretary of Defense, the Administrator of NASA, and the General Services Administration Administrator.  41 U.S.C. § 1302(b).

---

[8] *See* S. Rep. No. 100–424, at 4 ("[The Office of Federal Procurement Policy]'s performance as the [f]ederal [g]overment's procurement policy leader has been uneven. . . . [M]any of the procurement executives, industry officials and other procurement experts . . . rated [the Office]'s overall performance during this as being no more than marginally [e]ffective." (quoting Assessment of the Office of Federal Procurement Policy, GAO/NSIAD–88–35 (No. 1987))).

~~85.~~90. Subject to limited exceptions, the FAR Council has exclusive authority to issue "a single [g]overnment-wide procurement regulation, to be known as the Federal Acquisition Regulation." *Id.* at § 1303(a)(1). No other agency is authorized to issue government-wide procurement regulations. *Id.* at § 1303(a)(2).

~~86.~~91. Finally, the Office of Federal Procurement Policy Act further protects Congress's reforms to government-procurement practices by requiring that any "procurement policy, regulation, procedure, or form"—whether issued government-wide by the FAR Council or for one agency by that agency—be subject to notice and comment. 41 U.S.C. § 1707(a)–(b). More specifically, this Act requires that:

> [A] procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register . . . if it—(A) relates to the expenditure of appropriated funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a significant cost or administrative impact on contractors or offerors.

*Id.* at § 1707(a). The relevant official may waive that requirement only if "urgent and compelling circumstances make compliance with the requirements impracticable." *Id.* at § 1707(d).

## Relevant Federal Government Actions

### Creation of the Safer Federal Workforce Task Force

~~87.~~92. On his first day in office, President Biden signed Executive Order 13991, which created the Safer Federal Workforce Task Force to provide "ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19

pandemic." 86 Fed. Reg. 7,045, 7,046 (Jan. 20, 2021). The Executive Order also requires that the General Services Administration "provide funding and administrative support for the" Task Force. *Id.* Three co-chairs oversee the Task Force: (1) the Director of the Office of Personnel Management, Defendant Ahuja; (2) the Administrator of the General Services Administration, Defendant Carnahan; and (3) the COVID-19 Response Coordinator, Defendant Zients. Defendants Young, Patterson, Murray, Criswell, Walensky are also members of the Task Force.

**Executive Order 14042**

~~88.~~93. On September 9, 2021, President Biden announced his "new plan to require more Americans to be vaccinated" by imposing "new vaccination requirements." Joseph Biden, Remarks at the White House (Sept. 9, 2021), *available at* https://perma.cc/GQG5-YBXK.

~~89.~~94. President Biden further declared that he would "sign an executive order that will now require all executive branch federal employees to be vaccinated" and "another executive order that will require federal contractors to do the same." *Id.*

~~90.~~95. On that same day, President Biden signed Executive Order 14042. 86 Fed. Reg. 50,985 (Sept. 9, 2021).

~~91.~~96. The Executive Order relies on the FPASA, as well as the Constitution and the President's power under 3 U.S.C. § 301 to delegate his statutory authorities. *Id.* at 50,985.

~~92.~~97. The Executive Order requires departments and agencies, including independent establishments, to require contractors and subcontractors to "comply

24

with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force, provided that the Director of the Office of Management and Budget approves the Task Force Guidance and determines that the Guidance . . . will promote economy and efficiency in Federal contracting." *Id*.

93.98. The Executive Order required the Task Force to issue this guidance by September 24, 2021, and directs the OMB Director, pursuant to the President's delegation of his power under the FPASA, to determine whether the Task Force guidance will promote economy and efficiency in federal procurement. *Id*. at 50,985–86.

94.99. The Executive Order applies to new contracts, contract-like instruments, new solicitations for contracts or contract-like instruments, and extensions or renewals of contracts or contract-like instruments if the extension or renewal occurred on or after October 15, 2021. *Id*. at 50,987. The Executive Order exempts certain contracts such as those with a value below "the simplified acquisition threshold," which is typically $250,000. *Id*. at 50,986–87; FAR § 2.101.

95.100.    The Executive Order also authorized the Task Force to update guidance on a continuing basis, subject to re-approval by the OMB Director.[9] 86 Fed. Reg. at 50,985 (noting the "contract or subcontractor shall, for the duration of the

---

[9] To the extent the government seeks to require compliance with "updates" to the Task Force guidance that the Office of Management and Budget Director has not approved, this raises additional issues, including the Task Force's absence of authority, the fact that delegations under 3 U.S.C. § 301 must be made to officials appointed by the President and confirmed by the Senate, and the fact that the Task Force includes officials not appointed under the Appointments Clause.

contract, comply with all guidance for contractor or subcontractor workplace locations published by" the Task Force).

### The Task Force Guidance Issued on September 24, 2021

~~96.~~101.     On September 24, 2021, the Task Force released its initial guidance to federal agencies.  Safer Federal Workforce Task Force, *COVID–19 Workplace Safety:  Guidance for Federal Contractors and Subcontractors* ("September Task Force Guidance"), *available at* https://perma.cc/2R27-9J4U (last visited Nov. 3, 2021).  The Task Force Guidance defines and delineates the contractor vaccine mandate at issue in this case.

~~97.~~102.     More specifically, the September Task Force Guidance requires federal contractors and subcontractors to mandate "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation."  *Id.* at 5.  "[C]overed contractor employees" are to be "fully vaccinated" by December 8, 2021[10]—meaning said employees must obtain the final dose of their vaccine of choice no later than November 24, 2021, as "[p]eople are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a two-dose series, or two weeks after they have received a single-dose vaccine."  *Id.* at 4.

~~98.~~103.     In a lengthy Q&A portion, which continues to add more questions and answers, the guidance makes clear that prior COVID-19 infection, even with an antibody test, does not satisfy the vaccination requirement.  *Id.* at 7–8; *see also What's*

---

[10] The date has since been updated to January 18.  *See* paragraph 125.

*New?*, Safer Federal Workforce, *available at* https://~~perma.cc/Q9LE-D4FG~~www.saferfederalworkforce.gov/ new/ (last visited Nov. ~~2~~14, 2021) (listing ~~six~~seven FAQ updates since September 24).

~~99.~~104.    Pursuant to the Order, the September Task Force Guidance imposes a deadline of October 15, 2021[11] for federal agencies to include a vaccination mandate clause in new contracts.  Task Force Guidance at 11–12.

105.   ~~The~~The September Task Force Guidance was not published in the Federal Register for public comment, did not incorporate a required 60-day comment period, and did not include a waiver from an authorized officer indicating that "urgent and compelling circumstances ma[d]e compliance with" notice and comment and the effective period impracticable, *see* 41 U.S.C. § 1707(d), or otherwise exempt from notice-and-comment, *see* 5 U.S.C. § 553(b).

106.   On November 10, 2021, the Task Force updated its guidance to now require that employees be fully vaccinated no later than January 18, 2022.  Safer Federal Workforce Task Force Workplace Safety, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* ("November Task Force Guidance") 5, *available at* https://perma.cc/VR55-XZ24 (last visited Nov. 14, 2021).

~~100.~~107.    As with the September Task Force Guidance, the November Task Force Guidance was not published in the Federal Register for public comment, did not incorporate a required 60-day comment period, and did not include a waiver from

---

[11] This date is no longer mentioned in the Task Force Guidance issued on November 10, given that the November Task Force Guidance post-dates the compliance deadline.

an authorized officer indicating that "urgent and compelling circumstances ma[d]e compliance with" notice and comment and the effective period impracticable, *see* 41 U.S.C. § 1707(d), or otherwise exempt from notice-and-comment, *see* 5 U.S.C. § 553(b).

### The Office of Management and Budget Determination on September 28, 2021

101.108.    On September 28, 2021, the Acting Director of the Office of Management and Budget published an economy and efficiency determination in the Federal Register, stating without reasoning or explanation: "I have determined that compliance by Federal contractors and subcontractors with the COVID-19 workplace safety protocols detailed in that guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." Initial OMB Determination, 86 Fed. Reg. 53,691 (Sept. 28, 2021).

102.109.    This Initial OMB Determination purports to adopt the Task Force Guidance under the President's authority pursuant to 40 U.S.C. § 101. *Id.*

103.110.    The Initial OMB Determination contained no research or data supporting it. *Id.* The Initial OMB Determination was not published for public comment, nor did it incorporate a 60-day comment period. The Initial OMB Determination alternatively failed to include either a 41 U.S.C. § 1707(d) waiver or to invoke the good-cause exception to the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(b)(3)(B).

### The FAR Council's September 30 Memorandum and Deviation Clause

28

104.111.    On September 30, 2021, the FAR Council—purportedly pursuant to section 3(a) of Executive Order 14042—issued "guidance" to government officials with responsibility for government contracting (the "FAR Council Guidance") to assist agencies in mandating contractor and subcontractor compliance with the Task Force Guidance, prior to amendment of the Federal Acquisition Regulation (FAR).[12] Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042, *available at* (Sept. 30, 2021), https://perma.cc/9BQ8-XBT6 (last visited Nov. 2, 2021).

105.112.    The FAR Council Guidance provides that "[a]gencies are encouraged to make their deviations effective until the FAR is amended or the deviation is otherwise rescinded by the agency." *Id.* at 3.

106.113.    The "deviation clause" attached to the FAR Council Guidance provides text federal contractors should use to mandate compliance with the Task Force Guidance:

> (c) *Compliance*. The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https://www.saferfederalworkforce.gov/contractors/
>
> (d) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are

---

[12] A deviation clause is a clause that is inconsistent with the Federal Acquisition Regulation.  48 C.F.R. § 1.401.  The Federal Acquisition Regulation prescribes procedures for both individual deviations and class deviations.  *Id.* at § 1.403–04.

for services, including construction, performed in whole or in part within the United States or its outlying areas.

*Id.* at 5.

~~107.~~114.      A deviation clause is a clause that is inconsistent with the FAR. FAR 1.401.   The FAR prescribes procedures for both individual deviations and class deviations.  *Id.* at 1.403–04.

~~108.~~115.      The FAR Council did not publish its guidance in the Federal Register for the purpose of receiving public comment.

~~109.~~116.      Deviations are not an appropriate manner to implement a government-wide procurement policy such as the purported "procurement" policy at issue here.  Instead, "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a [Federal Acquisition Regulation] revision." FAR 1.404.

~~110.~~117.      The deviation clause attached to the FAR Council Guidance cites Executive Order 14042 as its sole authority and contains little substantive content other than requiring contractors and subcontractors to comply with the Task Force Guidance published on the Task Force's website, even if that guidance is amended during performance of the contract.  FAR Council Guidance, 4–5.

~~111.~~118.      The FAR Council Guidance "reminds" agencies that, under Executive Order 14042, they are "required to include an implementing clause" in new contracts awarded on or after November 14, 2021, new solicitations issued on or after October 15, 2021, and options on existing contracts exercised on or after October 15, 2021.  *Id.* at 2.

~~112.~~119.      Executive Order 14042 requires the FAR Council to amend the Federal Acquisition Regulation to require all contracts subject to Executive Order 14042 include whatever guidance is or may later be imposed by the Task Force and approved by OMB.   The FAR Council "has opened a case (FAR Case 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors) to make appropriate amendments in the FAR to reflect the requirements of the order."   FAR Council Guidance at 3.

**The Office of Management and Budget Determination on November 10, 2021**

120.   In response to a plethora of lawsuits across the nation, the OMB issued a post hoc rationalization for the vaccine mandate on November 10.  *See* Post Hoc OMB Determination.  The Post Hoc OMB Determination approves the November Task Force Guidance, exercising the President's delegated authority under FPASA.

121.   The Post Hoc OMB Determination replicates the OMB's finding in its Initial OMB Determination "that compliance by Federal contractors and subcontractors with the [Task Force Guidance] . . . will promote economy and efficiency in Federal contracting by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract[.]"

122.   The Post Hoc OMB Determination invites comment but does not comply with the procedural requirements under either 41 U.S.C. § 1707 or 5 U.S.C. § 553.

123.   Instead, the Post Hoc OMB Determination is effective immediately, on the purported basis that "[u]rgent and compelling circumstances justify waiving the notice-and-comment requirement."  Despite the Post Hoc OMB Determination pushing the deadline for covered employees to be fully vaccinated by a month-and-a-half, the purported urgent and compelling circumstance for bypassing procedural requirements is that the "pandemic continues to present an imminent threat to the health and safety of the American people."

32

124.   And, although the Task Force guidance has no weight until mandated by an entity pursuant to legal authority—legal authority that comes with procedural protections—the Post Hoc OMB Determination uses the Task Force's manufactured January 18 deadline as reason for bypassing federal procedural requirements.

125.   After describing the shifting vaccine mandate created by the Task Force, including the new January 18 deadline for vaccination, the Post Hoc OMB Determination provides an "Economy-And-Efficiency Analysis."

126.   Primarily, OMB believes that existing CDC guidance, which recommends that symptomatic individuals infected with COVID-19 to isolate for ten days, could cause infected employees to miss many days of work, which could pass on costs to the Federal Government.  OMB discounts contracting inefficiencies caused by the vaccine mandate, including by dismissing the likelihood of worker shortages as "anecdotal."

**Scope of Mandates**

~~113.~~127.   The United States Department of Labor recognizes that "workers employed by federal contractors" comprise "approximately *one-fifth of the entire U.S. labor force.*"  DOL, History of Executive Order 11246, Office of Contract Compliance Programs, *available at* https://perma.cc/6ZXJ-WGR8 (last visited Nov. 2, 2021) (emphasis added).  This includes similarly large proportions of the labor force in each of the States.

~~114.~~128.   The November Task Force Guidance's definitions section highlights the contractor vaccine mandate's broad scope.

33

115.129.   "[C]overed contractor employee" refers to "any full-time or part-time employee of a covered contractor working on or *in connection with* a covered contract or working at a covered contractor workplace. *This includes employees of covered contractors who are not themselves working on or in connection with a covered contract*." November Task Force Guidance, 3–4 (emphasis added).

116.130.   "[I]n connection with" includes "[e]mployees who perform duties necessary to the performance of the covered contract, but who are not directly engaged in performing the specific work called for by the covered contract, *such as human resources, billing, and legal review*." November Task Force Guidance at 9 (follow FAQ link, then click the "Scope and Applicability of Task Force Guidance for Federal Contractors" Tab to find this definition)*Id. at 13* (emphasis added).

117.131.   A contractor or subcontractor workplace location "means a location where covered contract employees work, including a covered contractor workplace or Federal workplace." *Id.*November Task Force Guidance at 3.

118.132.   "Covered contractor workplace" "means a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is *likely* to be present during the period of performance for a covered contract. A covered contractor workplace does not include a covered contractor employee's residence." *Id.* at 4 (emphasis added).

119.133.   "[L]ocations" to which the mandate applies includes "contractor or subcontractor workplace locations that are outdoors." *Id. at 10.* November Task

34

Force Guidance at 9 (follow FAQ link, then click the "Workplaces" Tab to find this definition).

~~120.~~134.    Furthermore, "unless a covered contractor can affirmatively determine that none of its employees on another floor or in separate areas of the building will come into contact with a covered contractor employee during the period of performance," employees in other areas of the building site or facility are also a part of the covered contractor workplace.  *Id*.

~~121.~~135.    "Contact" includes "interactions" in "common areas," such as "elevators," "stairwells," "kitchens," and "parking garages."  *Id*. ~~at 11.~~

~~122.~~136.    And if an employee is working completely remotely, but working on a covered federal contract, the employee still "must comply with the vaccination requirement . . . even if the employee never works at either a covered contractor workplace or Federal workplace during the performance of the contract."  *Id*. ~~at 11.~~

~~123.~~137.    Under the November Task Force Guidance, the contractor or subcontractor is responsible for ensuring that a covered contractor employee is fully vaccinated.  The contractor or subcontractor "must review its covered employees' documentation to prove vaccination status."  ~~*Id*. at~~November Task Force Guidance, 5–6.  Specifically, the subcontractor or contractor must require covered contractor employees to show or provide their employer with one of several documents.  *Id*.

~~124.~~138.    The November Task Force Guidance "strongly encourage[s]" contractors to "incorporate similar vaccination requirements into their non-covered contracts and agreements with non-covered contractors whose employees perform

35

work at covered contractor workplaces" but are not otherwise involved with a federal contract. *Id.* at 6.

**Negative Effects of the Mandate**

~~125.~~139.      Today, citizens of Kentucky, Ohio, and Tennessee face the prospect of losing their jobs and livelihoods due to an unprecedented power grab by the Federal government.  It is hardly a choice to tell a single mother that she must be vaccinated or lose the financial resources to feed her children.

~~126.~~140.      If left in place, the mandates will result in citizens of Kentucky, Ohio, and Tennessee turning to public benefit programs for unemployment compensation, food assistance, healthcare, and basic needs.

## COUNT I

### Agency action contrary to law and in excess of authority
### (Post Hoc OMB Determination)

~~127.~~141.      Plaintiffs incorporate each of the allegations stated above herein.

~~128.~~142.      Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right."  *See* 5 U.S.C. § 706(2)(A), (C).

~~129.~~143.      The Post Hoc OMB Determination approving the Task Force Guidance is contrary to law for at least four reasons.

~~130.~~144.      First, the Post Hoc OMB Determination violates 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

36

131.145.    Executive Order 14042 apparently seeks to circumvent § 1303 by delegating the President's authority under the Federal Property and Administrative Services Act to the Office of Management and Budget Director.

132.146.    But the President has no authority to issue regulations under the Federal Property and Administrative Services Act—only the FAR Council may issue government-wide procurement regulations.  *See Centralizing Border Control Pol'y Under the Supervision of the Att'y Gen.*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

133.147.    Second, and relatedly, the Post Hoc OMB Determination is contrary to law because the Federal Property and Administrative Services Act does not grant the President the power to issue orders with the force or effect of law. Congress authorized the President only to "prescribe policies and directives that the President considers necessary to carry out" 40 U.S.C. § 121(a).

134.148.    "Policies and directives" describe the President's power to direct the exercise of procurement authority throughout the government.  It does not authorize the President to issue regulations himself.

135.149.    Congress knows how to confer that power, as it authorized the General Services Administration Administrator—in the same section of the statute—to "prescribe regulations."  *Id.* at § 121(c); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the

statute and different language in another, the court assumes different meanings were intended.").

~~136.~~150.     And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense.  *E.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

~~137.~~151.     Third, even if the Federal Property and Administrative Services Act authorized the President to issue orders with the force or effect of law, it would not authorize OMB's approval of the November Task Force Guidance.  The President appears to assume that the FPASA's prefatory statement of purpose authorizes him to issue any order that he believes promotes "an economical and efficient" procurement system.  40 U.S.C. § 101; *see* Exec. Order No. 14042, 86 Fed. Reg. at 50,985 ("This order promotes economy and efficiency in [f]ederal procurement.").  In doing so, the President mistakenly construes the prefatory purpose statement for a grant of authority.  *Dist. of Columbia v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

~~138.~~152.     And even if the FPASA did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the ~~210-word~~cursory Post Hoc OMB Determination does not adequately explain or

38

support how the Task Force Guidance actually leads to better economy and efficiency. *See* OMB Determination, 86 Fed. Reg. at 53,691–92. Moreover, Congress's charge to provide the federal government with an economic and efficient system for procurement is not a broad enough delegation to impose a national-scale vaccine mandate that it has not separately authorized. Additionally, Executive Order 14042 is divorced from the practical needs of procurement. It will exclude otherwise competitive bidders and cause contractors to suffer labor shortages.

139.153. Fourth, the Post Hoc OMB Determination is inconsistent with the requirements of the Competition in Contracting Act, which requires federal agencies to "provide for full and open competition through the use of competitive procedures." 41 U.S.C. § 3301; *see* 40 U.S.C. § 121(a) (requiring "policies" issued by the President pursuant to the Federal Property and Administrative Services Act to be "consistent with this subtitle"); *id*. at § 111 (defining "this subtitle" in 40 U.S.C. § 121(a) as to also refer to division C (except §§ 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41). The Post Hoc OMB Determination precludes an entire class of contractors from obtaining federal contracts without regard to their capability to perform the contract. That is unlawful. *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 986 (Fed. Cir. 2019) (finding invalid an agency policy that "effectively exclude[ed] an offeror from winning an award, even if that offeror represent[ed] the best value to the government").

140.154. Because the Post Hoc OMB Determination adopting the Task Force Guidance violates § 1303(a), seeks to exercise a delegated power the President

39

does not possess, and relies on a misreading of the Federal Property and Administrative Services Act, it is contrary to law.

## COUNT II

### Agency action contrary to law and in excess of authority
### (FAR Council Guidance)

141.155.     Plaintiffs incorporate each of the allegations stated above herein.

142.156.     Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

143.157.     While the FAR Council claims to be issuing only "guidance," the guidance is being "applied . . . in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).  It is therefore reviewable.

144.158.     The FAR Council Guidance does not explain what authority enables the Federal Acquisition Regulatory Council to create a government-wide procurement regulation mandating vaccines for contractors.  To the extent the FAR Council relies on the Federal Property and Administrative Services Act, it lacks that authority for the reasons described in Count I.

## COUNT III

### Failure to conduct notice and comment
### (Post Hoc OMB Determination)

145.159.     Plaintiffs incorporate each of the allegations stated above herein.

40

146.160.　　Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D).

147.161.　　Pursuant to 41 U.S.C. § 1707(a)(1),[13] a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register if it relates to the expenditure of appropriated funds and has a significant effect beyond the internal operating procedures of the issuing agency or has a significant cost or administrative impact on contractors or offerors.

148.162.　　Federal agencies will have to expend appropriated funds to compensate contractors for the increased cost of compliance with the mandates imposed by Executive Order 14042 and the Task Force Guidance.　*See* 41 U.S.C. § 1707(a)(1)(A).

149.163.　　These mandates have a significant effect beyond internal operating procedures in that they require the vaccination of millions of Americans. *See id*. at § 1707(a)(1)(B)(i).

150.164.　　These mandates also have a significant cost or administrative impact on both current contractors, future contractors, and offerors in managing the implementation of the mandates.　*See id*. § 1707(a)(1)(B)(ii).

151.165.　　Although Defendants published the Initial OMB Determination in the Federal Register, they failed to similarly publish the OMB Determination (or

---

[13] Plaintiffs invoke both 41 U.S.C. § 1707 and 5 U.S.C. § 553, *see* 5 U.S.C. § 706(2)(D), but focus on § 1707 because it is more stringent.

underlying Task Force Guidance) in the Federal Register as required by there.  *See* 41 U.S.C. § 1707.

152.166.    Moreover, Defendants failed to provide the required 60-day comment period before the Initial OMB Determination (which adopts the Task Force Guidance) became effective.

153.167.    Further, the requirements of 41 U.S.C. § 1707 were never waived with regard to these promulgated documents, nor could they be, consistent with law.

154.168.    Additionally, pursuant to 48 C.F.R. § 1.501, "significant revisions" to the Federal Acquisition Regulation must be made through notice-and-comment procedures.  But, instead of amending the Federal Acquisition Regulation, the OMB issued a purported "Notice of determination" without engaging in notice and comment.

169.    Accordingly, Defendants failed to comply with 41 U.S.C. § 1707 and 48 C.F.R. § 1.501 when issuing the Initial OMB Determination, making the imposed mandates invalid as a matter of law.

170.    On November 10, 2021, the OMB, seemingly recognizing these defects, issued its Post Hoc OMB Determination.

171.    The Post Hoc OMB Determination is set to be published in the Federal Register on November 16, 2021.

172.    The Post Hoc OMB Determination concludes that "[u]rgent and compelling circumstances justify waiving the notice-and-comment requirement for

42

this notice," at the same time that the Post Hoc OMB Determination concludes that "[it is] soliciting comment on all subjects of this determination[.]"

173.   The OMB Determination also purports to waive the 60-day delayed effectiveness requirement of § 1707(a)(1).

174.   Although the notice-and-comment and delayed-effectiveness deadlines "may be waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable[,]" *see* 28 U.S.C. § 1707(d), the Post Hoc OMB Determination does not make that showing.  This is particularly evident by the fact that, in the same breath that the Post Hoc OMB Determination concludes that "urgent and compelling circumstances . . . warrant making this determination immediately effective[,]" the Post Hoc OMB Determination also pushes back the mandate's compliance date from December 8 to January 14.

~~155.~~175.   Finally, the Post Hoc OMB Determination cannot purport to make itself temporarily effective under Section 1707(e) without validly instituting a Section 1707(d) waiver.

### COUNT IV

**Failure to conduct notice and comment**
**(FAR Council Guidance)**

~~156.~~176.   Plaintiffs incorporate each of the allegations stated above herein.

~~157.~~177.   For the same reasons discussed in Count III, the FAR Council Guidance is invalid.

~~158.~~178.    Additionally, the FAR Council issued a purported "class deviation" not only without engaging in notice and comment but also without publication in the Federal Register.

~~159.~~179.    Accordingly, Defendants failed to comply with 41 U.S.C. § 1707 and 48 C.F.R. § 1.501 when issuing the FAR Council Guidance, making the imposed mandates invalid as a matter of law.

## COUNT V

### Arbitrary and Capricious Agency Action
### (Post Hoc OMB Determination)

~~160.~~180.    Plaintiffs incorporate each of the allegations stated above herein.

~~161.~~181.    Pursuant to the Administrative Procedure Act, agency action that is "arbitrary [or] capricious" is unlawful and must be set aside by a court of competent jurisdiction.  5 U.S.C. § 706(2)(A).

~~162.~~182.    The Initial OMB Determination (and underlying Task Force Guidance) were implemented with no express findings, no explanation, and no consideration of the distinct and diverse universe of federal agencies.  ~~Such omissions evidence~~All of this evinces the pretext behind ~~their~~the promulgation and ~~the~~Defendants' unreasoned decision-making leading thereto.

~~163.~~183.    OMB failed to conduct its own independent analysis and heavily relied on the Task Force Guidance.  But the Guidance does not display reasoned ~~decisionmaking.~~decision-making.  Instead, the Guidance ignores important aspects surrounding the mandate, including but not limited to economic impacts, cost to States, cost to citizens, labor-force and supply-chain disruptions, the current risks of

44

COVID-19, and basic distinctions among workers such as those with natural immunity to COVID-19 and those who work remotely or with limited in-person contacts, among other aspects.

164.184.    Furthermore, pursuant to 48 C.F.R. § 1.402, "[u]nless precluded by law, executive order, or regulation, deviations from the [Federal Acquisition Regulation] may be granted [] when necessary to meet the specific needs and requirements of each agency."

165.185.    The Initial OMB Determination imposes universal and uniform requirements without regard to the particularized needs and circumstances of each federal agency and areis therefore arbitrary and capricious.

186.   The Again, recognizing these problems, the OMB issued its Post Hoc OMB Determination is thereforein an attempt to address them.

166.187.    Although the Post Hoc OMB Determination purports to include six pages of an "Economy-and-Efficiency Analysis," *see* Post Hoc OMB Determination at 14–20, that analysis does not address the issues previously pointed out and only further highlights the arbitrary and capricious. nature of the mandate.  Moreover, the Post Hoc OMB Determination overemphasized harm discussed in the CDC guidance, not by the status of having unvaccinated workers in the workforce, and by irrationally dismissing the harm of worker shortage.

188.   For example, the analysis makes no mention of the transmissibility of COVID–19 in outdoor settings and, in fact, concludes only that "COVID–19 is a highly communicable disease that tends to spread between people who are indoors, sharing

45

space, and in close quarters[.]"  Post Hoc OMB Determination at 16.  Yet, the FAQs on the Task Force website that the Post Hoc OMB Determination incorporates make clear that the mandate "applies to contractor or subcontractor workplace locations that are outdoors."

189.   As another example, the totality of the data that the analysis relies on for its suggestion that workers will not actually quit if faced with a vaccine mandate is data reported by three major United States companies, one of which did not indicate whether workers quit (Tyson) and one of which placed unvaccinated employees on administrative leave (Kaiser Permanente).   The Post Hoc OMB Determination does not explain why this data is an appropriate sample size of the totality of federal contractors and subcontractors.

## COUNT VI

### Arbitrary and Capricious Agency Action
### (FAR Council Guidance)

~~167.~~190.   Plaintiffs incorporate each of the allegations stated above herein.

~~168.~~191.   Pursuant to the Administrative Procedure Act, agency action that is "arbitrary [or] capricious" is unlawful and must be set aside by a court of competent jurisdiction.  5 U.S.C. § 706(2)(A).

~~169.~~192.   For the same reasons discussed in Count V, ~~specifically including ¶¶ 153–158,~~ the FAR Council Guidance, which has not been updated since its initial issuance, is invalid.

## COUNT VII

### President's *Ultra Vires* Action

170.193.    Plaintiffs incorporate each of the allegations stated above herein.

171.194.    There is a nonstatutory cause of action to challenge unlawful procurement-related actions by the President. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996).

172.195.    The purpose of the Federal Property and Administrative Services Act is to provide the Federal Government with an "economic and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. Those activities include "[p]rocuring and supplying property and nonpersonal services," use and disposal of property, and records management. *Id*.

173.196.    Congress did not contemplate or design the FPASA as a public health statute, to impose a sweeping vaccination mandate on broad swaths of the American people.

174.197.    The FPASA empowers the President to "prescribe policies and directives that [he] considers necessary to carry out [the FPASA]." 40 U.S.C. § 121(a). Those policies "*must* be consistent with" the FPASA's purpose, *i.e.*, promoting economy and efficiency in federal contracting. *Id*. at § 121(a) (emphasis added).

175.198.    The Executive Order, and resulting Task Force Guidance, Initial OMB Determination, and FAR Council Guidance, and Post Hoc OMB Determination all fail to demonstrate a nexus between a vaccine mandate and the FPASA's purpose of promoting an "economic and efficient system" for federal contracting. 40 U.S.C. § 101; *see Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (explaining that the Federal Property and Administrative Services Act is

47

violated when the President does not demonstrate a "nexus" between executive action and the FPASA's policy).

176.199.    Further, before the executive branch may regulate a major policy question of "great and economic and political significance"—such as responding to the COVID-19 pandemic—Congress must "speak clearly" to assign the authority to implement such a policy.  *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

177.200.    Executive Order 14042 exceeds the President's Federal Property and Administrative Services Act authority by directing the Task Force, without a demonstrable nexus to the FPASA's purpose, to prescribe a sweeping public health framework.

178.201.    The President lacks authority to issue Executive Order 14042.

179.202.    Because Executive Order 14042 is unlawful, the imposed mandates in the Task Force Guidance, theInitial OMB Determination, and the FAR Council Guidance, and the Post Hoc OMB Determination are unenforceable.

## COUNT VIII

### Violation of the Non-Delegation Doctrine

180.203.    Plaintiffs incorporate each of the allegations stated above herein.

181.204.    The vaccine mandates imposed by Executive Order 14042, the Task Force Guidance, theInitial OMB Determination, and the FAR Council Guidance, and the Post Hoc OMB Determination exceed congressional authority.

182.205.    To the extent Defendants argue that the imposed mandates are authorized, such authorization would constitute an improper delegation of authority.

183.206.    Pursuant to Article I, Section 1 of the United States Constitution, Congress is vested with all legislative powers.  "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

184.207.    The executive branch can only exercise its own discrete powers reserved by Article II of the United States Constitution and such power that Congress clearly authorizes through statutory command.

185.208.    Congress gives such authorization when it articulates an intelligible principle to guide the Executive that not only sanctions but also defines and cabins the delegated legislative power.

186.209.    Under the nondelegation doctrine, a general policy untethered to a delegation of legislative power is not sufficient.  For a delegation to be proper, Congress must articulate a clear principle or directive of its will within the legislative act. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).  The principle must be binding, and the delegate must be "directed to conform" to it.  *Id.*

187.210.    The nondelegation doctrine preserves and protects important tenets of our democracy, including individual liberties, federalism, and the rule of law.

188.211.    The broad sweeping actions of the President, OMB Director, Task Force, and the FAR Council to impose a vaccine mandate are not supported by an

49

explicit statutory directive within the Federal Property and Administrative Services Act or any other federal law.

189.212.    Congress did not articulate clear or sufficient instructions in the Federal Property and Administrative Services Act directing the President to implement this public health policy scheme by executive order.  Even if Congress did clearly authorize a national vaccination schedule for federal contractors, it did not give sufficiently clear instructions to permit the President to delegate legislative judgment to the Task Force or the OMB Director.

190.213.    Under the nondelegation doctrine, the imposed mandates are unconstitutional because Congress did not articulate a clear principle by legislative act that directs the Executive to take sweeping action that infringes on state and individual rights.  A delegation sanctioning the broad and intrusive executive action at issue here cannot be sustained without clear and meaningful legislative guidance, especially given the important individual rights and separation-of-powers and federalism concerns implicated.

191.    The imposed mandates implicate the very issues of federalism that the nondelegation doctrine seeks to prevent.  Public health and the regulation of inoculation regimes are traditional state functions.  When the federal government intrudes on a traditional state function, it must clearly articulate the scope of the intrusion and rationale behind its unprecedented action, which it has not done here.

192.214.    Here, the Executive Order cuts deeply into the Plaintiff States' sphere of power without articulating the underlying reasons or providing a

50

justification beyond a superficial, unsupported, and pretextual reference to efficiency and economy in federal contracts.

193.215.    Without *explicit* congressional authorization, the President's Executive Order 14042 and its implementation to create a vaccine mandate for federal contractor employees is unconstitutional.

## COUNT IX

### Violation of Separation of Powers and Federalism

194.216.    Plaintiffs incorporate each of the allegations stated above herein.

195.217.    The imposed mandates are legislative actions, having the effect of a generally applicable, binding rule governing private conduct.

196.218.    Pursuant to Article I, Section 1 of the United States Constitution, Congress is vested with all legislative powers, but Congress must act pursuant to the enumerated powers granted to it by Article I.

197.219.    Pursuant to Article I, Section 8 of the United States Constitution, the Necessary and Proper Clause gives Congress the authority "to make all Laws which shall be necessary and proper for carrying into Execution" its general powers. It does not "license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (citation omitted).

198.220.    Defendants, through the imposed mandates, have exercised power far beyond what was delegated to the federal government by constitutional mandate or congressional action.  It is not a "proper" exercise of Congress' authority

51

to mandate that everyone who touches a federal contractor has to be vaccinated because the action here exceeds any Article I enumerated power.

~~199.~~221.    Pursuant to the Tenth Amendment of the United States Constitution, the powers not delegated by the Constitution to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

~~200.~~222.    The U.S. Constitution does not authorize the federal agencies of the executive branch to implement the imposed mandates.  This is a police power left to the States under the Tenth Amendment.  U.S. Const. amend X.

~~201.~~223.    By interfering with the traditional balance of power between the States and the federal government, and by acting pursuant to ultra vires federal action, Defendants violated the Constitution.

## COUNT X

### Unconstitutional Exercise of the Spending Power

~~202.~~224.    Plaintiffs incorporate each of the allegations stated above herein.

~~203.~~225.    The imposed mandates are an unconstitutional condition on the States' receipt (by and through their agencies and political subdivisions who are federal contractors) of federal funds.

~~204.~~226.    Federal contracts are an exercise of the Spending Clause, U.S. Const. art. I, § 8, cl. 1, yet the challenged actions ask the States to agree to an ambiguous contract term—specifically, agreeing to comply with imposed mandates that can be changed at any time.

205.227.    Because the imposed mandates, on information and belief, will lead to employees either being fired or resigning, it is not rationally related to any federal interest in a particular project or program that is the subject of a federal contract.

206.228.    Additionally, because the imposed mandates cover employees who have no connection to the federal contract beyond just being coworkers with an employee who works on such a contract and being likely to come into contact with them, the mandates are not rationally related to any federal interest in a particular project or program that is the subject of a federal contract.

207.229.    And as described above, the mandates are prohibited by other constitutional provisions.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully ask this Court to:

A.    Enter a declaratory judgment that Defendants, individually and collectively, have imposes a sweeping, unlawful, and unconstitutional COVID-19 vaccine mandate on federal contractors, subcontractors, and their employees.

B.    Enter a declaratory judgment that the vaccine mandate on federal contractors, subcontractors, and their employees is unlawful and therefore null and void *ab initio*.

C.    Hold unlawful and set aside the Executive Order, theInitial OMB Determination, and the FAR Council Guidance, and Post Hoc OMB Determination.

D.      Grant a temporary, preliminary, and permanent injunction prohibiting Defendants and those acting in concert with them from enforcing this sweeping, unlawful, and unconstitutional mandate on any federal contracting agency, subcontractor, and employees within the Commonwealth of Kentucky, the State of Ohio, and the State of Tennessee or with respect to any of its citizens.

E.      Grant a temporary, preliminary, and permanent injunction prohibiting Defendants and those acting in concert with them from enforcing this sweeping, unlawful, and unconstitutional mandate on any federal contracting agency, subcontractor, and employees anywhere in the United States.

F.      Award any other relief to which Plaintiffs might be entitled.

Dated: November 15, 2021

Respectfully Submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

/s/ Christopher L. Thacker
Barry L. Dunn (KBA No. 93787)
Christopher L. Thacker (KBA No. 91424)
Heather L. Becker (KBA No. 94360)
Jeremy L. Sylvester (KBA No. 92771)
Alexander Y. Magera (KBA No. 97708, *admission application* ~~*forthcoming*~~*submitted*)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Christopher.Thacker@ky.gov
Heather.Becker@ky.gov
Jeremy.Sylvester@ky.gov
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*

**Dave Yost**
**ATTORNEY GENERAL**

/s/ Benjamin M. Flowers
Benjamin M. Flowers (*pro hac vice application forthcoming*)
Carol O'Brien (*pro hac vice application forthcoming*)
May Davis (*pro hac vice application forthcoming*)
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-4986
bflowers@OhioAGO.gov

*Counsel for the State of Ohio, Fredrick W. Stevens, and Scott A. Hildenbrand*

55

James R. Flaiz (*pro hac vice application forthcoming*)
Prosecuting Attorney
Geauga County Prosecutor's Office
231 Main St., 3rd Floor
Chardon, OH 44024
Phone:  (440) 279-2100

*Counsel for Scott A. Hildenbrand*

**Herbert H. Slatery III
ATTORNEY GENERAL**

/s/ Herbert H. Slatery III
     Attorney General and Reporter
/s/ Brandon J. Smith
Dianna B. Shew (*pro hac vice application forthcoming*)
Brandon J. Smith (*pro hac vice application forthcoming*)
Office of the Attorney General
and Reporter
P.O. Box. 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-4081
dianna.shew@ag.tn.gov
brandon.smith@ag.tn.gov

*Counsel for State of Tennessee*

## CERTIFICATE OF SERVICE

     I certify that on November 15, 2021, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record for:

Kiran Ahuja
United States Office of Personnel Management
1900 E Street, NW
Washington, D.C. 20415

Randolph D. Alles
Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

National Aeronautics and Space Administration
Mary W. Jackson NASA Headquarters
300 E Street, SW
Washington, D.C. 20546

National Institutes of Health
9000 Rockville Pike
Bethesda, MD 20892

Office of Management and Budget

William W. Beach
Bureau of Labor Statistics
Postal Square Building
2 Massachusetts Avenue, NE
Washington, D.C. 20212

President Joseph R. Biden, Jr.
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Bureau of Labor Statistics
Postal Square Building
2 Massachusetts Avenue, NE
Washington, D.C. 20212

Robin Carnahan
General Services Administration
1800 F Street, NW
Washington, D.C. 20405

Francis S. Collins
National Institutes of Health
One Center Drive
Bethesda, MD 20892

Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

Deanne Criswell
Federal Emergency Management
Agency
500 C Street, SW
Room 828
Washington, D.C. 20472

SERVE: Civil Process Clerk
U.S. Attorney's Office for the Eastern
District of Kentucky
260 West Vine Street
Suite 300
Lexington, KY 40507

The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

United States Office of Personnel
Management
1900 E Street, NW
Washington, D.C. 20415

L. Eric Patterson
Federal Protective Service
800 North Capitol Street, NW
Suite 500
Washington, D.C. 20002

Safer Federal Workforce Task Force
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

United States of America
Attn: President Joseph R. Biden, Jr.
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

SERVE: Merrick Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Rochelle Walensky
Centers for Disease Control and
Prevention
1600 Clifton Road, NE
Room 5127
Atlanta, GA 30333

Janet Woodcock
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Federal Acquisition Regulatory Council
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Peter A. Feldman
Consumer Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

Lesley A. Field
Office of Management and Budget
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

General Services Administration
1800 F Street, NW
Washington, D.C. 20405

Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

Shalanda Young
Office of Management and Budget
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Jeffrey Zients
Safer Federal Workforce Task Force
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Tae D. Johnson
Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536

Jeffrey A. Koses
General Services Administration
1800 F Street, NW
Washington, D.C. 20405

James M. Murray
United States Secret Service
245 Murray Drive, SW
Washington, D.C. 20223

Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536

/s/ Christopher L. Thacker
*Counsel for the Commonwealth*