**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**
***Electronically Filed***

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, *et al.*, | |
| Plaintiffs, | Civil No. 3:21-cv-00055-GFVT |
| v. | |
| JOSEPH R. BIDEN, *et al.*, | |
| Defendants. | |

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**</u>
<u>**FOR A PRELIMINARY INJUNCTION**</u>

**<u>TABLE OF CONTENTS</u>**

BACKGROUND ............................................................................................................2

I.     The COVID-19 Pandemic ..............................................................................2

II.    Vaccine Requirements for Federal Contractors..............................................3

III.   Procedural History .........................................................................................4

ARGUMENT ...............................................................................................................5

I.     Plaintiffs Are Not Entitled to Preliminary Relief Because They Have Failed to Establish a Strong Likelihood of Standing. ...................................................5

II.    Plaintiffs Are Unlikely To Succeed On The Merits.......................................8

      A.    Plaintiffs Are Not Likely To Show That The President Lacks Authority To Regulate Federal Government Contracting.......................................8

      B.    The President's Power Is Within The Scope Of the Procurement Act. ...........10

      C.    The Mandate Does Not Violate The Competition In Contracting Act. ............12

      D.    Plaintiff's Challenges To The OMB Determination Are Not Justiciable.........12

      E.    OMB's Determination Is Not Arbitrary And Capricious .................................13

      F.    Challenges To The FAR Memo Are Likewise Not Likely To Succeed. ............17

      G.    Plaintiffs' Constitutional Claims Are Meritless. ...................................................18

            1.    The challenged actions do not violate the Tenth Amendment.................................................................................18

            2.    The challenged actions do not violate the Spending Clause.................21

            3.    The challenged actions do not violate the nondelegation doctrine. ..................................................................................23

III.   Plaintiffs Are Not Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief.........................................................................................25

IV.   The Requested Preliminary Relief Is Contrary To The Public Interest.........29

CONCLUSION ..........................................................................................................31

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ................................................................. 27

*ACLU of Ky. v. McCreary Cnty.,*
    354 F.3d 438 (6th Cir. 2003), *aff'd*, 545 U.S. 844 (2005) ................................. 5, 26

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ................................................................... 6

*AFGE v. Carmen,*
    669 F.2d 815 (D.C. Cir. 1981) ........................................................... 9

*AFL-CIO v. Kahn,*
    618 F.2d 784 (D.C. Cir. 1979) ................................................... *passim*

*Air Trans. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
    840 F. Supp. 2d 327 (D.D.C. 2012) ..................................................... 29

*Akiachak Native Community v. U.S. Dep't of Interior,*
    827 F.3d 100 (D.C. Cir. 2016) ......................................................... 12

*Am. Petroleum Inst. v. Jorling,*
    710 F. Supp. 421 (N.D.N.Y. 1989) ..................................................... 27

*Am.'s Frontline Drs. v. Wilcox,*
    No. EDCV 21-1243, 2021 WL 4546923 (C.D. Cal. July 30, 2021) ...................... 30

*Anselma Crossing, L.P. v. USPS,*
    637 F.3d, 238 (3d Cir. 2011) ........................................................... 28

*Arbitraje Casa de Cambio, S.A. de CV. v. United States,*
    79 Fed. Cl. 235 (Fed. Cl. 2007) ........................................................ 22

*Bennett v. Ky. Dep't of Educ.,*
    470 U.S. 656 (1985) ................................................................... 23

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................... 17

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ................................................................................ 22

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014) .................................................................................... 21

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021), *petition for cert. filed*, No. 21-380 (U.S. Sept. 8, 2021) ........ 20

*Brown v. Gilmore,*
  533 U.S. 1301 (2001) ............................................................................................... 31

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................................. 16

*Cardinal Health Inc. v. Holder,*
  846 F. Supp. 2d 203 (D.D.C. 2012) ........................................................................ 29

*Case v. Bowles,*
  327 U.S. 92 (1946) ................................................................................................... 20

*Chamber of Com. of U.S. v. Napolitano,*
  648 F. Supp. 2d 726 (D. Md. 2009) ................................................................... 9, 11

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................................ 9, 11

*City of Albuquerque v. U.S. Dep't of Interior,*
  379 F.3d 901 (10th Cir. 2004) ............................................................................ 9, 25

*Clearwater Constructors, Inc. v. United States,*
  56 Fed. Cl. 303 (Fed. Cl. 2003) ............................................................................... 29

*Commonwealth of Ky., Dep't of Hum. Resources v. Donovan,*
  704 F.2d 288 (6th Cir. 1983) ............................................................................ 22, 23

*D.T. v. Sumner Cnty.,*
  *Schs.*, 942 F.3d 324 (6th Cir. 2019) ......................................................................... 26

*Dalton v. Specter,*
  511 U.S. 462 (1994) ................................................................................................. 13

iii

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ........................................................................................ 10

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) .......................................................................................... 7

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) .................................................................................... 16

*Detroit Int'l Bridge Co. v. Canada,*
   189 F. Supp. 3d 85 (D.D.C. 2016) .................................................................. 13

*Dickson v. Sec'y of Def.,*
   68 F.3d 1396 (D.C. Cir. 1995) ........................................................................ 14

*Distributed Sols., Inc. v. United States,*
   539 F.3d 1340 (Fed. Cir. 2008) ...................................................................... 29

*Doe v Univ. of Cincinnati,*
   872 F.3d 393 (6th Cir. 2017) .......................................................................... 26

*Elrod v. Burns,*
   427 U.S. 347 (1976) ........................................................................................ 26

*Farkas v. Tex. Instrument, Inc.,*
   375 F.2d 629 (5th Cir. 1967) ............................................................................ 8

*Farmer v. Phila. Elec. Co.,*
   329 F.2d 3 (3d Cir. 1964) ................................................................................. 8

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) .................................................................................... 14

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ........................................................................................ 13

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ........................................................................................ 19

*GEO Grp., Inc. v. City of Tacoma,*
   No. 3:18-cv-05233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019) ................................ 21

*Gill v. Whitford*,
　　138 S. Ct. 1916 (2018) ................................................................. 31

*Gundy v. United States*,
　　139 S. Ct. 2116 (2019) ............................................................. 23, 24

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
　　452 U.S. 264 (1981) ................................................................ 20, 27

*In re Nat'l Sec. Agency Telecomms. Recs. Litig.*,
　　671 F.3d 881 (9th Cir. 2011) ........................................................ 24

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
　　448 U.S. 607 (1980) ................................................................... 24

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
　　849 F.3d 1129 (D.C. Cir. 2017) ..................................................... 26

*Kentucky v. Yellen*,
　　---F. Supp. 3d---, 2021 WL 4394249 (E.D. Ky. Sept. 24, 2021) ........................ 31

*Klayman v. President of the U.S.*,
　　689 F. App'x 921 (11th Cir. 2017) .................................................. 17

*Ky. Waterways All. v. Johnson*,
　　540 F.3d 466 (6th Cir. 2008) ....................................................... 14

*Lance v. Coffman*,
　　549 U.S. 437 (2007) .................................................................. 5

*Liberty Mut. Ins. Co. v. Friedman*,
　　639 F.2d 164 (4th Cir. 1981) ..................................................... 9, 10

*Live 365, Inc. v. Copyright Royalty Bd.*,
　　698 F. Supp. 2d 25 (D.D.C. 2010) ................................................... 27

*Lujan v. Defs. of Wildlife*,
　　504 U.S. 555 (1992) ................................................................ 6, 8

*Maryland v. King*,
　　567 U.S. 1301 (2012) ................................................................ 27

*Maryland v. Wirtz,*
   392 U.S. 183 (1968) ........................................................................................... 20

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ..................................................................... 22, 23

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ............................................................................................. 5

*McKay v. Federspiel,*
   823 F.3d 862 (6th Cir. 2016) ............................................................................... 7

*M'Culloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ......................................................................... 20

*Memphis A. Philip Randolph Inst. v. Hargett,*
   978 F.3d 378 (6th Cir. 2020) ............................................................................. 26

*Memphis A. Phillip Randolph Inst. v. Hargett,*
   2 F.4th 548 (6th Cir. 2021) ................................................................................. 8

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,*
   945 F.2d 150 (6th Cir. 1991) ....................................................................... 26, 28

*Mistretta v. United States,*
   488 U.S. 361 (1989) ............................................................................... 23, 24, 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................. 14

*Munaf v. Geren,*
   553 U.S. 674 (2008) ............................................................................................. 5

*N.Y. Cent. Secs. Corp. v. United States,*
   287 U.S. 12 (1932) ............................................................................................. 24

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,*
   545 F. Supp. 2d 363 (S.D.N.Y. 2008), *rev'd on other grounds,*
   556 F.3d 114 (2d Cir. 2009) ............................................................................. 26

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) ........................................................................................... 14

*Nat'l Broad. Co. v. United States,*
    319 U.S. 190 (1943) ................................................................................ 24

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ................................................................................ 21

*Nat'l Gov't Servs., Inc. v. United States,*
    923 F.3d 977 (Fed. Cir. 2019) ............................................................... 12

*Newspaper Ass'n of Am. v. Postal Regul. Comm'n,*
    734 F.3d 1208 (D.C. Cir. 2013) ............................................................. 15

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................ 19

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................... 30, 31

*NRDC v. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ...................................................... 13

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ................................................................. 26

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ........................................................................ 21, 22, 23

*Perkins v. Lukens Steel Co.,*
    310 U.S. 113 (1940) .................................................................................. 2

*Pub. Serv. Co. of N.H. v. Town of W. Newbury,*
    835 F.2d 380 (1st Cir. 1987) .................................................................. 27

*Raines v. Byrd,*
    521 U.S. 811 (1997) .................................................................................. 6

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ............................................................................... 30

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) ............................................................. 15

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ................................................................................. 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007) ................................................................................... 2

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
    576 U.S. 519 (2015) ................................................................................. 10

*Thompson v. DeWine,*
    976 F.3d 610 (6th Cir. 2020) .............................................................. 5, 27

*Tigges v. Northam,*
    473 F. Supp. 3d 559 (E.D. Va. 2020) ..................................................... 30

*TJM 64, Inc. v. Harris,*
    475 F. Supp. 3d 828 (W.D. Tenn. 2020) ................................................ 30

*Touby v. United States,*
    500 U.S. 160 (1991) ................................................................................. 25

*Town of Chester v. Laroe Ests., Inc.,*
    137 S. Ct. 1645 (2017) ............................................................................... 7

*Town of Johnston v. Fed. Hous. Fin. Agency,*
    765 F.3d 80 (1st Cir. 2014) ..................................................................... 19

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ............................................................................. 31

*UAW-Lab. Emp. & Training Corp. v. Chao,*
    325 F.3d 360 (D.C. Cir. 2003) ............................................................. 9, 11

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) .................................................................. 20

*United States v. Comstock,*
    560 U.S. 126 (2010) ................................................................................. 19

*United States v. Mikhel,*
    889 F.3d 1003 (9th Cir. 2018) ................................................................ 19

*Wachovia Bank v. Watters*,
    431 F.3d 556 (6th Cir. 2005), *aff'd*, 550 U.S. 1 (2007) ........................................................... 19

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) ................................................................................ 5, 7, 8

*Weisshaus v. Cuomo*,
    512 F. Supp. 3d 379 (E.D.N.Y. 2021) ................................................................................ 27

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................ 24, 25

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 28

*Yakus v. United States*,
    321 U.S. 414 (1944) ................................................................................ 25

## **STATUTES**

3 U.S.C. § 301 ................................................................................ 13

5 U.S.C. § 553 ................................................................................ 13, 17

28 U.S.C. § 1491 ................................................................................ 28, 29

40 U.S.C. § 101 ................................................................................ 24

40 U.S.C. § 121 ................................................................................ 8, 9, 24

40 U.S.C. § 486 (2000) ................................................................................ 9

41 U.S.C. § 121 ................................................................................ 13

41 U.S.C. § 133 ................................................................................ 13

41 U.S.C. § 1303 ................................................................................ 18

41 U.S.C. § 1707 ................................................................................ 13, 14

41 U.S.C. § 3301 ................................................................................ 12

41 U.S.C. §§ 7101–7109 ................................................................................ 28

Pub. L. No. 99-500,
    100 Stat. 1783 (1986) ............................................................. 10

Pub. L. No. 99-591,
    100 Stat. 3341 (1986) ............................................................. 10

Pub. L. No. 104-208,
    110 Stat. 3009 (1996) ............................................................. 10

Pub. L. No. 107-217,
    116 Stat. 1062 (2002) ............................................................. 10

**REGULATIONS**

85 Fed. Reg. 15,337 (Mar. 13, 2020) .......................................... 2

Exec. Order No. 12,072,
    43 Fed. Reg. 36,869 (Aug. 16, 1978) .................................... 10

Exec. Order No. 13,465,
    73 Fed. Reg. 33,285 (June 11, 2005) .................................... 10

Exec. Order No. 13,950,
    85 Fed. Reg. 60,683 (Sept. 28, 2020) ................................... 10

Exec. Order No. 14,042,
    86 Fed. Reg. 50,985 (Sept. 14, 2021) ............................... *passim*

Exec. Order No. 14,043,
    86 Fed. Reg. 50,989 (Sept. 14, 2021) ..................................... 3

**U.S. CONSTITUTION**

U.S. Const. amend. X ................................................................. 18

**OTHER AUTHORITIES**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012) ............... 10

CDC Covid Data Tracker, as of Nov. 13, 2021,
    https://perma.cc/J7VW-7H8M ............................................. 3

Centers for Disease Control and Prevention ("CDC"), *Delta Variant*
(updated Aug. 26, 2021),
https://perma.cc/4RW6-7SGB ............................................................................ 2

Chris Isidore & Virginia Langmaid, *72% of unvaccinated workers vow to quit if ordered
to get vaccinated*, CNN (Oct. 28, 2021),
https://perma.cc/7JMV-SULY ........................................................................... 15

Determination of the Acting OMB Director Regarding the Revised Safer Federal Work-
force Task Force Guidance for Federal Contractors and the Revised
Economy & Efficiency Analysis,
http://federalregister.gov/d/2021-24949 ...................................................... *passim*

HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020),
https://perma.cc/VZ5X-CT5R ........................................................................... 2

https://perma.cc/CL8P-YV5B .............................................................................. 3

https://www.federalregister.gov/public-inspection/2021-24949/determination-
regarding -the-revised-safer-federal-workforce-task-force-guidance-for-federal ........ 28

Memo. from FAR Council to Chief Acquisition Officers, et al., re: Issuance of Agency
Deviations to Implement Executive Order 14042 (Sept. 30, 2021),
https://perma.cc/9BQ8-XBT6 ............................................................. 4, 8, 17, 18

Open FAR Cases,
https://perma.cc/P84M-3XUY .............................................................................. 4

Pandemic Response Accountability Committee, Top Challenges Facing Federal
Agencies (June 2020),
https://perma.cc/GGF4-F4FV ............................................................................. 30

Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors
and Subcontractors,
https://perma.cc/6DRV-LV2Q ............................................................................. 3

Plaintiff States—Kentucky, Ohio, Tennessee—and two Ohio sheriffs have sued the President, the United States, and more than two dozen federal agencies and officials. Plaintiffs challenge Executive Order 14042, which directs certain types of federal government contracts to include a clause requiring certain COVID safety protocols— including vaccination requirements—in "any new contract," "new solicitation for a contract," "extension or renewal of an existing contract," and "exercise of an option on an existing contract."  Executive Order 14042, 86 FR 50985 (Sept. 14, 2021) ("Executive Order" or "EO").

Plaintiffs ask this Court to exercise its extraordinary emergency powers to enjoin this EO across the country—even outside the boundaries of the Plaintiff States.  *See* Motion for TRO and Preliminary Injunction, ECF No. 12 ("Mot."); Proposed Order ECF No. 12-5.  But Plaintiffs have failed to show how they have been harmed at all, much less that they face irreparable harm.  Plaintiffs provide no evidence that they are parties to a federal contract that already has this clause, or parties to an existing covered contract that is up for an option, extension, or renewal that will include the challenged clause.  Nor do Plaintiffs identify any covered solicitations they plan to bid on or covered contracts they plan to enter into in the immediate future.  For these reasons alone, Plaintiffs' motion should be denied.

Even if this Court reaches the merits, it should reject Plaintiffs' argument that the President has no power to direct federal contracting—an argument that conflicts with more than 50 years of precedent.  Additionally, their procedural arguments are meritless and now are moot because the Director of the Office of Management and Budget has superseded her prior Notice with a revised document that solicits public comments.  And the constitutional claims raised by Plaintiffs have been considered and rejected by courts many times over.

When COVID-19 first emerged in the United States, it ravaged the economy and devastated government contractors.   No less than private entities, the federal

government's operations suffered when its contractors' employees became sick and died from COVID-19.   Safe and effective vaccines provide the promise that the federal government and its contractors can resume full operations.   The Federal Government has therefore made a decision to require those with whom it contracts to take precautions to prevent the spread of this virulent, contagious disease.   "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."   *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). "Those wishing to do business with the Government must meet the Government's terms; others need not."   *AFL-CIO v. Kahn*, 618 F.2d 784, 794 (D.C. Cir. 1979) (en banc).   The Court should reject Plaintiffs' request to impose their novel view of the ability of the Federal Government to set the terms of its own contracts.

## BACKGROUND

### I.     The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency because of COVID-19, a respiratory disease caused by the novel coronavirus, SARS-CoV-2.   HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R.   On March 13, 2020, the President declared the COVID-19 outbreak a national emergency.   85 FR 15,337 (Mar. 13, 2020).   In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 cases and hospitalization rates," driven by an especially contagious strain.   *See* Centers for Disease Control and Prevention ("CDC"), *Delta Variant* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1]   To date, more than 46 million Americans have been infected with COVID-19 and more than 759,000 have died from COVID-19.   CDC Covid

---

[1] The Court may take judicial notice of factual information available on government websites.   *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

Data Tracker, as of Nov. 13, 2021, https://perma.cc/J7VW-7H8M

## II.      Vaccine Requirements for Federal Contractors

On September 9, the President acting as CEO of the federal government, issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument."  EO 14042.  He determined that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."  *Id*.  And he directed the Safer Federal Workforce Task Force ("Task Force") to issue guidance.  EO 14043, 86 FR 50, 989, 50,990 (Sept. 14, 2021).

EO 14042 directs federal executive departments and agencies, "to the extent permitted by law," to include a clause requiring compliance with workplace safety guidance issued by the Task Force that is approved by the Director of the Office of Management and Budget ("OMB"), after a finding that the guidance, "if adhered to by contractors or subcontractors, will promote economy and efficiency in Federal contracting."  86 FR at 50,985; *see also id*. at 50,986-50,987.

The Task Force issued safety guidance on September 24, 2021.  Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, https://perma.cc/6DRV-LV2Q ("Contractor Guidance").  That guidance, which OMB approved, requires that covered contractor and subcontractor employees should receive a COVID-19 vaccination, except insofar as any such employee is legally entitled to an accommodation.  https://perma.cc/CL8P-YV5B ("Old OMB Determination").

The EO directs the Federal Acquisition Regulatory Council ("FAR Council") to make corresponding amendments to the Federal Acquisition Regulation ("FAR") and in the interim to issue guidance on how to use existing agency authority to include the new

provision in covered contracts.  86 FR at 50,986.  The FAR Council issued initial guidance on September 30, 2021, which provided a sample clause that agencies could use to implement the EO in new contracts and solicitations.  Memo. from FAR Council to Chief Acquisition Officers, et al., re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021),  https://perma.cc/9BQ8-XBT6 ("FAR Memo"). *See also* Open FAR Cases, https://perma.cc/P84M-3XUY (No. 2021-21 relates to FAR Rulemaking).

On November 10, 2021, the OMB Director issued a revised Determination which revoked the prior OMB Determination, gave covered contractors additional time to comply with the EO's vaccination requirements, and provided a more detailed analysis of how the Contractor Guidance would promote economy and efficiency in government contracting.  *See* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, available at: http://federalregister.gov/d/2021-24949 (Nov. 16, 2021) ("New OMB Determination").  The updated Determination provides that as of January 18, 2022, covered contractor employees must be vaccinated on the first day of a new covered contract or when there is a renewal, extension, or exercised option on an existing one.  *Id*.  The New OMB Determination is effective as of November 10, 2021, and provides for a public comment period through December 16, 2021.  *Id.*

## III.   Procedural History

On November 4, 2021, Plaintiffs filed this lawsuit.  *See* Compl., ECF No. 1.  Their complaint contains ten counts challenging EO 14042, the OMB Director's now-superseded determination, and the FAR Council's guidance.  *See id.*, ¶¶ 127–207.  On November 8, 2021 (before the New OMB Determination), Plaintiffs filed a motion for a TRO and a preliminary injunction.  *See generally* Mot.  The next day, the Court held a telephonic status conference with the parties and set a briefing schedule on the motion. *See* ECF No. 16.  Defendants now submit this brief opposing Plaintiffs' pending motion.

**ARGUMENT**

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 444 (6th Cir. 2003) (citation omitted), *aff'd*, 545 U.S. 844 (2005). "A preliminary injunction is . . . never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). And one "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Thompson v. DeWine*, 976 F.3d 610, 615 (6th Cir. 2020) (citation omitted).

**I.     Plaintiffs Are Not Entitled to Preliminary Relief Because They Have Failed to Establish a Strong Likelihood of Standing.**

The Court lacks subject-matter jurisdiction over this case because Plaintiffs have not established standing to bring their claims. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam). Plaintiffs bear the burden of demonstrating standing "'for each claim [they] seek[] to press' *and* 'for each form of relief sought.'" *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018) (citation omitted).

The "irreducible constitutional minimum of standing contains three elements": (1) an "injury in fact—an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted). And where, as here, "reaching the merits of [a] dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous."

*Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Plaintiffs have made no serious effort to carry their "especially rigorous" burden: claims about the potential loss of unnamed contracts or harm from hypothetical loss of potential tax revenue does not even begin to satisfy their burden to "clearly show" a concrete, particularized, and imminent injury that can be traced to the Order and is likely to be redressable by a favorable decision. When a claim involves a challenge to a future contracting opportunity, the pertinent question is whether Plaintiffs "ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995).

Plaintiffs fail to demonstrate that any state agency or subdivision is currently (or will soon be) subject to such a mandate. Plaintiffs identify five contracts between the federal government and a state agency or subdivision, each providing for the housing of federal detainees at county jails or sheriff's offices on behalf of either Immigration and Customs Enforcement ("ICE") or the U.S. Marshals Service. *See* Decl. of Fredrick W. Stevens ("Stevens Decl."), ¶ 2, Ex. A at 1, ECF No. 12-2; Decl. of Scott A. Hildenbrand ("Hildenbrand Decl."), Ex. A, ECF No. 12-3 at 7, 20; Decl. of Victor B. Maddox ("Maddox Decl."), ¶ 6, Ex. A–C, ECF No. 12–4. Yet none of these contracts are "covered contracts"— *i.e.*, a contract that includes a clause requiring compliance with OMB-approved Task Force Guidance. *See* 86 FR at 63419; *see also* EO 14042, § 2(a).

Nor do Plaintiffs provide any indication that these contracts will soon be amended to include such a requirement. While ICE and the U.S. Marshals Service are "strongly encouraged" under EO 14042 to incorporate the Task Force's COVID-19 safety protocols into "existing contracts," they can only do so "to the extent permitted by law." *See* EO 14042, § 6(c). The contracts that Plaintiffs identify can be amended only upon the mutual, written agreement of the parties. *See* Stevens Decl., Ex. A at 8; Hildebrand Decl., Ex. A at 12, 25; Maddox Decl., Ex. A at 11, Ex. B at 11, Ex. C at 11. There is no indication that the U.S. Marshals Service has made a request to amend its contracts to incorporate a COVID-

19 safety clause.  ICE has, however, requested that the Seneca County Jail, in Tiffin, Ohio, agree to a *bilateral* modification that implements EO 14042 and requires compliance with Task Force Guidance.[2]  *See* Decl. of Natalie Carr, ¶ 2, Exs. 1–2.  But because this bilateral modification would only be effective upon Seneca's approval, if Seneca refuses ICE's request, its contract will not be subject to the "federal contractor vaccine mandate" that it seeks to preliminarily enjoin.  Asking to change a contract term is not a cognizable harm.

This failure of proof is fatal to Plaintiffs' motion.  "[W]here a plaintiff moves for a preliminary injunction, [a] district court . . . should normally evaluate standing under the heightened standard for evaluating a motion for summary judgment," *Waskul*, 900 F.3d at 255 n.3 (internal quotation marks and citation omitted)—that is, by requiring the plaintiff to support their allegations of standing "by affidavit or other evidence," *see McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (citation omitted).  Failure "to establish a substantial likelihood of standing *requires* denial of [a] motion for preliminary injunction." *Waskul*, 900 F.3d at 255 n.3; *accord id.* at 256 n.4.

Plaintiffs also lack standing to challenge the FAR Memo because they fail to explain how enjoining the FAR Memo would redress any injury.  As the Supreme Court has made clear, "standing is not dispensed in gross."  *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.* (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). The President instructed agencies and contracting officers to include certain provisions in new contracts.  EO § 2. The FAR Memo suggests a sample clause that agencies and contracting officers might use to implement the Executive Order.  Far Memo at 4.  Agencies have the authority to include a verbatim clause in contracts and solicitations even without the FAR Memo.

---

[2] This request for a bilateral modification also complies with DHS's own policy for implementing EO 14042.  *See* Decl. of Natalie Carr, ¶ 3, Ex. 3.

Plaintiffs may have standing to challenge the inclusion of a COVID-19 safety clause in some future contract or bid.  But because Plaintiffs have not shown an injury that is "actual and imminent," and not merely "conjectural or hypothetical," *see Lujan*, 504 U.S. at 560, Plaintiffs are "not entitled to a preliminary injunction," and their motion should therefore be denied, *see Waskul*, 900 F.3d at 256 n.4.; *accord Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021).

**II.    Plaintiffs Are Unlikely To Succeed On The Merits.**

**A.    Plaintiffs Are Not Likely To Show That The President Lacks Authority To Regulate Federal Government Contracting.**

Plaintiffs argue that the President lacks authority to issue binding guidance for government contracts.  Mot. at 16–19.  This argument ignores that Congress specifically authorized the President to manage federal procurement in the Federal Property and Administrative Services Act (FPASA).  40 U.S.C. § 121(a).  While Plaintiffs claim that FPASA does not grant the President such authority, they cite no opinions interpreting FPASA in the novel manner they are proposing.  Indeed, Plaintiffs' position ignores more than a half century of precedent from all three branches of our constitutional system.

Since the 1960s, federal appellate courts have routinely held that FPASA authorizes the President to manage government contracting through executive orders. *See, e.g.*, *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967).  Courts have concluded, for example, that FPASA authorizes the President to require government contractors to comply with wage and price controls, *Khan*, 618 F.2d 784, to post notices at all of their facilities informing employees that they cannot be forced to join a union or to pay mandatory dues for costs unrelated to representational activities, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003), and to require contractors to confirm employee's immigration status through e-Verify, *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 729 (D. Md. 2009).  *See also City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004)

(urban renewal); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis).  Indeed, even cases relied on by Plaintiffs confirm that "the Procurement Act does vest broad discretion in the President."  *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330, 1333 (D.C. Cir. 1996) (affirming the "President's authority to pursue 'efficient and economic' procurement" through EOs, but holding the challenged order conflicted with another statute).

Plaintiffs asks the Court to adopt their cramped interpretation of FPASA by purportedly relying on the text of the statute.  But the text is quite broad—the FPASA authorizes the President to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act."  *Chao*, 325 F.3d at 366 (quoting 40 U.S.C. § 486(a) (2000) (now codified as amended at 40 U.S.C. § 121)).  The President is given broad discretion to supervise government contracting "as he shall deem necessary" so long as the President does not act "inconsistent[ly] with the provisions" of the FPASA.  Courts have "read this as requiring that the executive order have a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'"  *Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted); *see also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 169 (4th Cir. 1981).  And as discussed below, the challenged policies satisfy this nexus requirement.

Plaintiffs' argument that the President lacks authority to direct government contracting is further undermined by Congress's implicit endorsement of an expansive view of the President's power under FPASA.  Presidents have regularly exercised their authority under FPASA since it was enacted.  *See Kahn*, 618 F.2d at 790–91 ("Since 1941, though, the most prominent use of the President's authority under the FPASA has been a series of anti-discrimination requirements for Government contractors"); *see also, e.g.*, EO 12072, 43 FR 36869 (Aug. 16, 1978); EO 13465, 73 FR 33285 (June 11, 2008); EO 13950, 85 FR 60683 (Sept. 28, 2020).  "Past [Presidential] practice does not, by itself, create power,

9

but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).  "[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect." *Kahn*, 618 F.2d at 790.

Congress, likewise, has long understood and accepted that FPASA granted broad authority to the President.  While Congress has revised the FPASA since 1949, including a complete recodification in 2002, none of those amendments modified or restricted the power being used by the President here.[3]  "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-37 (2015) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)).

**B.     The President's Power Is Within The Scope Of The Procurement Act.**

The President's authority to direct government procurement is consistent with the Congressional grant of authority in FPASA, so long as those policies are "reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement." *Liberty Mut.*, 639 F.2d at 170.  Courts have "emphasized the necessary flexibility and 'broad-ranging authority'" that FPASA provides. *Chao*, 325 F.3d at 366.  The standard is "lenient" and can be satisfied even when "the order might in fact increase procurement costs" in the short run. *Id.* at 366–67.  "[T]his close nexus requirement [] mean[s] little more than that President's explanation for how an Executive Order promotes efficiency and economy must be reasonable and rational."

---

[3] *See, e.g.*, Pub. L. No. 99-500, §101(m) [title VIII, §832], 100 Stat. 1783-345 (1986); Pub. L. No. 99-591, §101(m) [title VIII, §832], 100 Stat. 3341-45 (1986); Pub. L. No. 104-208 § 101(f) [Title VI, § 611], 110 Stat. 3009-355 (1996); Pub. L. No. 107-217, 116 Stat. 1062, 1068 (2002).

*Napolitano*, 648 F. Supp. 2d at 738 (one sentence explanation sufficient); *see also Reich*, 74 F.3d at 1333 ("The President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept of efficiency and economy in procurement.") (collecting examples).

Executive Order 14042 easily satisfies this lenient standard. The President explained in Section 1 of the EO:

> This order promotes economy and efficiency in Federal procurement by en-suring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in con-nection with a Federal Government contract . . . . These safeguards will decrease the spread of COVID-19, which will decrease worker absence, re-duce labor costs, and improve the efficiency of contractors and subcontrac-tors at sites where they are performing work for the Federal Government.

To anyone who has lived through the COVID-19 pandemic and its resulting economic turmoil, the nexus between reducing the spread of COVID-19 and economy and efficiency in federal contracting is self-evident. While Plaintiffs may disagree with the President's policy or consider it unwise, the EO's explanation is sufficient to show the required nexus between the policy and economy and efficiency. *Compare* EO § 1 *with Chao*, 325 F.3d at 366–67 (holding sufficiently close nexus to efficient and economic procurement based on two sentences: "When workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts."). The OMB Director's Determinations that economy and efficiency would be promoted through the contractor vaccination requirement underscores the nexus. *See* 86 FR at 63421–23.

Plaintiffs argue that the FAR Council's statutory responsibility to "issue and maintain" the Federal Acquisition Regulation—a 2,000+-page regulation—means that the FAR Council has the *exclusive* authority to issue procurement regulations. Mot. at 12 –14 (citing 41 U.S.C. § 1303(a)(1)). But the FAR Council's authority to issue regulations is not

exclusive.  The very next subsection, Section 1303(a)(2)(A), permits agencies to proscribe "regulations essential to implement Government-wide policies and procedures."  And, of course, the EO and the OMB Director's Determination set Government-wide procurement policies pursuant to 40 U.S.C. § 121(a), which authorizes the President to "prescribe policies."  Section 3 of the EO recognizes these two sources of authority by directing the FAR Council to revise the FAR, and until that happens, directing agencies "to exercise any applicable authority" to implement the Government-wide policies and procedures described in the Executive Order and any subsequent OMB Determinations.

### C.   The Vaccination Requirement Does Not Violate The Competition In Contracting Act.

Plaintiffs are also unlikely to show that the contractor vaccination requirement conflicts with the Competition in Contracting Act, which simply requires "full and open competition" and "competitive procedures."  41 U.S.C. § 3301.  Plaintiffs argue that the requirement violates this Act because certain bidders may not meet the qualifications in solicitations that require a vaccinated workforce.  Mot. at 16–17 (citing *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019)).  But *National Government Services* squarely rejected Plaintiffs' argument when it upheld "the unremarkable proposition that a solicitation requirement (such as a past experience requirement) is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement."  923 F.3d at 985; *id.* at 986 (holding a rule preventing bidders who already had a certain amount of agency contract work violated the Contracting Act because "the exclusion is not based on some capability or experience requirement" or any other substantive evaluation factor).  Setting requirements that contractors may refuse does not violate the Competition In Contracting Act.

### D.   Plaintiff's Challenges To The OMB Determination Are Not Justiciable.

Plaintiffs challenge the OMB's initial determination, issued on September 24, 2021.  Plaintiffs' APA challenge to the now-superseded OMB determination is moot because

this determination has been expressly superseded by the New OMB Determination containing substantive changes. *See Akiachak Native Community v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) (noting the "well-settled principle of law" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot.").

In any event, neither the previous notice nor the operative New OMB Determination is reviewable under the APA, because neither is an "agency action." "Because the President is not an 'agency' for purposes of the APA, presidential action is not subject to judicial review under that statute." *NRDC v. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994)).  The President delegated to the OMB Director, pursuant to 3 U.S.C. § 301, the authority to determine whether the Safer Federal Workforce Task Force Guidance "will promote economy and efficiency in Federal contracting." *See* EO 14042, § 2(c).  Section 301 authorizes the President "to designate and empower the head of any department or agency in the executive branch, . . . to perform without approval, ratification, or other action by the President [] any function which is vested in the President by law," including the President's power to direct government contracting pursuant to 41 U.S.C. § 121(a).  When exercising delegated authority, the official "stands in the President's shoes" and "cannot be subject to judicial review under the APA." *NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *see also Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).

### E.   Plaintiffs Are Not Likely to Succeed on Merits of their OMB Determination Challenges.

Plaintiffs also fault the now-superseded OMB determination for not following the notice-and-comment requirements of the APA and 41 U.S.C. § 1707.  But the APA does not apply. *See* 5 U.S.C. § 553(a)(2) (excluding matters related to contracts).  And § 1707 does not apply to exercises of Presidential authority like the OMB determination because

§ 1707 applies only to "executive agencies." 41 U.S.C. § 133. But when the OMB Director exercises delegated presidential authority, she is not acting as "the head of [an] agency."

In any event, even if § 1707 were applicable, the New OMB Determination satisfies § 1707's procedural requirements. Section 1707 permits a proposal to become temporarily effective without publication and public comment if "the officer authorized to issue" the proposal finds that "urgent and compelling circumstances make compliance with [those] requirements impracticable." *Id.* § 1707 (d)–(e). Here, the OMB Director did just that by finding that the imminent threat of the COVID-19 pandemic and its impact on "worker absence," "labor costs," and "the efficiency of federal contracting" presented "[u]rgent and compelling circumstances justify[ing]" a waiver under § 1707(d). 86 FR at 63423–24. And consistent with § 1707(e), the OMB Director "solicit[ed] comment on all subjects of" the OMB Determination, thus permitting the determination to become temporarily effective upon filing with the Federal Register on November 10, 2021. *Id.* at 63424.

Even if the Determination were subject to the APA, the arbitrary-and-capricious claims would still fail because the Determination provides "a rational connection between the facts found and the choice made." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404–05 (D.C. Cir. 1995) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[R]eview under the arbitrary and capricious standard is deferential." *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). A court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

The OMB Determination is eminently reasonable. OMB's Director approved the revised Task Force Guidance because it concluded that "[t]he safety protocols that are set forth" in the guidance "are meant to ensure that COVID-19 does not easily spread within

the workplace, so that Federal contractor employees can continue to be productive." 86 FR at 63423. The requirement promotes economy and efficiency in federal contracting because decreasing worker absences saves costs.   As OMB's Director explains, "[r]educing the number of infected people mechanically reduces transmission," and "evidence also indicates that vaccines also reduce transmission by people who contract 'breakthrough' infections." *Id.* at 63422.  In conjunction with the other safety protocols proposed in the Workforce Guidance, the vaccine requirements will "prevent infection and illness and preserve the productivity" of federal contractors. *Id*.

The OMB Director's Determination also explains that, in her judgment, requiring vaccination will not lead any meaningful number of workers to quit their jobs, thereby addressing Plaintiffs' concern about the "possibility that [the vaccine requirement] would cause a labor shortage."  Mot. at 18.  OMB looked at data from major private employers to see whether workers leave their jobs instead of complying with vaccine requirements and concluded that there was "no systematic evidence that this has been a widespread phenomenon or that it would be likely to occur among employees of Federal contractors. In fact, the experience of private companies is to the contrary."  86 FR at 63422 (citing evidence from Tyson Foods and United Airlines, among other companies).[4]  The OMB Director's "predictive judgment," based on empirical evidence, is entitled to deference. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *see also Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis.").

Plaintiffs claim that the vaccine requirement's costs to the States, and their reliance

---

[4] The article and survey cited by Plaintiffs, Mot. at 8, Chris Isidore & Virginia Langmaid, *72% of unvaccinated workers vow to quit if ordered to get vaccinated*, CNN (Oct. 28, 2021), https://perma.cc/7JMV-SULY, includes this same data and notes that "[w]hat people say in a survey, and what they would [ultimately] do . . . can be two different things."

15

interests, were not considered. Mot. at 18. But the OMB Director's Determination *did* consider the costs to covered contractors, including Plaintiffs, and determined that "[b]ecause vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status. Such costs are likely to be small." 86 FR 63422. As for "reliance interests," Plaintiffs fail to articulate any harm from their "reliance" on the absence of a contractor vaccine requirement when enacting state laws. The EO does not apply to existing contracts. And OMB was entitled to approve guidance to manage federal operations and contracts on the basis of the data it considered, notwithstanding the presence of state and local measures that would be preempted for federal contracting purposes.

Plaintiffs also argue that OMB's Determination was pretextual because it was "never about procurement efficiency—it is about public health." Mot. at 19. In support, they rely on an extra-record and inapposite statement made earlier in the pandemic by the White House Press Secretary. Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext, *see id.* at 26 n.19, should be rejected. As the Supreme Court has explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). Plaintiffs also fail to establish that the New OMB Determination and attendant explanation "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). As the OMB Director reasonably concluded, slowing the spread of COVID-19 has an economically beneficial impact on federal operations, since federal workers are incurring significant labor costs from workers getting sick from COVID-19 and spreading it to others in the workplace. *See* 86 FR 63421–23. While such a policy may also have salutary public health effects, that result does not undermine the reasoning or legitimacy of the OMB Director's determination. Further,

even if the public-health effect was a background consideration, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Com.*, 139 S. Ct. at 2573.

F.      **Challenges To The FAR Memo Are Likewise Not Likely To Succeed.**

The FAR Memo is also not subject to judicial review under the APA because it does not apply to matters relating to contracts. 5 U.S.C. § 553(a)(2). Moreover, the APA provides review only of *final* agency action—*i.e.*, a decision (1) that marks the "consummation of the agency's decisionmaking process" and (2) by which "rights or obligations have been determined, or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). Neither prong is met here.

First, the FAR Memo is not final agency action because it is not a FAR regulation. This guidance was issued in accordance with the EO's instructions for the FAR to "take *initial* steps to implement" the contract clause described in the EO. EO 14042 § 3(a) (emphasis added). The FAR Memo suggests a clause for contracting officers to use in the interim, subject to agency- and contract-specific deviations to be developed by each agency. FAR Memo at 4. The conclusion of the policymaking process set forth in the EO—the FAR Council's amendment to the FAR to complete the implementation of the EO by providing the contract clause "for inclusion in Federal procurement solicitation and contracts" subject to the EO—has yet to occur. EO 14042 § 3(a).

Second, agencies can implement the EO without the FAR Memo, so the FAR Memo is not a decision from which "legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (citation omitted). Plaintiffs cannot challenge guidance when they fail to show "any risk of future harm traceable to the . . . Guidance itself, as opposed to the preexisting federal laws it describes." *Klayman v. President of the U.S.*, 689 F. App'x 921, 924 (11th Cir. 2017). Indeed, that is why Plaintiffs also lack standing to challenge the FAR Memo.

Even if the FAR Memo was final agency action, Plaintiffs fail to challenge any specific aspect as unreasonable. The FAR Memo simply carries out the EO directive to

17

"take initial steps to implement appropriate policy direction" for how agency acquisition offices can use the contract clause described in the EO.  EO 14042 § 3(a).  Plaintiffs claim that the FAR Memo improperly reveals "the goal of . . . 'getting more people vaccinated and decreas[ing] the spread of COVID-19,'" Mot. at 19 (quoting FAR Memo at 3), but it is difficult to see what is problematic about this intention, which dovetails with the EO's goal of "decreas[ing] the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."  EO 14042 § 1.

Section 1707's procedural notice requirements also do not apply to the FAR Memo because it is, at most, nonbinding guidance, and not "a procurement policy, regulation, procedure, or form" with "a significant effect beyond" the FAR Council's operating procedures.  The FAR Council issued the memo to develop a template COVID-19 safety clause "to *support* agencies in meeting the applicability requirements and deadlines set forth in [EO 14042]" and to "encourage[]" agencies to "exercise their authority" to temporarily deviate from the FAR by including similar clauses in their procurement contracts.  FAR Memo at 2–3.  The FAR Memo has no independent effect, however, and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract.  *See* 41 U.S.C. § 1303(a)(2)(A) (agencies have authority separate from the FAR).  And the FAR Memo does not direct an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the memo's guidance.  *Id.*

G.    **Plaintiffs' Constitutional Claims Are Meritless.**

1.    *The challenged actions do not violate the Tenth Amendment.*

Plaintiffs cannot succeed on a Tenth Amendment claim by simply invoking general maxims of federalism.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  The powers

18

specifically delegated to the federal government by the Constitution "are not powers that the Constitution 'reserved to the States.'" *United States v. Comstock*, 560 U.S. 126, 144 (2010); *accord New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]"). Simply put: As long as federal action rests on a constitutionally delegated power, "there can be no violation of the Tenth Amendment." *United States v. Mikhel*, 889 F.3d 1003, 1024 (9th Cir. 2018) (citation omitted).

Where (as here) a federal statute is validly enacted under one of Congress's enumerated powers, and the Executive Branch exercises authority lawfully delegated under that statute, the Tenth Amendment is no bar to federal action. *See, e.g.*, *Wachovia Bank v. Watters*, 431 F.3d 556, 563 (6th Cir. 2005), *aff'd*, 550 U.S. 1 (2007). As explained above, *see supra* § II.A–B, D, EO 14042 and the OMB Determination were issued pursuant to the President's authority under the Procurement Act, a federal statute that was an evident exercise of Congress's power under the Spending Clause, *see infra*.

Plaintiffs' vague references to "time-honored principles of federalism" cannot alter this conclusion. Mot. 20–21. In addressing a Tenth Amendment claim, a court has "no license to employ freestanding conceptions of state sovereignty when measuring" federal authority under the Constitution. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). The only question under the Tenth Amendment is whether the federal government acts pursuant to one of its powers under the Constitution; if it does, a court "necessarily must also conclude that the [plaintiffs'] efforts to invoke abstract principles of federalism through the Tenth Amendment fail." *See, e.g.*, *Town of Johnston v. Fed. Hous. Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014); *see also Garcia*, 469 U.S. at 549 ("States unquestionably do retain a significant measure of sovereign authority," but "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." (cleaned up)).

Plaintiffs also appear to suggest that a Tenth Amendment problem exists

whenever federal action regulates subject matter that is also regulated by the states. *See* Mot. at 20–21 ("[T]he regulation of health and safety matters is primarily and historically[] a matter of local concern." (citation omitted)). But "[t]here is no general 'doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.'" *Maryland v. Wirtz*, 392 U.S. 183, 195 (1968) (quoting *Case v. Bowles*, 327 U.S. 92, 101 (1946)). Indeed, it is axiomatic that the federal government does not "invade[] areas reserved to the States by the Tenth Amendment simply because it exercises *its* authority" under the Constitution, even "in a manner that *displaces* the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981) (emphasis added). Thus, "'the Federal Government, when acting within a delegated power, may override countervailing state interest,' whether those interests are labeled traditional, fundamental, or otherwise." *Brackeen v. Haaland*, 994 F.3d 249, 310 (5th Cir. 2021) (en banc) (op. of Dennis, J.) (quoting *Wirtz*, 392 U.S. at 195)), *petition for cert. filed*, No. 21-380 (U.S. Sept. 8, 2021).

Plaintiffs' argument also ignores that the terms of a federal contract are an exclusively *federal* concern. Under the doctrine of intergovernmental immunity, a federal contractor is immune from conflicting state laws and regulations even when those state laws are purportedly based on state police power. The doctrine arises from the Supremacy Clause and bars state regulations that "retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819). "For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself." *U.S. v. Cal.*, 921 F.3d 865, 882 n.7 (9th Cir. 2019). Courts regularly conclude that government contractors are immune from conflicting state laws, even when those laws are based on state power to regulate health and safety. *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir.

2014); *GEO Grp., Inc. v. City of Tacoma*, No. 3:18-cv-05233, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019). Thus, the Federal Government may contract with whom it likes under whatever terms it pleases without interference from states.

> **2.      *The challenged actions do not violate the Spending Clause.***

Plaintiffs also claim that EO 14042 and its implementing guidance exceed a limitation imposed on "the federal government's spending power," Mot. at 20—namely, that if Congress "condition[s] the States' receipt of federal funds, it must do so unambiguously," to "enable[] the States to exercise their choice knowingly." *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

This limit on Congress's authority to condition grants of federal funding does not apply to federal contracts. Plaintiffs cite no case where a court has found federal contract obligations invalid under *Dole* and *Pennhurst*'s clarity requirement. And for good reason: adopting Plaintiffs' position would make simple imprecisions in federal procurement contracts matters of constitutional magnitude. As the Supreme Court has explained, even "the consequences of imprecision" in spending legislation "are not constitutionally severe" when the government "is acting as patron rather than as sovereign." *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). That is especially true when the government procures property or services "as private parties, individuals or corporations also engage in among themselves." *See Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240–41 (Fed. Cl. 2007) (citation omitted).

At any rate, EO 14042 and its implementing guidance unambiguously put contractors on notice that compliance with OMB-approved Task Force Guidance is an obligation under a covered contract. *Dole* and *Pennhurst* require nothing more. *See Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004). The Court in *Pennhurst* was concerned with a federal grant program that "was unclear as to whether the states

incurred *any* obligations *at all* by accepting federal funds." *See id.* (emphasis added); *accord Commonwealth of Ky., Dep't of Hum. Resources v. Donovan*, 704 F.2d 288, 299 n.17 (6th Cir. 1983). Here, however, EO 14042 ensures that "the *existence* of the condition itself" will be "explicitly obvious" to federal contractors by directing agencies to incorporate (to the extent permitted by law) a COVID-19 safety clause into a contract before obligating a contractor's compliance. *See Benning*, 391 F.3d at 1307 (emphasis added) (quoting *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002)). For each contract identified by Plaintiffs, *see supra* § I, such a clause could only be incorporated upon the mutual agreement of the parties. Thus, because the challenged actions ensure that the "*intention to impose a condition* is expressed clearly" in a covered contract, *see Mayweathers*, 314 F.3d at 1067, a state will be capable of making "an informed," voluntary decision whether to accept the attendant obligations of contracting with the federal government, *see Pennhurst*, 451 U.S. at 25; *see also id.* at 17 (conditions must be imposed clearly so a state is not "unaware of the conditions" or "unable to ascertain what is expected of [them]").

Furthermore, Plaintiffs stake their entire claim on the fact that agencies are encouraged under the FAR Memo to include a provision requiring compliance with "guidance conveyed through Frequently Asked Questions," which may be amended during the period of performance. *See* Mot. 21. But the Supreme Court has not required exactitude when conditioning federal funding. *See, e.g.*, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) ("[T]he Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of [a grant program's] requirements …."). Indeed, "the Supreme Court has held that conditions may be 'largely indeterminate,'" and yet constitutionally permissible, "so long as the statute 'provid[es] clear notice to the States that they, by accepting funds under [federal law], would indeed be obligated to comply with [the conditions]." *Mayweathers*, 314 F.3d at 1067 (quoting *Pennhurst*, 451 U.S. at 24–25). Federal contractors are capable of making informed, voluntary decisions to accept an obligation to comply with periodically updated

22

guidelines. *See Donovan*, 704 F.2d at 299 ("Thus, the state voluntarily accepts the Secretary's power to alter the program and require compliance.").

### 3.   *The challenged actions do not violate the nondelegation doctrine.*

Plaintiffs contend that the Procurement Act violates the Constitution's nondelegation doctrine if it authorizes the President to issue EO 14042.  *See* Mot. at 22–23. To the contrary, the Procurement Act's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations.  Congress may lawfully delegate decision-making authority so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted).  A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted); *accord Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.) ("[A] delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority.'" (cleaned up)).

The intelligible-principle standard is so deferential that the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (quoting *Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)).  In fact, the Supreme Court has struck down congressional delegations only twice in United States history—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion.  *Gundy*, 139 S. Ct. at 2129. Over the last eighty years, the Court "has countenanced as intelligible seemingly vague principles in statutory text such as whether something would 'unduly or unnecessarily complicate,' … be 'generally fair and equitable,' in the 'public interest,' … [or] authoriz[es] the recovery of excessive profits."  *In re Nat'l Sec. Agency Telecomms. Recs.*

*Litig.*, 671 F.3d 881, 896 (9th Cir. 2011) (citing multiple cases); *see also, e.g., Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (upholding delegation to determine what constituted a "safe" place of employment); *Gundy*, 139 S. Ct. at 2129 (noting that the Supreme Court has, on multiple occasions, "approved delegations to various agencies to regulate in the 'public interest'" (citing *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), and *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932))); *id.* at 2130–31 (Alito, J., concurring in the judgment) ("[S]ince 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards.").

In light of this longstanding precedent, the statute at issue here reflects an intelligible principle that falls well within permissible bounds.  As explained, the Procurement Act sets forth a general policy—the promotion of economy and efficiency in the federal government's procurement of property and services, *see* 40 U.S.C. § 101—and authorizes the President to issue orders designed to further those specific statutory goals in that narrow, definable context, *see id.* § 121(a).  The statute's criteria thus establishes a clear boundary for the President's actions, and compares favorably to other congressional delegations that have been sustained against challenges under the nondelegation doctrine.  *See, e.g., Whitman*, 531 U.S. at 474–75 (listing cases).  Several courts have already held that the Procurement Act's delegation of authority to the President is valid.  *See Kahn*, 618 F.2d at 785–86, 793 n.51 ("[The Procurement Act] requires the President to make procurement policy decisions based on considerations of economy and efficiency.  Although broad, this standard can be applied generally to the President's actions to determine whether those actions are within the legislative delegation."); *City of Albuquerque*, 379 F.3d at 914–15 (finding the Procurement Act's limit that the President "establish 'an economical and efficient system for . . . the procurement and supply' of property" provided an "'intelligible principle' to guide the exercise" of the "relatively broad delegation of authority" in the statute (citations omitted).

Plaintiffs cite no authority to the contrary.  Instead, they largely reiterate their statutory objections, maintaining that EO 14042 "has no basis in the text of" the Procurement Act, but if it did, the statute would be too "broad."  *See* Mot. 23.  But that is not the standard.  "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  As the Supreme Court has acknowledged, "Congress simply [could not] do its job absent an ability to delegate power under broad general directives."  *Mistretta*, 488 U.S. at 372.  In sum, only if this Court "could say that there is an *absence* of standards for the guidance of the [President's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would [the Court] be justified in overriding [Congress's] choice of means for effecting its declared purpose" in the Procurement Act.  *See Yakus v. United States*, 321 U.S. 414, 426 (1944) (emphasis added).  That is not the case here.

## III.   Plaintiffs Are Not Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief.

Plaintiffs are also not entitled to a preliminary injunction because they have failed to show a likelihood of irreparable harm, an "'indispensable' requirement for a preliminary injunction."  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted).  "To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical."  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up).  A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must "substantiate a claim that irreparable injury is likely to occur" by providing competent "evidence" of irreparable harm, *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

*First*, Plaintiffs suggest that they will suffer irreparable harm in the absence of preliminary relief because the challenged actions violate "the constitutional structure."

25

Mot. at 24–25.  But as explained above, Plaintiffs have identified no constitutional defect in EO 14042, the OMB Determination, or the FAR Memo.  *See supra* § II.G.  At any rate, Plaintiffs have not alleged the type of constitutional violation contemplated by the authorities they cite—*i.e.*, the deprivation of an individual constitutional right.  *See Doe v Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) (involving the alleged deprivation of the individual right to due process); *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) (involving "the fundamental right to vote"); *McCreary Cnty.*, 354 F.3d 438 (involving "constitutional rights" under the Establishment Clause); *Elrod v. Burns*, 427 U.S. 347 (1976) (involving the "loss of First Amendment freedoms" of political association and expression).  Although the violation of an individual constitutional right can support a finding of irreparable harm, *see N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009), Plaintiffs here seek preliminary relief on the basis of *structural* constitutional claims involving Congress's authority under the Spending Clause, the Tenth Amendment, and the non-delegation doctrine.  *See* Mot. at 19 (alleging violations of "three key constitutional limitations on federal government power").  An alleged violation of "a structural provision of the Constitution that does not confer personal rights" cannot support a finding of irreparable harm.  *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 389 (E.D.N.Y. 2021) (citation omitted); *accord, e.g.*, *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989); *Live 365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 45 (D.D.C. 2010).

*Second*, Plaintiffs claim that EO 14042 and its implementing guidance will harm them by "intruding on their sovereign authority" to enforce their own public-health "policies that conflict with" federal law.  Mot. at 23–24.  But this claim simply reiterates Plaintiffs' doctrinally barren view of the Tenth Amendment.  Again, it is black-letter law that the federal government does not "invade[]" areas of state sovereignty "simply because it exercises *its* authority" in a way that preempts conflicting state laws, even "in

a manner that displaces the States' exercise of their police powers." *Hodel*, 452 U.S. at 291 (emphasis added). Here, EO 14042 and the OMB Determination, and the FAR Memo were issued pursuant to delegated authority under the Procurement Act. *See supra* § I.C. And as federal law, these actions preempt conflicting state laws by simple operation of the Supremacy Clause, and nothing in the text or structure of the Constitution entitles Plaintiffs to "enact or enforce … laws and policies that conflict" with federal law.[5]

*Third*, Plaintiffs claim that they will be irreparably harmed because they are being denied the opportunity for notice and comment. Mot. at 25–26. As explained above, this claim is moot. Plaintiffs have notice and they can submit their comments to: https://www.federalregister.gov/public-inspection/2021-24949/determination-regarding -the-revised-safer-federal-workforce-task-force-guidance-for-federal

*Lastly*, Plaintiffs argue that, absent preliminary relief, they "will suffer irreparable economic harm caused by loss of contracts with the federal government." Mot. at 26. This claim fails for a multitude of reasons. As explained above, *see supra* § I, Plaintiffs do not identify a single contract that will be affected by the challenged actions during the pendency of this litigation. *See Griepentrog*, 945 F.2d at 154 (requiring competent evidence to substantiate a claim of irreparable harm). Their allegations of economic harm from lost contracts are thus bare, speculative assertions that are insufficient to support a finding of irreparable harm.[6] *See, e.g.*, *Wis. Gas. Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d

---

[5] Plaintiffs' reliance on *Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020), *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), and *Abbott v. Perez*, 138 S. Ct. 2305 (2018), is misplaced. None support the theory that states suffer irreparable injury whenever the federal government "prevent[s]" them "from effectuating" their own laws. *See* Mot. at 24 (citation omitted). If such a rule existed, a state would suffer irreparable harm *per se* from all federal laws with preemptive effect. Instead, each case held that a state defend-ant established irreparable harm sufficient to grant a stay of a lower court's injunction barring the state from enforcing a challenged state law—a scenario not at issue here.

[6] As explained above, *see supra* § I, Plaintiffs Stevens and Hildenbrand, two Ohio Sheriffs who have sued in their official capacities, likewise fail to point to any *covered* contract to

669, 674 (D.C. Cir. 1985).

Additionally, Plaintiffs are incorrect to assert that any theoretical economic harm resulting from the loss of a federal procurement contract would be unrecoverable, as a state agency or subdivision could seek recovery for such loss in the Court of Federal Claims under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109. The CDA "applies to any express or implied contract entered into by an executive agency for the procurement of property, services, construction, repair, or the disposal of personal property." *Anselma Crossing, L.P. v. USPS*, 637 F.3d, 238, 240 (3d Cir. 2011). And under 28 U.S.C. § 1491(a)(2), the Court of Federal Claims "has jurisdiction to decide both monetary and non-monetary disputes" arising under the CDA, "including a dispute concerning termination of a contract." *See Clearwater Constructors, Inc. v. United States*, 56 Fed. Cl. 303, 307 (Fed. Cl. 2003) (quoting 28 U.S.C. § 1491(a)(2).

Similarly, to the extent a state agency or subdivision were to challenge the solicitation requirements for any new contracts with a COVID-19 safety clause, Plaintiffs may bring an action in the Court of Federal Claims "objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This encompasses "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citation omitted).

But even assuming for argument's sake that Plaintiffs' theoretical economic losses were unrecoverable, that fact alone would not itself "compel a finding of irreparable harm." *Cardinal Health Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (citation

---

which they are, or will soon be, a party. There are thus no grounds upon which to find that the challenged actions will cause them imminent, irreparable harm.

omitted).  For such a rule would "effectively eliminate the irreparable harm requirement" against the federal government, in that "[a]ny movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard."  *Air Trans. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  Instead, to support a preliminary injunction, economic harm must "be great, certain and imminent," *Cardinal Health*, 46 F. Supp. 2d at 211 (citation omitted), "even where it is irretrievable because a defendant has sovereign immunity," *Air Trans.*, 840 F. Supp. 2d at 335.  Plaintiffs provide no evidence on which to find that they will suffer certain and imminent irreparable economic injury.

## IV.    The Requested Preliminary Relief Is Contrary To The Public Interest.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest— "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, these considerations tilt decisively in Defendants' favor.

*First*, enjoining the challenged actions would harm the public interest in slowing the spread of COVID-19 among millions of employees of federal contractors and the public at large.  "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  Numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction.[7]

*Second*, enjoining the challenged actions would harm the public interest by hampering the efficiency of federals contractors on which the federal government depends.  The COVID-19 pandemic has interfered with numerous aspects of the

---

[7] *See, e.g., Tigges v. Northam*, 473 F. Supp. 3d 559, 573–74 (E.D. Va. 2020); *Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 840–41 (W.D. Tenn. 2020).

government's work by, for example, forcing office closures, interfering with employees' access to paper-based records, limiting official travel, and causing staffing shortages. *See* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. Requiring federal contractors to ensure that their employees become fully vaccinated against COVID-19, with exceptions only as required by law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in efficiency. Enjoining EO 14042 and its implementing guidance would prevent these gains and would likely interfere with federal contractors' ability to resume normal, pre-pandemic operations.

Granting the requested preliminary injunction would not "preserve the status quo" (as Plaintiffs suggest, *see* Mot. 9), but would instead upend it by (i) preventing further implementation of EO 14042, which has been in effect for over two months; and (ii) interfering with the federal government's ability to determine the terms on which it will enter into contracts. *See Nken*, 556 U.S. at 428–29 (explaining that enjoining a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo"); *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) (explaining that "an injunction against the enforcement of a presumptively valid" enactment should only be granted in extraordinary circumstances). In sum, granting the pending motion would harm the public interest far more than denying the motion would harm Plaintiffs, and the motion should therefore be denied.

Finally, although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged injuries. Plaintiffs ask the Court to enter a preliminary injunction prohibiting Defendants "from enforcing" a vaccination mandate "on any federal contracting agency, subcontractor [or] employee[] *anywhere in the United States*." Compl., Prayer for Relief. No such relief is warranted. A federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the

plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted); *see also Kentucky v. Yellen*, ---F. Supp. 3d---, 2021 WL 4394249, at *8 (E.D. Ky. Sept. 24, 2021) (concluding that "the Sixth Circuit has already defined the outer-bounds of this Court's powers").   Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).   EO 14042 and its implementing guidance have been challenged in other cases, underscoring why this Court should not attempt to decide its legality for all parties.

Here, the only contracts that Kentucky has identified in its motion are the five contracts with ICE or the U.S. Marshals Service, none of which are covered contracts. Even assuming these contracts give Kentucky standing to challenge the EO and its implementing guidance, any relief should be tailored to those five contracts and limited to the states of Ohio and Kentucky.   Moreover, any relief should merely block enforcement—not inclusion—of a COVID-19 safety clause.   Allowing COVID-19 safety clauses to be included but not enforced during the pendency of this litigation best preserves the legal status quo:  As long as the injunction remains in place, contractor employees within its scope need not be vaccinated.   But if EO 14042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

DATED: November 16, 2021          Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director

/s/ Jody D. Lowenstein
ZACHARY A. AVALLONE
JODY D. LOWENSTEIN
Mont. Bar. No. 55816869
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On November 16, 2021, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Kentucky, using the Court's electronic case filing system.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jody D. Lowenstein*

JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice
