UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

COMMONWEALTH OF KENTUCKY, *et al.*,

      Plaintiffs,

v.

JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:21-cv-00055-GFVT

**OPINION**
**&**
**ORDER**

*** *** *** ***

This is not a case about whether vaccines are effective. They are. Nor is this a case about whether the government, at some level, and in some circumstances, can require citizens to obtain vaccines. It can. The question presented here is narrow. Can the president use congressionally delegated authority to manage the federal procurement of goods and services to impose vaccines on the employees of federal contractors and subcontractors? In all likelihood, the answer to that question is no. So, for the reasons that follow, the pending request for a preliminary injunction will be GRANTED.

**I**

On January 20, 2021, Joseph Robinette Biden, Jr. became the forty-sixth President of the United States. On his first day in office, President Biden signed Executive Order 13991, which established the Safer Federal Workforce Task Force. 86 Fed. Reg. 7,045–48 (Jan. 20, 2021). The Task Force's stated mission is to "provide ongoing guidance to heads of agencies on the

operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." *Id.* at 7,046.

On September 9, 2021, President Biden signed Executive Order 14042. 86 Fed. Reg. 50,985–88 (Sept. 9, 2021). Executive Order 14042 mandated the Safer Federal Workforce Task Force to provide Guidance regarding "adequate COVID–19 safeguards" by September 24, 2021, that would apply to all federal contractors and subcontractors. *Id.* at 50,985. According to the Department of Labor, "workers employed by federal contractors" make up "approximately one-fifth of the entire U.S. labor force." United States Department of Labor, *History of Executive Order 11246*, https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (last visited Nov. 24, 2021). For Kentucky, Ohio, and Tennessee, federal contracting is a multi-billion-dollar industry. [R. 32 at 4.] The executive order specified that the Guidance would be mandatory at all "contractor or subcontractor workplace locations" so long as the Director of the Office of Management and Budget approved the Guidance and determined that it would "promote economy and efficiency in Federal contracting." 86 Fed. Reg. at 50,985. Furthermore, the executive order applies to "any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument." *Id.* at 50,986.[1]

On September 24, the Safer Federal Workforce Task Force issued its Guidance pursuant to Executive Order 14042. *See* Safer Federal Workforce Task Force, *COVID–19 Workplace*

---

[1] President Biden made clear his intentions in signing Executive Order 14042 in a speech to the American Public. On the day that President Biden signed Executive Order 14042, he stated that earlier in the day he had signed an executive order requiring all federal contractors to be vaccinated. Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

*Safety: Guidance for Federal Contractors and Subcontractors*,

https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20

210922.pdf (last visited Nov. 24, 2021).  The Guidance requires all "covered contractors"[2] to be

fully vaccinated by December 8, 2021,[3] unless they are "legally entitled to an accommodation."

*Id.* at 1.  The Guidance applies to all "newly awarded covered contracts" at any location where

covered contract employees work and covers "any full-time or part-time employee of a covered

contractor working on or in connection with a covered contract or working at a covered

contractor workplace."  *Id.* at 3–5.

On September 28, the Director of the OMB, "determined that compliance by Federal

contractors and subcontractors with the COVID–19 workplace safety protocols detailed in that

guidance will improve economy and efficiency by reducing absenteeism and decreasing labor

costs for contractors and subcontractors working on or in connection with a Federal Government

contract."  86 Fed. Reg. 53,692.

Executive Order 14042 tasked the Federal Acquisition Regulatory Council with

"amend[ing] the Federal Acquisition Regulation."  86 Fed. Reg. 50,986.  The Federal

Acquisition Regulation is a set of policies and procedures that governs the drafting and

procurement processes of contracts for all executive agencies.  *See* United States General

Services Administration, *Federal Acquisition Regulation (FAR)*, https://www.gsa.gov/policy-

regulations/regulations/federal-acquisition-regulation-far (last visited Nov. 24, 2021).  On

---

[2] A covered contractor is "a prime contractor or subcontractor at any tier who is party to a covered contract."  Safer Federal Workforce Task Force, *COVID–19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, at 3.

[3] The deadline for full vaccination has been delayed until January 18, 2022.  This means that covered contractors would need to receive their Johnson & Johnson vaccine or the second dose of a Pfizer or Moderna vaccine by January 4 to be fully vaccinated by January 18.  *See* The White House, *Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies*, https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/ (last visited Nov. 24, 2021).

September 30, the Federal Acquisition Regulatory Council issued Guidance in the form of a memo to assist agencies responsible for mandating contractor and subcontractor compliance with the vaccination requirement until the Federal Acquisition Regulation can be officially amended. *See* FAR Council Guidance, https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf (last visited Nov. 24, 2021).  The vaccine requirement officially only applies to contracts awarded (1) on or after November 15; (2) "new solicitations issued on or after October 15"; and (3) extensions to or renewals of existing contracts exercised on or after October 15."  *Id.* at 2.  However, the Federal Acquisition Regulatory Council attached a deviation clause to the Guidance that contractors were encouraged to insert into their current contracts.  *Id.* at 4–5.

Plaintiffs filed their Complaint on November 4, and on November 8, Plaintiffs filed a temporary restraining order and preliminary injunction asking this court to enjoin the federal contractor vaccine mandate.  [R. 12 at 31.]  Plaintiffs argue that Defendants' actions were contrary to procedure, arbitrary and capricious, and violated the U.S. Constitution.  *Id.* at 9–10. On November 9, the Court held a telephonic conference with the parties, and with no objection from the parties, denied Plaintiffs' temporary restraining order and construed the motion as one for a preliminary injunction only.[4]  The Court set briefing deadlines for the parties and scheduled a hearing for Thursday, November 18.  [R. 16; R. 17.]  On November 10, the OMB Director issued a revised Determination that (1) revoked the prior OMB Determination; (2) provided

---

[4] Courts frequently construe joint TRO and preliminary injunction motions as a motion for a preliminary injunction only and deny the TRO as moot.  *See Ranchers-Cattlemen Action Legal Fund v. Perdue*, 2017 WL 2671072, at *1 (D. Mont. June 21, 2017) (denying TRO as moot and addressing as preliminary injunction only); *Justice Res. Ctr. v. Louisville-Jefferson Cnty. Metro. Gov't*, 2007 WL 1302708, at *5 (W.D. Ky. Apr. 30, 2007) (denying plaintiffs' request for a temporary restraining order and focusing only on plaintiffs' motion for a "temporary injunction," which the court construed as a motion for preliminary injunction because defendant was given notice and opportunity to respond to Plaintiff's request); *New England Health Care v. Rowland*, 170 F. Supp. 2d 199, 201 n.2 (D. Conn. 2001) (denying TRO as moot after setting hearing on a preliminary injunction).

additional reasoning and support for how the Contractor Guidance will promote economy and efficiency in government contracting; and (3) gave covered contractors additional time to comply with the vaccination requirement.  *See* 86 Fed. Reg. 63,418.  On November 15, in light of the revised Determination, Plaintiffs filed an Amended Complaint.  [R. 22.]  Defendants filed a response in opposition to Plaintiffs' preliminary injunction on November 16, Plaintiffs replied on November 17, and the Court held a hearing with the parties on November 18.  [R. 27; R. 32; R. 41.]

## II

### A

An initial matter is the question of standing.  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  "At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y.*, 137 S. Ct. at 1651.

Standing is a threshold inquiry in every federal case that may not be waived by the parties.  *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).  "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted).  Plaintiffs' injury-in-fact must be both particularized and concrete.  *Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 1545 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.
(TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  "For an injury to be particularized, it must affect the
plaintiff in a personal and individual way." *Id.* at 1548 (internal quotation marks omitted).
Further, a "concrete" injury is a de facto injury that actually exists. *Id.*  Finally, "a plaintiff must
also establish, as a prudential matter, that he or she is the proper proponent of the rights on which
the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations
omitted).

Here, Defendants argue that (1) Plaintiffs have failed to provide proof in either their
Complaint or Amended Complaint that any state agency or subdivision will be affected by the
vaccine mandate; and (2) Plaintiffs lack standing to challenge the FAR Memo under the
redressability prong.  [R. 27 at 17–19.]  Under the first argument, Defendants argue that none of
the contracts Plaintiffs provide in their briefing are actually covered by the vaccine mandate
because they are present and not future contracts and are merely requests for bilateral
modification.  *Id.* at 18–19.  Defendants argue that "[a]sking to change a contract term is not a
cognizable harm."  *Id.* at 19.

Although the Plaintiffs did not provide an example of a new contract that is subject to the
mandate in their briefing, the Court finds that Plaintiffs satisfy standing as to this argument for
multiple reasons.  States are "entitled to special solicitude in the standing analysis."
*Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007).  And States are permitted "to litigate as
*parens patriae* to protect quasi-sovereign interests—i.e., public or governmental interests that
concern the state as a whole."  *Id.* at 520 n.17 (quoting R. Fallon, D. Meltzer, & D. Shapiro, *Hart
& Wechsler's The Federal Courts and the Federal System* 289 (5th ed. 2003)).

In 2020, according to the federal government's System for Award Management, which tracks federal contracts, $10,221,706,227 worth of federal contracts were performed in Kentucky, and $9,934,033,221 worth of federal contracts were held by vendors located in Kentucky, including numerous state agencies.[5]  [R. 22 at 13 (citing SAM.gov).]  In 2020, Ohio was the place of performance for $8,935,417,106 worth of federal contracts, and $12,498,379,202 worth of federal contracts were held by vendors located in Ohio, including Ohio agencies.  *Id.* at 14.  And in 2020, Tennessee was the place of performance for $10,258,679,277 worth of federal contracts, and $10,010,028,677 worth of federal contracts were held by Tennessee vendors, including Tennessee agencies.  *Id.*

"When a claim involves a challenge to a future contracting opportunity, the pertinent question is whether Plaintiffs ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract."  *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200, 211 (1995).  As the facts above indicate, federal contracts bring in billions of dollars to the states of Kentucky, Ohio, and Tennessee annually, and there is every indication that federal contractors and subcontractors throughout Kentucky, Ohio, and Tennessee will continue bidding for new contracting opportunities.[6]  *But see Hollis v. Biden*, 2021 WL 5500500 (N.D. Miss. Nov. 23, 2021) (finding institutions who are "likely to be recipients of" future federal contracts lacked standing to challenge Executive Order 14042).  Therefore, given that the OMB's latest Determination on the matter is only a couple of weeks old, it seems disingenuous of Defendants to argue that because Plaintiffs do not yet have an example of a new contract

---

[5] As both parties declare in their briefing, the Court may take judicial notice of factual information located on government websites.  *See Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 947 n.3 (6th Cir. 2020) (Bush, J., dissenting).

[6] This also applies to the two Sheriff Plaintiffs, Frederick W. Stevens and Scott A. Hildenbrand, who are suing in their official capacities as sheriffs for the Seneca County and Geauga County Sheriff's Offices, respectively.  [*See* R. 12-2; R. 12-3.]

ensuring compliance with the vaccine clause, they lack standing.  This situation is constantly

changing, as evidenced by the email Counsel for the Plaintiffs received during the hearing in this

matter stating that the University of Louisville, which relies on numerous contracts with the

federal government to operate, would be implementing a vaccine mandate for all University of

Louisville employees pursuant to Executive Order 14042.

Furthermore, the fact that governmental agencies are already requesting that current

contracts, which are not officially subject to Executive Order 14042 and subsequent Guidance,

comply with the vaccine mandate indicates a threat of future harm to the Plaintiffs.  [*See* R. 32 at

5.]  The Defendants argue that because the vaccine mandate only applies to future contracts,

contractors with current contracts have a choice as to whether they will comply with the vaccine

mandate or not.  [R. 27 at 18.]  However, if the government is already attempting to require

contracts not officially covered by the vaccine mandate to still include such a mandate, it stands

to reason that contractors who do not comply will likely be blacklisted from future contracting

opportunities if they refuse to comply.  This is particularly true given President Biden's remarks

on September 7: "If you want to work with the federal government, vaccinate your workforce."

Remarks of President Joseph Biden, Remarks at the White House (Sept. 9, 2021), available at

https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-

biden-on-fighting-the-covid-19-pandemic-3/.  Accordingly, the Court finds that Plaintiffs have

satisfied their burden as to the Defendants' first standing argument.

Defendants next argue that Plaintiffs do not have standing to challenge the FAR Memo

under the redressability prong.  [R. 27 at 19.]  Specifically, Defendants argue that because the

FAR Memo merely "suggests a sample clause that agencies and contracting officers might use to

implement the Executive Order," enjoining the FAR Memo would not actually redress any

injury.  *Id.*  However, the FAR Memo flows directly from the President's executive order, which tasked the FAR Council with recommending to agencies language to include in existing contracts until the Federal Acquisition Regulation could be amended.  86 Fed. Reg. at 50, 986.

Essentially, the effect of the FAR Memo is to force contractors and subcontractors with existing federal government contracts to include a vaccine mandate in their current contracts by adding a deviation clause to those current contracts.  Sure, a contractor may refuse to include the deviation clause in their current contracts because current contracts are not covered by the vaccine mandate.  But moving forward, those contractors who refuse to include a deviation clause, many of whom rely on federal contracts, are provided with a Hobson's choice: add the vaccine mandate to your current federal contracts by way of the deviation clause or lose out on future federal contracts.  [R. 32 at 5–6.]  Enjoining the vaccine mandate, including the FAR Memo, would redress this injury.

Here, the Court finds that Plaintiffs have sufficiently demonstrated that they have suffered an injury in fact, that the injury is fairly traceable to the Defendants' actions, and that enjoining the vaccine mandate will redress the Plaintiffs' injuries.  *See Spear*, 520 U.S. at 162. The Court has the power to hear this case.

**B**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power ....")).  To issue a preliminary injunction, the Court must consider: (1) whether the movant has shown a strong likelihood of

success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet*, 305 F.3d at 573 (citations omitted).

The Court of Appeals clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). However, even if the plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Thus, the Plaintiffs must show that the foregoing preliminary injunction factors are met, and that immediate, irreparable harm will result if the injunction is not issued.

Defendants' arguments against Plaintiffs' motion for a preliminary injunction fall primarily into two buckets: (1) whether the president exceeded his statutory and constitutional authority in promulgating the executive order at issue in this case; and (2) whether the agencies at issue in this case followed the proper administrative procedures. Plaintiffs argue both that the president exceeded his authority in promulgating the executive order and that the agencies failed to follow the proper administrative procedures in implementing and enforcing President Biden's executive order.

1

President Biden issued Executive Order 14042 pursuant to the U.S. Constitution, 3 U.S.C § 301, which provides the president with general delegation authority, and 40 U.S.C. 101 *et seq.*, also known as the Federal Property and Administrative Services Act (FPASA). *See* 86 Fed. Reg. 50,985–88 (Sept. 9, 2021). Congress delegated to the president the authority to manage federal procurement through FPASA. 40 U.S.C. 101 *et seq.* The first question the Court must answer is whether President Biden exceeded his delegated authority under FPASA in promulgating Executive Order 14042. The Court finds that he did.

The scope of FPASA is a matter first impression in the Sixth Circuit[7] and presents a "difficult problem of statutory interpretation." *AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc). The FPASA "was designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector." *Id.* Congress's goal in enacting FPASA was to create an "economical and efficient system for…procurement and supply." *Id.* at 788. "'Economy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.* at 789.

Through the FPASA, Congress granted to the president a broad delegation of power that presidents have used to promulgate a host of executive orders. *See, e.g.*, *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360, 366 (2003) (holding that FPASA authorized the president to require contractors to post notices at all facilities informing

---

[7] A Westlaw search of the term "Federal Property and Administrative Services Act" revealed that only four cases in the Sixth Circuit have even mentioned the Federal Property and Administrative Services Act, and none of them addressed the scope of the act. *See Americans United for Separation of Church and State v. School Dist. of City of Grand Rapids*, 718 F.2d 1389, 1415 (6th Cir. 1983) (Krupansky, J. dissenting); *Higginson v. United States*, 384 F.2d 504, 506 (6th Cir. 1967); *Solomon v. United States*, 276 F.2d 669, 673 (6th Cir. 1960); *United States v. Witherspoon*, 211 F.2d 858, 860 n.1 (6th Cir. 1954).

employees of certain rights); *Kahn*, 618 F.2d 784 (holding that FPASA authorized the president to require government contractors to comply with price and wage controls); *Albuquerque v. U.S. Dept. of Interior*, 379 F.3d 901, 905 (10th Cir. 2004) (holding that FPASA authorized executive order setting out priorities "for meeting Federal space needs in urban areas"). For decades, "the most prominent use of the President's authority under the FPASA [was] a series of anti-discrimination requirements for Government contractors." *Kahn*, 618 F.2d at 790.[8]

However, despite Congress's broad delegation of power under the FPASA, the President's authority is not absolute. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996). The District of Columbia Circuit cautioned that the FPASA does not provide authority to "write a blank check for the President to fill in at his will. The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Id.* (quoting *Kahn*, 618 F.2d at 793). Furthermore, the FPASA "does not allow the President to exercise powers that reach beyond the Act's express provisions, *Kahn*, 618 F.2d. at 797 (Tamm, J., concurring), and there must be a "close nexus between the Order and the objectives of the Procurement Act." *Id.* (Bazelon, J., concurring).

Defendants argue that the nexus between the vaccine mandate and economy and efficiency in federal contracting "is self-evident." [R. 27 at 23.] After all, Defendants argue, requiring vaccination for all government contractors and subcontractors will limit the spread of Covid-19, which in turn will (1) decrease worker absence; (2) decrease labor costs; and (3) improve efficiency at work sites. [R. 27 at 23 (citing Executive Order 14042).] However, the

---

[8] In dissent, Judge MacKinnon argues that the majority's argument that FPASA has been used in the past to invoke anti-discrimination orders is misleading because, in the cases relied on by the majority, either "the courts' discussion of the scope of the procurement power was dicta," or the court did not need to "rely exclusively on the presidential procurement power to uphold an affirmative action plan," and "did not do so." *Kahn*, 618 F.2d at 810 (MacKinnon, J. dissenting).

FPASA's goal is to create an "economical and efficient system for…*procurement and supply*." *Kahn*, 618 F.2d at 788 (emphasis added).  While the statute grants to the president great discretion, it strains credulity that Congress intended the FPASA, a procurement statute, to be the basis for promulgating a public health measure such as mandatory vaccination.

If a vaccination mandate has a close enough nexus to economy and efficiency in federal procurement, then the statute could be used to enact virtually any measure at the president's whim under the guise of economy and efficiency.  *Cf. Ala. Ass'n of Realtors v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485, 2488–89 (2021) (finding the federal government's interpretation of § 361 would grant the CDC a "breathtaking amount of authority" that could be used to "mandate free grocery delivery for the sick or vulnerable…[r]equire manufacturers to provide free computers to enable people to work from home" or "[o]rder telecommunications companies to provide free high-speed Internet service to facilitate remote work").

The vaccine mandate applies to employees of federal contractors and subcontractors who work entirely from home and are not at risk of spreading Covid-19 to others.  [R. 12 at 6 (citing Task Force Guidance).]  Under the same logic employed by the Defendants regarding the vaccine mandate, what would stop FPASA from being used to permit federal agencies to refuse to contract with contractors and subcontractors who employ individuals over a certain BMI for the sake of economy and efficiency during the pandemic?  After all, the CDC has declared that "obesity worsens the outcomes from Covid-19."  Centers for Disease Control and Prevention, *Obesity, Race/Ethnicity, and COVID-19*, https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (last visited Nov. 22, 2021).

Furthermore, the CDC states that Covid-19 spreads more easily indoors than outdoors. Centers for Disease Control and Prevention, *Participate in Outdoor and Indoor Activities*,

https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/outdoor-activities.html (last visited Nov. 22, 2021).  Why couldn't the federal government refuse to contract with contractors and subcontractors who work in crowded indoor office spaces or choose to engage in indoor activities where Covid-19 is more likely to spread?

Although Congress used its power to delegate procurement authority to the president to promote economy and efficiency federal contracting, this power has its limits.  *Reich*, 74 F.3d at 1330.  Furthermore, even for a good cause, including a cause that is intended to slow the spread of Covid-19, Defendants cannot go beyond the authority authorized by Congress.  *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2488–89; *see also Missouri v. Biden*, Case No. 4:21-cv-01329-MTS, at *3–4 (E.D. Mo. Nov. 29, 2021) (holding that Congress must provide clear authorization if delegating the exercise of powers of "vast economic and political significance," if the authority would "significantly alter the balance between federal and state power," or if the "administrative interpretation of a statute invokes the outer limits of Congress' power").  Accordingly, the Court finds that the president exceeded his authority under the FPASA.

### a

There are several concerning statutory and constitutional implications from President Biden exceeding his authority under the FPASA.  Three of particular concern are the Competition in Contracting Act, the nondelegation doctrine and concerns regarding federalism, and the Tenth Amendment.[9]

---

[9] The Plaintiffs also briefly argue that the vaccination mandate violates the Spending Clause.  Plaintiffs cite to *Cutter v. Wilkenson* to argue that the government must "state all conditions on the receipt of federal funds 'unambiguously' so as to 'enabl[e] the states to exercise their choice knowingly." [R. 12 at 21 (citing 423 F.3d 579, 585 (6th Cir. 2005) (citing *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).]  However, Plaintiffs fail to point to any support for the proposition that federal contract obligations are subject to the *Dole* clarity requirement.  The Court is concerned, given that the Defendants in this case are "acting as patron rather than sovereign" that accepting the Plaintiffs' argument may turn simple budgetary imprecisions in federal procurement into matters of constitutional concern.  [R. 27 at 33 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998)).]  At this early stage in the

14

Plaintiffs argue that President Biden exceeded his authority under the Competition in Contracting Act.  [R. 12 at 16.]  Pursuant to 41 U.S.C. § 3301(a)(1), federal agencies must provide "full and open competition through the use of competitive procedures" in procurement. Plaintiffs argue that the vaccine mandate violates § 3301.  *Id.*  Defendants argue that just because a requirement may exclude certain contractors from bidding on certain jobs, that does not mean that the requirement runs afoul of the Competition in Contracting Act.  [R. 27 at 24 (citing *Nat'l Gov't Servs, Inc. v. United States*, 923 F.3d 977, 985 (Fed. Cir. 2019)).]

However, *National Government Services* supports the Plaintiff's position.  In *National Government Services*, the Federal Circuit determined that a contract award limit placed on contractors by Centers for Medicare and Medicaid Services violated the Competition in Contracting Act because it failed to provide for full and open competition, which the Act requires.  923 F.3d at 990.  The court held that "the Award Limitations Policy precludes full and open competition by effectively excluding an offeror from winning an award, even if that offeror represents the best value to the government."  *Id.*  Here, Defendants may run into the same problem: contractors who "represent[] the best value to the government" but choose not to follow the vaccine mandate would be precluded from effectively competing for government contracts. *Id.*

Defendants cannot preclude full and open competition pursuant to the Competition in Contracting Act, and Defendants have not demonstrated that they followed "the congressionally designed procedure for" excluding unvaccinated contractors and subcontractors from government contracts.  *Id.*  Accordingly, at this early stage in the litigation, the Court finds that this argument favors the Plaintiffs.

---

litigation, and on the record before the Court, the Court does not find that Plaintiffs are likely to succeed on the merits as to this claim.

**b**

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I § 1.  "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government."  *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019). Therefore, under the nondelegation doctrine, Congress may not "delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935).  In the nondelegation doctrine context, "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."  *Gundy*, 139 S. Ct. at 2123.  Here, Plaintiffs argue that FPASA "lacks any intelligible principle if interpreted so loosely as to bless the Administration's practices here."  [R. 12 at 22.]  Plaintiffs argue that mandating vaccination for millions of federal contractors and subcontractors is a decision that should be left to Congress (or, more appropriately, the States) and is a public health regulation as opposed to a measure aimed at providing an economical and efficient procurement system.  *Id.* at 22–23. Defendants respond that the "Procurement Act's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations," particularly given the leniency of the "intelligible principle" standard.  [R. 27 at 35.]

It would be reasonable to assume that a vaccine mandate would be more appropriate in the context of an emergency standard promulgated by OSHA.  After all, OSHA was created "to ensure safe and healthful working conditions for workers by setting and enforcing standards and by providing training, outreach, education and assistance."  Occupational Safety and Health Administration, *About OSHA*, https://www.osha.gov/aboutosha (last visited Nov. 23, 2021).  On

16

November 5, 2021, OSHA promulgated a vaccine mandating requiring all employers with 100 or more employees to "develop, implement, and enforce a mandatory COVID-19 vaccination policy." 86 Fed. Reg. 61,402,61,402. However, the Fifth Circuit recently found that the "Occupational Safety and Health Act, which created OSHA," could not be used under the nondelegation doctrine to "make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways." *BST Holdings, LLC v. OSHA*, --- F.4th --- -, 2021 WL 5279381, at *3 (5th Cir. Nov. 12, 2021). If OSHA promulgating a vaccine mandate runs afoul of the nondelegation doctrine, the Court has serious concerns about the FPASA, which is a procurement statute, being used to promulgate a vaccine mandate for all federal contractors and subcontractors.[10]

Admittedly, the OSHA vaccine mandate at issue in *BST Holdings* and the vaccine mandate in this case differ in significant ways. First, of course, the purposes and effects of the two statutes are markedly different. The Occupational Safety and Health Act created OSHA, which is a governmental agency responsible for overseeing workplace safety in the United States. *See* Occupational Safety and Health Administration, *About OSHA*. The FPASA, on the other hand, was enacted to create an "economical and efficient system for…procurement and supply." *Kahn*, 618 F.2d at 788.

Second, the scope and impact of the two vaccine mandates are different. The OSHA vaccine mandate applied to all companies in the United States with one hundred or more employees. *BST Holdings, LLC*, 2021 WL 5279381, at *1. The OSHA mandate would have

---

[10] Following the Fifth Circuit's stay issued on November 6 and extended on November 12, the Sixth Circuit was chosen by random multi-circuit lottery to decide the outcome of OSHA's Emergency Temporary Standard requiring Covid-19 vaccination or weekly testing. Andrea Hsu, *6th Circuit Court 'wins' lottery to hear lawsuits against Biden's vaccine rule*, NPR (Nov. 16, 2021), https://www.npr.org/2021/11/16/1056121842/biden-lawsuit-osha-vaccine-mandate-court-lottery. That matter is currently pending before the Sixth Circuit. *See In re: MCP No. 165; OSHA Rule on Covid19 Vaccination and Testing, 86 Fed. Reg. 61402*, No. 21-7000.

forced all companies in the United States with one hundred or more employees to comply with the mandate or pay a fine. *Id.* Here, however, contractors and subcontractors are free to choose whether they want to bid for federal government contracts. Only if a contractor or subcontractor chooses to contract with the federal government will they be required to abide by the vaccine mandate. Therefore, the federal government is not forcing the vaccine mandate on contractors writ large, only contractors and subcontractors who choose, moving forward, to contract with the federal government.

Third, although *BST Holdings* concerned the imposition of a vaccine mandate on private businesses, the vaccine mandate in this case concerns the federal government acting as a business entity in its own interest. Generally, the federal government, as a business entity, is free to "determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940).

Notwithstanding these differences, however, one thing is clear in both cases: neither OSHA nor the executive branch is permitted to exercise statutory authority it does not have. *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."); *Kahn*, 618 F.2d at 811 (MacKinnon, J., dissenting) ("Mere proximity may count in horseshoes and dancing, but adherence to congressionally-prescribed standards is required for valid lawmaking by executive officers."). In this case, the FPASA was enacted to promote an economical and efficient procurement system, and the Defendants cannot point to a single instance when the statute has been used to promulgate such a wide and sweeping public health regulation as mandatory vaccination for all federal contractors and subcontractors.

It is true that only twice in American history, both in 1935, has the Supreme Court found Congressional delegation excessive.  *See A.L.A. Schechter Poultry Corp.*, 295 U.S. 495; *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).  The Court believes that today's holding is consistent with prior nondelegation doctrine precedent.  However, because cases analyzing the contours of the nondelegation doctrine are scarce, it may be useful for appellate courts to further develop the contours of the nondelegation doctrine, particularly in light of the pandemic.  *See Gundy*, 139 S. Ct. at 2131 (Alito, J., concurring) ("If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort.").

### c

The Court is also concerned that the vaccine mandate intrudes on an area that is traditionally reserved to the States.  This principle, which is enshrined in the Tenth Amendment of the Constitution, states that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[11]  U.S. Const. amend. X.  Generally, "[t]he regulation of health and safety matters is primarily and historically, a matter of local concern."  *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985); *see also South Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring).  Plaintiffs argue that the federal government "has no general police power, and nothing in the Constitution gives the federal government the power it seeks here."  [R. 12 at 20.]  In response, Defendants argue that the FPASA is a "validly enacted

---

[11] *See* Thomas Jefferson Letter to George Washington, Feb. 15, 1791, Opinion on Bill for Establishing a National Bank ("I consider the foundation of the Constitution as laid on this ground that 'all powers not delegated to the U.S. by the Constitution, not prohibited by it to the states, are reserved to the states or to the people' ... To take a single step beyond the boundaries thus specially drawn around the powers of Congress, is to take possession of a boundless field of power, no longer susceptible of any definition.").

[statute] under one of Congress's enumerated powers, and the Executive Branch [is exercising] authority lawfully delegated under that statute."[12]  [R. 27 at 31.]

The Fifth Circuit recently addressed federalism concerns in a similar governmentally imposed vaccine mandate context:

> [T]he Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power. A person's choice to remain unvaccinated and forgo regular testing is noneconomic inactivity. And to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power…The Commerce Clause power may be expansive, but it does not grant Congress the power to regulate noneconomic inactivity traditionally within the States' police power. In sum, the Mandate would far exceed current constitutional authority.

*BST Holdings, LLC*, 2021 WL 5279381, at *7 (citations omitted).  The Court finds *BST Holdings* to be persuasive.  On the record currently before the Court, there is a serious concern that Defendants have stepped into an area traditionally reserved to the States, and this provides an additional reason to temporarily enjoin the vaccine mandate.

**2**

The next issue is whether the relevant agencies in this case followed the proper administrative procedures.  Plaintiffs argue that (1) the Defendants issued the FAR Council Guidance and OMB Determination in violation of the procedure required by law; and (2) the agencies' actions were "arbitrary and capricious."  [R. 12 at 10, 17.]

---

[12] Defendants also argue that the doctrine of intergovernmental immunity applies here, arguing that "federal contractors are treated the same as the federal government itself."  [R. 27 at 32 (citing *United States v. Cal.*, 921 F.3d 865, 882 n.7 (9th Cir. 2019)).]  However, as Plaintiffs point out, intergovernmental immunity is not relevant to this lawsuit because "Plaintiffs are not suing federal contractors for violations of state law," but are instead suing the federal government as, at least in part, federal contractors.  [R. 32 at 18.]

**a**

The Administrative Procedure Act (APA) requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Specifically, Plaintiffs argue that 41 U.S.C. § 1707(a) requires procurement policies, regulations, procedures, or forms to be published in the Federal Register for sixty days before it can take effect, which Plaintiffs state Defendants failed to do with regards to the FAR Council Guidance and OMB Determination.[13] In response, Defendants argue that the FAR Council Guidance is not final agency action or subject to review under § 1707. [R. 27 at 29.] Furthermore, Defendants argue that the OMB Determination is not reviewable under § 1707, and even if it were reviewable, the OMB Determination satisfies § 1707's procedural requirements. *Id.* at 25. Although the procedural path taken by the agencies was, at times, inartful and a bit clumsy, the Court finds based on the record before it that the Defendants likely followed the procedures required by statute.

First, FAR Council Guidance is not subject to judicial review pursuant to the APA because the Guidance does not constitute final agency action. *See Spear*, 520 U.S. at 178 (finding that final agency action is action that marks "the consummation of the agency's decisionmaking process," and "by which rights or obligations have been determined, or from which legal consequences will flow"). Here, as Defendants correctly argue, Executive Order 14042 instructed the FAR Council to "take *initial* steps to implement" the contract clause. 86 Fed. Reg. 50,985–88 (Sept. 9, 2021) (emphasis added). Therefore, the FAR Council Guidance is not final agency action and is therefore not subject to judicial review under the APA.

---

[13] Plaintiffs also invoke 5 U.S.C. § 553 but focus on § 1707 "because it is more stringent." [R. 12 at 11.]

Furthermore, § 1707 does not apply to the FAR Council Guidance because it constitutes nonbinding guidance that does not rise to the level of a "procurement policy, regulation, procedure, or form." § 1707. The purpose of the FAR Council Guidance was to "support agencies in meeting the applicability requirements and deadlines set forth in" the executive order, and to encourage agencies to "exercise their authority" in helping contractors and subcontractors insert deviation clauses into their contracts. FAR Council Guidance. Therefore, the Court finds that Plaintiffs' challenge of Defendants' FAR Council Guidance is not likely to succeed on the merits.

The OMB Determination is a bit more complicated. Plaintiffs filed their Motion for a Preliminary Injunction and argued that the OMB Determination failed to "adhere to the process mandated by law." [R. 12 at 12.] However, on November 16, eight days after Plaintiffs filed their motion, the OMB Director rescinded its original Determination and issued a new Determination. 86 Fed. Reg. 63418. In addition to revoking the prior Determination, the OMB Director's new Determination also provided more robust support for the proposition that the vaccine mandate will promote economy and efficiency in government contracting, provided covered contractors more time to comply with the vaccine mandate, and invoked § 1707 "to the extent that...1707 is applicable." *Id.*

Defendants first argue that § 1707 does not apply to the OMB determination because that section "does not apply to exercises of Presidential authority like the OMB Determination" in this case. [R. 27 at 25.] However, the D.C. Circuit squarely rejected this argument in *Reich*. There, the Court stated:

> That the "executive's" action here is essentially that of the President does not
> insulate the entire executive branch from judicial review. We think it is now well
> established that "[r]eview of the legality of Presidential action can ordinarily be
> obtained in a suit seeking to enjoin the officers who attempt to enforce the

President's directive." *Franklin*, 505 U.S. at 815, 112 S.Ct. at 2790 (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this "does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands."

*Reich*, 74 F.3d at 1328. The Court further explained that "if [a] federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Id.* at 1329. The Court finds *Reich* to be persuasive. *Reich* also involved a challenge to an executive order promulgated under FPASA. *Id.* at 1324. Therefore, the Court finds that review of the OMB Determination is appropriate in this case.

However, judicial review is not fatal to the OMB Determination. From the outset, the Court notes that Plaintiff's arguments pertaining to the September 24 OMB Determination were rendered moot by the promulgation of the new OMB Determination on November 16. *See Akiachak Native Community v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016) (collecting cases demonstrating that it is an "uncontroversial and well-settled principle of law" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot"). Furthermore, Plaintiffs argued that the OMB Director failed to either permit notice and comment or invoke § 1707(d)'s waiver of notice and comment. [R. 12 at 11–12.] While this was true of the OMB Director's initial Determination, the subsequent Determination included a thirty-day notice and comment period and invoked § 1707(d). 86 Fed. Reg. 63423.

Plaintiffs argue that the OMB Director's invocation of § 1707(d) in its subsequent Determination is "facially senseless" and irrational because the Determination simultaneously delayed the mandate compliance date and invoked the § 1707(d) "urgent and compelling circumstances," exception. [R. 32 at 10–11.] Plaintiffs' argument is well taken, and further

review may demonstrate that the OMB Determination failed to follow the proper procedures. However, there is no evidence of bad faith on the part of the OMB Director, and Counsel for the Defendants explained during the hearing in this matter that the compliance date was delayed to benefit federal contractors and ensure that they would have sufficient time to comply with the mandate. Ultimately, based on the limited record, the Court finds that the FAR Council Guidance and subsequent OMB Determination in this matter did not run afoul of the proper administrative procedures.

**b**

Plaintiffs also argue that the administration's actions in promulgating the vaccine mandate were arbitrary and capricious under the APA.[14]  As the Supreme Court recently explained:

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

First, Plaintiffs argue that the OMB Determination failed to explain how the vaccine mandate would "promote economy and efficiency in procurement."  [R. 12 at 17.]  Second, Plaintiffs argue that Defendants "failed to consider the possibility that their actions would cause a labor shortage."  *Id.* at 18.  Third, Plaintiff argue that the OMB Determination ignored "costs to the Plaintiffs."  *Id.*  Fourth, Plaintiffs argue that the OMB Determination failed to consider "lesser alternatives to a vaccine mandate."  *Id.*  And finally, Plaintiffs argue that the Task Force

---

[14] Plaintiffs' arguments here pertain to both the FAR Council Guidance and OMB Determination.  [R. 12 at 17–19.] However, because the Court found above that the FAR Council Guidance was not subject to review under the APA, the Court need only address Plaintiffs' arguments as they pertain to the OMB Determination.

Guidance and FAR Council Guidance concluding that the vaccine mandate would "improve procurement efficiency by reducing absenteeism and decreasing labor costs is blatantly pretextual." *Id.* at 19.

Plaintiffs' first argument primarily pertained to the OMB Director's first Determination, which, as explained above, is now moot. It is true that the first Determination only included a 210-word explanation for how the vaccine mandate would create contracting efficiencies. *See* OMB Determination, 86 Fed. Reg. at 53,691–92. But the subsequent Determination promulgated on November 16 included a more thorough and robust economy-and-efficiency analysis. *See* Fed. Reg. 86 63,421–23. Therefore, Plaintiffs' first argument fails.

Similar to Plaintiffs' first argument, the second are third arguments are more applicable to the OMB Director's first Determination than the second. In the OMB Director's second Determination, she specifically addressed potential effects on the labor force and costs of the vaccine mandate, finding that few employees will quit if faced with a vaccine mandate and that Covid-19 vaccination will reduce net costs. *Id.* at 63421–23. It is perfectly reasonable for the Plaintiffs to disagree with Defendants on this point. However, "[w]hen, as here, an agency is making predictive judgments about the likely economic effects of a rule, we are particularly loath to second-guess its analysis." *Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013).

The Court likewise rejects Plaintiffs' one-sentence argument that the OMB Director failed to consider lesser alternatives to a vaccine mandate. *See La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 338 n.5 (6th Cir. 2010) (finding argument made without elaboration is waived); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 901

(6th Cir. 2009) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Plaintiffs' final argument, that Defendants' finding that a vaccine mandate would improve procurement efficiency is pretextual, also fails.  To support this argument, Plaintiffs argue that from the beginning, the President's statements demonstrate that this executive order and the vaccine mandate are an effort to get more people vaccinated.  [R. 12 at 19.]  However, the Court is "reluctant to consider the President's motivation in issuing the Executive Order." *Reich*, 74 F.3d at 1335.  Furthermore, the subsequent OMB Determination provided ample support for the premise that a vaccine mandate will improve procurement efficiency.  *See* 86 Fed. Reg. 63,421–23.  Furthermore, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).  Accordingly, the Plaintiffs' arguments that the administration's actions were arbitrary and capricious fail.

**3**

The Court finds, based on the limited record at this stage in the litigation, that Defendants have followed the appropriate procedural requirements in promulgating the vaccine mandate. However, because the Court also finds that the president exceeded his authority under the FPASA, and for the serious Constitutional concerns addressed above, the Court holds that Plaintiffs are likely to succeed on the merits as to their preliminary injunction.  Furthermore, the Court finds that Plaintiffs are likely to suffer irreparable harm without preliminary relief and that preliminary relief is not contrary to the public interest.

Plaintiff agencies and contractors are now having to make tough choices about whether they will choose to comply with the vaccine mandate or lose out on future federal government

contracts.  For the individual Plaintiffs, "the loss of constitutional freedoms 'for even minimal periods of time…unquestionably constitutes irreparable injury.'"  *BST Holdings, LLC*, 2021 WL 5279381, at *8 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Furthermore, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance."  *Id.* (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).  And the States "have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach."  *Id.*  Finally, "any abstract 'harm' a stay might cause…pales in comparison and importance to the harms the absence of a stay threatens to cause countless individuals and companies."  *Id.*  Therefore, Plaintiffs have satisfied the requisite preliminary injunction factors in this case.

## C

Lastly, the Court must consider the scope of its injunction.  The Sixth Circuit has held that a "district court should limit the scope of [an] injunction to the conduct 'which has been found to have been pursued or is related to the proven unlawful conduct.'"  *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quoting *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).  The Defendants' actions affect Kentucky, Ohio, and Tennessee, as well as the additional two plaintiffs in this case.  However, individuals in every state in the country are affected.  While it is true that the evidence presented by the parties primarily relates to Kentucky, Ohio, and Tennessee, this Court's ruling rests on facts that are universally present in the federal government's dealings with contractors and subcontractors in all of the states.  Consequently, this Court must consider the breadth of its injunction.  Should it temporarily enjoin enforcement of the vaccine mandate for contractors and subcontractors as it relates to (1)

the Eastern District of Kentucky (this Court's District); (2) Ohio, Tennessee, and Kentucky (the entities before the Court); or (3) all of the States (both parties and non-parties).

In *Trump v. Hawaii*, 138 S. Ct. 2392, 2424 (2018) (Thomas, J., concurring) Justice Thomas discussed the increasing frequency of "universal" or "nationwide injunctions." Justice Thomas expressed his skepticism of such injunctions, noting: (1) historical principles of equity in Article III courts; (2) the recency of nationwide injunctions; (3) and the properly limited role of district courts. *Id.* at 2425–29 ("[In the past, as] a general rule, American courts of equity did not provide relief beyond the parties to the case"). Justice Thomas found that the sweeping relief brought by nationwide injunctions likewise brings "forum shopping" and makes "every case a national emergency for the courts and the Executive Branch." *Id.* at 2425. Instead, district courts should allow legal questions to percolate through the federal court system. *Id.* Justice Gorsuch affirmed this notion in *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Noting that "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit," Justice Gorsuch found that nationwide injunctions "raise serious questions about the scope of courts' equitable powers under Article III." *Id.* Not only are such injunctions impracticable, they "force judges into making rushed, high-stakes, low-information decisions." *Id.* Careful review by multiple district and circuit courts, on the other hand, allows the Supreme Court the benefit of thoughtful and, at times, competing outcomes. *Id.*

Although the debate over the proper scope of injunctions is ongoing, this Court believes that redressability in the present case is properly limited to the parties before the Court. Consequently, the scope of the permanent injunction shall apply to Kentucky, Ohio, Tennessee and the additional sheriff plaintiffs before the Court in equal force.

28

**III**

Once again, the Court is asked to wrestle with important constitutional values implicated in the midst of a pandemic that lingers.  These questions will not be finally resolved in the shadows.  Instead, the consideration will continue with the benefit of full briefing and appellate review.  But right now, the enforcement of the contract provisions in this case must be paused.

Accordingly, and the Court being sufficiently advised and for the reasons set forth herein, it is hereby **ORDERED** as follows:

1. Plaintiffs' motion for a preliminary injunction **[R. 12]** is **GRANTED**;

2. The Government is **ENJOINED** from enforcing the vaccine mandate for federal contractors and subcontractors in all covered contracts in Kentucky, Ohio, and Tennessee.

This the 30th day of November, 2021.

Gregory F. Van Tatenhove
United States District Judge