UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY**, *et. al.*  *Plaintiffs*  v.  **JOSEPH R. BIDEN** in his official capacity as President of the United States, *et al.*  *Defendants* | Civil Action No. 3:21-cv-00055-GFVT |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND FOR IMMEDIATE ADMINSTRATIVE STAY**

The Court should deny Defendants' request to stay its injunction of the federal contractor vaccine mandate. Defendants offer no sound reason for the Court to revisit its decision, which already rejected each of the arguments Defendants make here. According to Defendants, Congress quietly authorized the Executive Branch to impose a vaccination mandate on millions of Americans when it streamlined the federal government's property management system in the wake of World War II. As the Court has already recognized, Congress did not do so. As support for their motion, Defendants make dire but speculative allusions to productivity losses absent a stay. Reality and recent experience disprove their point.

1

# ARGUMENT

## I. A stay will harm others and is not in the public interest.

Defendants first argue that a federal contractor vaccine mandate that they, themselves, delayed instituting must now take effect immediately to prevent catastrophic consequences relating to federal contracting. [*See* R. 53 at 3–4; *see also* R. 53-1 at ¶¶ 3–21]. For support, Defendants have produced a new declaration from an OMB official that claims "delaying implementation" of the vaccine mandate will "result in a significant reduction in economy and efficiency in the Federal Government's procurement of essential services." [R. 53-1 at ¶ 3]. Yet in the declaration, the official does not even *attempt* to point to any federal contracting disruptions that have occurred because of a lack of a federal contractor vaccine mandate over the last year. [*See generally* R. 53, 53–1]. In other words, Defendants have a year's worth of experience with several types of contractors—contractors with vaccine mandates, contractors without vaccine mandates, contractors with mask mandates, and so on. But Defendants do not identify even one historical contracting disruption that will now allegedly overtake federal procurement if the Court's injunction is not stayed. [*See generally* Rs. 53, 53-1].

In stark contrast, the public record is replete with specific harms that will occur if the preliminary injunction is lifted. For example, the CEO of Raytheon Technologies warned that it would lose "several thousand" employees because of the mandate. Tina Bellon and Eric Johnson, *From Boeing to Mercedes, a U.S. worker rebellion swells over vaccine mandates*, Reuters (Nov. 2, 2021),

https://www.reuters.com/world/us/boeing-mercedes-us-worker-rebellion-swells-over-vaccine-mandates-2021-11-02/. As the title of the article suggests, Raytheon is in good company. Moreover, if mandating vaccines increased efficiency (and thus profits) for every contractor, then contractors would not need the federal government to tell them to mandate vaccines. If truly necessary for efficiency, contractors would have voluntarily adopted such requirements without unlawful federal coercion.

Instead of identifying harms, Defendants speculate about what *could* happen to federal contracting without a federal contractor vaccine mandate. [*See generally* Rs. 53, 53-1]. But speculation about harm is not grounds for staying this Court's well-reasoned decision, particularly when all that decision did was maintain the status quo that has existed since the availability of vaccines. *See Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) ("To demonstrate irreparable harm, [Defendants] must show that . . . they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." (citations omitted)); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

Defendants' own delay confirms that a stay is unnecessary to avert contracting harms. The Biden Administration did not propose a federal contractor vaccine mandate until September 2021. And even then, it delayed the deadline for compliance with the mandate, first until December 8, 2021 and now until January 18, 2022. Given their delay, and given the lack of identifiable procurement issues

during the last year, there is simply no basis for Defendants to claim that "the balance of the harms and the public interest weigh so overwhelmingly in favor of a stay" of the Court's injunction. [*See* R. 53 at 3]. And in the short time since the Court entered its preliminary injunction, another federal court has enjoined the federal contractor vaccine mandate nationwide on similar grounds. *See Georgia v. Biden*, --- F. Supp. 3d ---, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021).

Even if the "OMB Determination provided ample support for the premise that a vaccine mandate will improve procurement efficiency[,]" [R. 53 at 3 (citations omitted)]—a notion that Plaintiffs contest—it does not follow that Defendants will be irreparably harmed without the mandate. Even if a measure purports to "improve procurement efficiency," pausing it does not *cause* contracting inefficiencies. It simply maintains the status quo for the duration of legal proceedings. Just because the government hopes a vaccine mandate may improve procurement efficiency, that does not mean procurement efficiency will be irreparably harmed without that mandate.

In comparison to Defendants' speculative harm, the harm to Plaintiffs absent an injunction is real and immediate. As previously outlined, [*see* R. 12 at 23–30; R. 32 at 2–7, 19–20; R. 22 at 1–52],[1] and as explained in *BST Holdings, L.L.C. v. OSHA*,

---

[1] As the Court referenced in its opinion, [R. 50 at 8], before the Court's preliminary injunction, the University of Louisville felt "required" to abide by the mandate. [*See* Silletto Decl.; Nov. 18 Univ. of Louisville Email]. Following the Court's preliminary injunction, the University of Louisville has suspended its enforcement of the mandate. [*See* Dec. 7 Univ. of Louisville Email].

4

17 F. 4th 604 (5th Cir. 2021), it is Plaintiffs and the interests they represent that will suffer irreparable harm from implementing the vaccine mandate.[2] *Id.* at 618–19.

## II. *Parens patriae* actions are allowed to challenge federal administrative action.

Defendants do not contend that Plaintiffs lack constitutional standing to maintain this suit to seek redress for their own contracts, but in challenging the scope of the Court's injunction, they question Plaintiff States' ability to maintain a *parens patriae* action. [R. 53 at 2 (requesting a stay of the injunction "insofar as it prohibits Defendants from enforcing COVID–19 safety clauses in federal contracts with non-parties in" the States), 8–9]. But as this Court recognized in its decision, the States can assert *parens patriae* actions to invalidate an administrative rule "to protect quasi-sovereign interests." [R. 50 at 6–7 (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007))].

---

[2] The Commonwealth was also recently notified that Defendant General Services Administration (GSA) continues to contact federal contractors in Kentucky with demands to include the Deviation Clause in contracts currently in effect. [*See* Cosby Decl.; Representative GSA Emails; Sample Letter Attached to All GSA Emails; Dated GSA Emails]. As recently as December 7, 2021, the GSA sent an email to the Kentucky League of Cities, which, at the very least, pressures the League to agree to inclusion of the Deviation Clause in their contracts with the GSA. [*See* Representative GSA Emails at 1–3; Sample Letter Attached to All GSA Emails at pdf page 1 ("If you hold a GSA contract for services, construction, or a leasehold interest in property that exceeds the simplified acquisition threshold (SAT), the contracts modification is **mandatory** and your acceptance is required in order to ensure compliance with E.O. 14042.")]. If ultimately applicable to the League, the mandate would not only require its own staff to comply with the vaccine mandate, but would also require all visitors—such as the mayors and other leaders attending Executive Board meetings at its office—to comply with current FAR Council Guidance. *See* https://perma.cc/9BQ8-XBT6 ("FAR Council Guidance"). The mandate would also place on the League the burden of policing the compliance of outside contractors, such as cleaning staff, coming into the building.

Some courts have misunderstood the Supreme Court's decision in *Massachusetts v. Mellon*, 262 U.S. 447 (1923), to stand for the broad assertion that "a state does not have standing as *parens patriae* to bring actions against the federal government." *See Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984) (quoting dicta from *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)). But *Mellon* applies only when a State sues to invalidate a federal statute because Congress and state legislatures share the role of *parens patriae*. *See Abrams*, 582 F. Supp. at 1159–60. Here, by contrast, the States seek to invalidate a mandate promulgated by a combination of administrative *agencies*. Courts have held "this distinction to be crucial" and have ruled "that *Mellon* does not bar a *parens patriae* action against a federal agency." *Abrams*, 582 F. Supp. at 1159–60 (collecting cases). For one thing, "a suit to 'vindicate the Congressional will' by preventing an administrative agency from violating a federal statute, unlike a challenge to the constitutionality of the underlying statute, does not implicate the federalism concerns behind the *Mellon* decision." *Id*. at 1159 (citation omitted). Moreover:

> [T]here is a valid distinction between a state's challenge to the constitutional authority of the central government to enact a given statute and an attack upon the manner in which a concededly lawful statute is enforced and administered. . . . [T]his distinction is pivotal. The former is clearly and obviously a fundamental threat to the federal sovereign power; the latter seeks only to vindicate the will of the people as it has been expressed by their duly elected representative in the national legislature.

*Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 682 (D.C. Cir. 1976) (Lumbard, J., dissenting). In sum, because the States here, in part, challenge administrative

6

agencies' adherence to Congress's commands, and not Congress's commands themselves, the States may maintain this suit as *parens patriae*.³ And because the Plaintiff States may maintain a *parens patriae* action here, there is no reason for the Court to limit the scope of its injunction in any way, much less in the ways Defendants suggest. [*See* R. 53 at 8–9].⁴

Moreover, allowing Defendants to enforce the unconstitutional federal contractor vaccine mandate against Ohio, Tennessee, and Kentucky residents would permit the exact injury this suit aims to prevent. A constitutional violation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Our Constitution does not permit abuse of its limitations, even if popular by a majority. And if Defendants can enforce the mandate against non-state entities, they could place Plaintiff States—and anyone else questioning the constitutionality of this mandate—on a blacklist, another harm this suit aims to prevent.

---

³ None of the Supreme Court cases that Defendants cite hold otherwise. [*See* R. 53 at 9 (citing cases)].

⁴ As a point of clarification, despite what Defendants suggest, [*see* R. 53 at 2], Plaintiffs' counsel did not consent to the federal government's mandatory inclusion of the Deviation Clause in its contracts with federal contractors. Counsel's full statement in response to the Court's questioning reads: "That's right. What we want to enjoin is the Executive Order and then the actions taken by OMB, FAR and the Task Force pursuant to it that purport to require parties to agree to it as part of receiving or maintaining a federal contract." [*See* R. 49 at 66:12–22].

### III. FPASA does not give Defendants the authority to enact a nationwide vaccine mandate by fiat.

This Court already rejected Defendants' attempt to couch the federal contractor vaccine mandate as validly falling within the scope of FPASA, and for good reason. [*Compare* R. 53 at 5–6, *with* R. 50 at 11–14]. Another federal court now agrees with this Court's conclusion. *Georgia*, 2021 WL 5779939, at *1 ("In this case, Plaintiffs will likely succeed in their claim that the President exceeded the authorization given to him by Congress through [FPASA] when issuing Executive Order 14042."); *id.* at *8–10. Defendants continue to offer no limiting principle on their view of the scope of the President's authority under FPASA, even as they concede the narrowness of the field of federal procurement. [*See* R. 53 at 7 (characterizing "field of federal procurement of property and services" as "narrow")]. If, as Defendants claim, "there exists a self-evident nexus between the federal contractor vaccination requirement and economy and efficiency in federal procurement," [R. 53 at 6], then, as the Court recognized, FPASA "could be used to enact virtually any measure at the president's whim under the guise of economy and efficiency." [R. 50 at 13 (citing *Ala. Ass'n of Realtors v. Dept' of Health & Human Servs.*, 141 S. Ct. 2485, 2488–89 (2021) (finding the federal government's interpretation of a statute would grant the CDC a "breathtaking amount of authority" that could be used to "mandate free grocery delivery for the sick or vulnerable . . . [r]equire manufacturers to provide free computers to enable people to work from home" or "[o]rder telecommunications companies to provide free high-speed Internet service to facilitate remote work"))].

8

## IV. The federal contractor vaccine mandate violates the Competition in Contracting Act.

This Court also rejected Defendants' argument that the federal contractor vaccine mandate complies with the Competition in Contracting Act. [*Compare* R. 53 at 6–7, *with* R. 50 at 15]. The government, once again, rests on quoting an out-of-context statement from *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019), that "a solicitation requirement . . . is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement." [R. 53 at 6 (quoting *Nat'l Gov't Servs.*, 923 F.3d at 985–86); *see also* R. 27 at 12 (Defendants' response to Plaintiffs' motion for preliminary injunction quoting same statement)]. As this Court already recognized, Defendants' reading of *National Government Services* is erroneous. [*See* R. 50 at 15].

## V. The nondelegation doctrine is not toothless.

The Court additionally rejected Defendants' attempt to escape a separation of powers problem with their limitless reading of FPASA. [*Compare* R. 53 at 7 *with* R. 50 at 16–19]. As the Court recognized, the judiciary "expects Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." [R. 50 at 18 (quoting *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489))]. Congress did not clearly grant the power Defendants now claim in justifying the

vaccine mandate, and Defendants have given the court no new arguments for the Court to second-guess its well-reasoned decision.

## VI. The federal contractor vaccine mandate tramples on the States' police power.

The final substantive argument that Defendants make (that this Court has already rejected) is that the federal government can wield FPASA to trample the States' sovereignty. [*Compare* R. 53 at 7–8, *with* R. 50 at 19–20]. Contrary to what Defendants suggest, Plaintiffs take no issue with the propriety of FPASA itself as a valid exercise of Congressional authority under the Spending Clause. Rather, the problem is Defendants' *use* of FPASA far beyond what Congress intended.

If any provision in the U.S. Code explicitly provides for a national vaccine mandate, Defendants would have found it by now. Instead, Defendants fall back on FPASA, a procurement statute passed in 1949 to improve the "largely uncoordinated" and "duplicative" mess of governmental property management. 95 Cong. Rec. 7441 (June 8, 1949) (remarks of Rep. Holifield). That Congress has not provided Defendants with explicit authority to institute a national vaccine mandate conveys that Congress recognizes that vaccine-mandate authority resides with the States, if such authority exists at all. The judicial branch has agreed. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ([T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); *Zucht v. King*, 260 U.S. 174, 176 (1922) (noting that precedent had long "settled that it is within the police power of a state to provide for compulsory vaccination"); *Jacobson v. Massachusetts*, 197 U.S. 11, 25–26 (1905) (similar). And the Supreme Court

"*always* ha[s] rejected readings of the . . . scope of federal power that would permit Congress to exercise a police power." *United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (citation and quotation marks omitted).

## VII. The Court need not revisit the scope of its injunction.

Finally, Defendants ask the Court to modify its injunction to exclude the "masking" and "physical distancing" provisions of the vaccine mandate. [R. 53 at 1–3, 9–10]. The Court need not revisit its language at this stage. *Georgia*, 2021 WL 5779939, at *12 (citing with approval this Court's injunction and entering nationwide injunction). The portion of the mandate requiring masking and distancing is, for the same reason as the portion requiring vaccines, outside the scope of the agency's authority.

## CONCLUSION

The Court should deny Defendants' motion to stay.


Respectfully Submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

/s/ Christopher L. Thacker
Barry L. Dunn (KBA No. 93787)
Christopher L. Thacker (KBA No. 91424)
Heather L. Becker (KBA No. 94360)
Jeremy L. Sylvester (KBA No. 92771)
Alexander Y. Magera (KBA No. 97708, *admission application submitted*)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov

Christopher.Thacker@ky.gov
Heather.Becker@ky.gov
Jeremy.Sylvester@ky.gov
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*

**Dave Yost**
**ATTORNEY GENERAL**

/s/ Benjamin M. Flowers
Benjamin M. Flowers, *pro hac vice*
Carol O'Brien, *pro hac vice*
May Davis, *pro hac vice*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-4986
bflowers@OhioAGO.gov

*Counsel for the State of Ohio, Fredrick W. Stevens, and Scott A. Hildenbrand*

James R. Flaiz, *pro hac vice*
Prosecuting Attorney
Geauga County Prosecutor's Office
231 Main St., 3rd Floor
Chardon, OH 44024
Phone: (440) 279-2100

*Counsel for Scott A. Hildenbrand*

**Herbert H. Slatery III**
**ATTORNEY GENERAL**

/s/ Brandon J. Smith
Dianna Baker Shew, *pro hac vice*
Brandon J. Smith, *pro hac vice*
Office of the Attorney General and Reporter
P.O. Box. 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-4081
dianna.shew@ag.tn.gov
brandon.smith@ag.tn.gov
*Counsel for State of Tennessee*

## CERTIFICATE OF SERVICE

I certify that on December 8, 2021, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record for Defendants.

/s/ Christopher L. Thacker
*Counsel for the Commonwealth*
